IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Sheryl L. Szeinbach,                              :

                Plaintiff          :        Civil Action 2:08-cv-822

   v.                                             :

The Ohio State University,                        :        Magistrate Judge Abel

               Defendant         :

**OPINION AND ORDER**

Plaintiff Dr. Sheryl L. Szeinbach ("Szeinbach") has brought this action alleging

claims against Defendant The Ohio State University ("OSU") under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, for retaliation and for discrimination and

retaliation by association.  This matter is before the Court on OSU's motion for summary

judgment (Doc. 122).

**Introduction and factual background**.  The following facts are drawn from the

parties' pleadings, the deposition transcripts and exhibits filed in this case, and the

exhibits accompanying the summary judgment motion and its opposition.  The Court

notes at the outset that the factual record in this case is voluminous, encompassing

twenty-four depositions and hundreds of pages of exhibits.  Plaintiff's memorandum

contra summary judgment, aside from its attachments, is some 121 pages long, and

contains an exhaustive narrative concerning Szeinbach's disputes with her colleague

Dr. Raj Balkrishnan, the nature and progress of an investigation into alleged research

misconduct on her part, and her extensive arguments – supported by the testimony of

two expert witnesses – that OSU should have conducted thorough investigations of three of her colleagues as well. Although it has reviewed the factual record, given this wealth of detail the Court will herein summarize that portion of the undisputed factual record directly relevant to the issues raised by the motion for summary judgment and the parties' briefs of those issues.

Szeinbach came to OSU's College of Pharmacy ("COP") from the University of Mississippi in 1999, starting as a full professor with tenure. (Doc. 122-17 at 3.) Szeinbach is currently employed in COP's Division of Pharmacy Practice and Administration ("PPAD"). In 2002, COP hired Dr. Enrique Seoane-Vazquez ("Seoane"), a native of Spain, as an assistant professor.[1] In 2005, it hired Dr. Rajesh Balkrishnan ("Balkrishnan"), a native of India, as an associate professor with tenure. Prior to Balkrishnan's hiring, Szeinbach had met him at a meeting and formed an opinion that he was rude and disrespectful. (*Id.* at 10.) At the faculty meeting to approve Balkrishnan's tenure, Szeinbach voiced her concerns about him, and she was displeased when he was hired. (*Id.* at 8, 10.)

In 2005, Dr. Milap Nahata ("Nahata"), the chairman of PPAD, appointed Balkrishnan to prepare and present Seoane's February 9, 2005 annual review to PPAD's promotion and tenure committee. According to Szeinbach, she had observed Balkrishnan and Nahata discriminating in favor of students of Indian origin. (Doc. 135-1 at 3.) During the review, Balkrishnan apparently made plain his opinions that Seoane

---

[1] Dr. Seoane-Vazquez' allegations of discrimination on the part of OSU are the subject of other litigation. The facts regarding Dr. Seoane set forth in this analysis are drawn from the pleadings and briefs which have been filed in the instant case.

was not a productive member of the COP faculty.  (Doc. 98 at 4; 98-1 at 7.)  The next

day, Szeinbach sent an email to Robert Bruggemeier, the dean of COP, stating:

> Dear Bob: I attended the P & T meeting yesterday.  I have questions
> regarding the fairness of the evaluation that was performed for Enrique
> Seoane-Vazquez.  I felt the presentation of the evaluation was
> intentionally very biased against Enrique – there was a lot of discussion as
> well.  I was wondering if Enrique should be evaluated at all given his
> extensive illness, where his recovery took several months.  Also, I wanted
> to provide a message *a priori* so there is an awareness of the situation –
>
> I would not send this message unless I felt very strongly that something is
> not right –

(Doc. 98-1 at 7.)  In the following months, Szeinbach deliberately got to know Seoane

better, and "wanted to work with him so that . . . I could find out . . . where's all this

coming from, maybe the faculty is right, maybe there's something wrong with this guy."

(Doc. 110 at 56.)  She concluded that there was "absolutely nothing wrong with Enrique"

and that "for some reason people were really trying to sabotage his efforts to do

research . . . that's when I became concerned and said, whoa, this – this has to stop."

(*Id.*)

On August 22, 2005, Seoane submitted an internal complaint at OSU, alleging

"discrimination and retaliation."  (Doc. 98 at 4.)  Szeinbach did not help him file it, and

was not aware at the time that Seoane had filed the complaint.  (Doc. 110 at 55-56.)

She provided Seoane with a copy of her February 10, 2005 email to Dean Bruggemeier,

but did nothing else in particular to support his complaint except that she "listened to

him."  (*Id.* at 56.)  The COP's investigation committee investigated Seoane's OSU HR

complaint, interviewing numerous faculty, including Szeinbach, Balkrishnan, Cynthia

Carnes ("Carnes"), Craig Pedersen ("Pedersen"), and Phillip Schneider ("Schneider").

3

Szeinbach told the committee that Balkrishnan had attempted to change the ranking of one of Seoane's students, that students had reported to her that Balkrishnan did not want Seoane's students to do as well as his, and that an Indian graduate student had been told to switch to an advisor of Indian national origin.   (Doc. 135-5 at 4.)  An OSU-HR investigator separately, in October 2005, interviewed Szeinbach, Seoane, Schneider, and two graduate students concerning Seoane's racial discrimination claims. Szeinbach told the OSU-HR investigator that Nahata and Balkrishnan were working together to end Seoane's employment, and that some COP students were being told not to take her classes.  She also told the investigator that Nahata had falsely reported that she had voted in favor of a negative annual review for Seoane.  (*Id.*)

On November 3, 2005, Szeinbach sent an email to Dr. James Dalton ("Dalton"), the chairman of the promotion and tenure committee, complaining of several inaccuracies and omissions in materials which Nahata had recently circulated for Seoane's fourth-year review.  (Doc. 98-1 at 9-10.)  Dalton responded to this email, noting that Bruggemeier had recently announced that the college would be restarting Seoane's review and discarding all existing materials.  (*Id.*)

Balkrishnan and Szeinbach clashed repeatedly.  Pedersen testified at deposition that he had seen Szeinbach and Balkrishnan "go at it pretty good in faculty meetings"; they would "typically raise their voice at each other.  And they would typically not treat the other one with respect."  He opined that they were both equally to blame for their personal conflicts, and that "they were both very good at raising the ire of the other one."  (Doc. 109 at 58.)  Brueggemeier testified that for three years in a row he had to inform Balkrishnan that he was receiving a lower annual raise because of "his lack of

ability to . . . appropriately interact with students and faculty in the Division".  He referred to disagreements Balkrishnan had with Szeinbach, Seoane, Pedersen, and Schneider. (Doc. 116 at 6-7.)

On February 16, 2006, Balkrishnan sent an email to Dean Brueggemeier and Nahata complaining about teaching assistantship ("TA", "GA", or "GTA") position allocations, and stating that he nevertheless understood if the department was funding "unqualified GAS" "for fear of additional 'discrimination' law suits, which are as usual, totally baseless."  (Doc. 118-11 at 2.)  In May and June 2006, Balkrishnan allegedly advised his students not to participate in a research program Szeinbach advised, and complained about Szeinbach to a group of peers at a national conference.  (Doc. 132 at 4; Doc. 130 at 15.)  On June 23, 2006, Balkrishnan sent an email to Brueggemeier and Nahata alleging that a faculty candidate had been contacted several times by Szeinbach and advised not to come to the COP, because of discrimination there and the bad influence of Balkrishnan himself.  (Doc. 118-11 at 6.)  He alleged further that she had complained to a prospective PhD student that he was a "slavedriver" and "an evil person", and that the candidate should work with her instead.  Finally, he claimed that Szeinbach had slandered him and the COP at the recent International Society for Pharmacoeconomics and Outcomes Research ("ISPOR") meeting, and that she had falsely reported to OSU HR that he was harassing her students.  (*Id.*)  On July 14, 2006, Balkrishnan sent an email to Brueggemeier complaining that in one of her classes Szeinbach gave her students the answers to exam questions the day before the exam. (*Id.* at 9.)

Several of Szeinbach's colleagues (although not including Balkrishnan), sent

5

Brueggemeier a letter on June 6, 2006,  "to express the collective frustration and dissatistfaction of several Senior members of [PPAD] with . . . Dr. Sheryl Szeinbach."  (Doc. 127-1 at 32.)  They complained that she rarely attended division meetings, and that when she did so she disrupted the proceedings and was disrespectful of others, "so much so that several members refuse to attend the meetings, and most dread them."  The writers alleged specifically that Szeinbach had done a poor job teaching individual classes, and that three graduate students had asked to have their advisor reassigned.  They stated that "[n]one of us feel that . . . the Graduate Program [is] better now than when she came", and stated that the complaints they were addressing were known to colleagues around the country, reflecting poorly on COP's reputation.  (Doc. 127-1 at 32-33.)

On September 6, 2006, Seoane filed a charge of discrimination against OSU with the Equal Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC").  Szeinbach again did nothing specific to assist Seoane with filing this charge.  (Doc. 111 at 27.)  On the same day, Szeinbach sent Balkrishnan an email claiming that one of her graduate students reported that Balkrishnan had been harassing her to join his research instead.  (Doc. 118-11 at 10.)  Balkrishnan forwarded this email on to Bruggemeier and Nahata, stating that he was tired of baseless allegations and "harassment" from Szeinbach, and that "she also has a tendency to storm into my office and say things which do not make any sense".  (*Id.*)  He then forwarded the email to Ms. Chitra Iyer, an HR officer at OSU, accompanied by a lengthy complaint against harassment on the part of Szeinbach.  (Doc. 122-5 at 22.)  Balkrishnan alleged the harassment had included:

6

email communication, unsolicited entry and harrassing verbal
communication in my office, defamation and slander in public at faculty
meetings as well as to other colleagues, racially tinged remarks, and false
allegations of harrassing her students (she also has filed a false complaint
in this regard with OSU human resources).

(*Id.*) Balkrishnan claimed further that Szeinbach had been misusing her senior faculty

rank to harass and intimidate him, and that she had told him that she wanted him to

leave as soon as possible.  (*Id.*)  Later that day, Brueggemeier sent a follow-up email to

Vice Provost Barbara Snyder, Iyer, and Nahata, stating:

I have "defused" the situation at this time.  It is clearly an issue between
two tenured faculty who refuse to resolve their conflicts and would rather
"throw bombs" at each other.

(*Id.* at 21.)

Later, on September 8, 2006, Balkrishnan sent an email to Brueggemeier

reporting that two of Szeinbach's students who held TA positions also worked full-time

elsewhere, and complaining that this was unfair to his students.  (*Id.* at 11.)  On

September 21, 2006, he sent another, complaining that Szeinbach's graduate students

were being permitted to keep their TA positions despite having failed to enroll in a

compulsory seminar.  (Doc. 118-11 at 14.)  On September 26, 2006, Balkrishnan sent

another email to Iyer in response to her voice mail, complaining again of false

allegations leveled by Szeinbach and Seoane, and claiming that he and his students

had been harassed.  (Doc. 118-10 at 6-7.)

In November 2006, Szeinbach filed an EEOC charge against OSU.  In it, she

stated:

In August 2006 and prior, I complained to Bob Bruggemeier, Dean, of his
discriminatory treatment of a male colleague.  In September 2006, I
received a below average performance rating and a low salary increase,

7

although previous wage increases were higher and performance ratings
were good.

I believe I was retaliated against because of my sex, female, and opposing
of discriminatory practices in violation of Title VII of the Civil Rights Act of
1964, as amended.

(Doc. 122-2 at 2.)  In December 2006, Szeinbach filed an internal complaint with OSU's

Office of Human Resources ("OSU HR"), alleging that Bruggemeier had retaliated

against her for her support of Seoane's EEOC complaint.[2]  On January 25, 2007,

Balkrishnan filed a formal internal complaint with OSU HR against Szeinbach and

Seoane, alleging that he had been discriminated against and harassed on the basis of

his national origin, race, and comparatively superior academic productivity.  (Doc. 118-

10 at 5.)  He claimed that the mistreatment had lasted for over two years, and that his

previous complaints had not led to "an agreeable solution".

On February 13, 2007, Balkrishnan sent an email to Brueggemeier and Nahata

claiming that one of his research collaborators had reported to him that Szeinbach had

called to complain at length about Balkrishnan and to report that he had been

discriminating against Seoane.  Balkrishnan commented that "[t]hese obviously seem to

be the rantings of someone who is quite discontent and unhappy here".  (Doc. 118-11 at

48.)  He sent several more emails throughout 2007 complaining about Szeinbach,

Seoane, their graduate students, and their alleged misconduct.  (*See* Doc. 118-12 at 1-

2 (unprofessional TA conduct); Doc. 118-12 at 16 (Szeinbach should recuse herself

---

[2]  The parties concur that Szeinbach cannot recover for retaliation occurring more
than 300 days prior to her October 12, 2007 EEOC charge.  (Doc. 130 at fn 12.)  The
plaintiff has therefore conceded that she generally cannot recover for conduct dating
from before December 15, 2006.

from tenure decisions about him); Doc. 118-12 at 17 (Szeinbach teaching a course with too few students enrolled); Doc. 118-22 at 57-58 (Szeinbach promised everyone in a course A grades).)

On April 28, 2007, Balkrishnan sent an email to Dr. Mark Levy, editor of *Primary Care Respiratory Journal*, concerning an article which Szeinbach had co-authored and which his journal had recently published. Balkrishnan stated that the 2007 article had reported "exactly identical results just analysing the data slightly differently" from a 2005 article Szeinbach had co-authored in a different journal, and that the 2007 article had failed to reference the 2005 article.[3] (Doc. 98-1 at 12.) The same day, he emailed Nahata with the same allegations, although Balkrishnan characterized this email as seeking Nahata's advice on the situation given his experience as editor of (an unrelated) journal. (*Id.* at 14.) Balkrishnan apparently forwarded his correspondence with Dr. Levy to Nahata and Brueggemeier, as well as to Dr. Craig Pedersen ("Pedersen"), a professor in PPAD, and Dr. William Hayton ("Hayton"), OSU's Associate Dean of Research. (Doc. 98-1 at 16.) On May 1, 2007, Balkrishnan also sent his email correspondence to a group of professors at other universities, adding an allegation that Szeinbach had presented this research at the 2005 International Society for Pharmacoeconomics and Outcomes Research ("ISPOR") meeting, and that she planned to present it again in 2007. (*Id.* at 20.) On June 1, 2007, Pedersen wrote back, recommending that Szeinbach's graduate student co-author be kept out of the investigation. Balkrishnan responded, stating that "I will defer to the rest of the group for

_____

[3] The article was co-authored by three other individuals, including Seoane and a

9

the final decision, but I will respectfully disagree with Craig about this".  (*Id.* at 16.)

Soon thereafter, Balkrishnan filed an OSU "whistleblower" complaint charging Szeinbach with research misconduct.[4]  This formally activated an investigative procedure set forth in OSU's "University Research Committee Interim Policy and Procedures Concerning Misconduct in Research or Scholarly Activities" (the "Interim Policy").  *See* Doc. 99-3.  This policy prohibited, and defined as misconduct, activities which included "other practices that seriously deviate from those that are commonly accepted within the relevant scholarly community".  (*Id.* at 4.)  The Interim Policy stated that misconduct charges could be filed by anyone, and that anyone receiving such charges should immediately refer them to the Office of the Vice President for Research.  Upon such referral, the Office of the Vice President for Research, the Dean of the relevant college, and the Coordinator designated by the university to administer the policy, were to conduct a preliminary review and investigation of the charges, to determine whether sufficient evidence existed to warrant an inquiry, and whether the complained-of activity fell within the definition of misconduct.  (*Id.* at 5.)  If the Dean and Coordinator were to determine that the charges contained sufficient evidence to warrant an inquiry and that the charges fell within the definition of misconduct, they were to reduce them to writing and meet with the accused researcher to present the charges and advise them of the pending investigation.  Then, the Vice President for Research

---

graduate student.

[4] Balkrishnan's complaint was undated.  (Doc. 122-5 at 25.)  The Preliminary Report of the Committee of Initial Inquiry did not identify the date upon which Balkrishnan filed the complaint.  (Doc. 122-7 at 5.)

would form a Committee of Initial Inquiry ("CII"), to consist of at least three persons.  (*Id.* at 7.)  The purpose of the CII was to make a preliminary evaluation and investigation of the evidence and determine whether there was sufficient evidence of possible scientific misconduct to warrant an investigation under OSU's disciplinary rules.  It was then to prepare a Preliminary and a Final Report.  If the CII were to determine that sufficient evidence existed to warrant an investigation, then it would trigger a lengthy and complex faculty discipline process established by University Rule 3335-5-04 (the "04 Process"), which could ultimately result in a faculty member's termination.  (*Id.* at 10.)

Upon initial review, Dean Brueggemeier determined that the similarities between the two articles might meet the definition of research conduct under the Interim Research Policy and should be referred to a CII.    (Doc. 102-1 at 16.)  He recommended to Vice President McGrath that the matter not be resolved through alternative dispute resolution.  (Doc. 68-1 at 177.)  McGrath organized a CII, charging it with determining whether Balkrishnan's allegations contained sufficient evidence of possible misconduct to warrant further investigation under the disciplinary rules.  (Doc. 122-7 at 6.)  The CII first met on August 15, 2007, and again in September and October 2007.  On November 16, 2007, it produced its preliminary report.  The CII considered four potential areas of misconduct.  It rejected three of these, but found potential misconduct in Szeinbach's failure to cite her 2005 article in her 2007 article "seriously deviates from commonly accepted practices within the research community and as such represents misconduct."[5]  (*Id.* at 8.)  After reviewing objections from Szeinbach,

---

[5]  The Preliminary Report rebuked, although it did not find misconduct on the part

11

including evidence that she argued showed that other faculty such as Brueggemeier and Balkrishnan had engaged in similar practices, the CII issued a substantively similar Final Report on January 9, 2008.  (*Id.* at 26.)  The CII's final determination was that sufficient evidence existed to warrant an investigation under the 04 Process.  However, on February 19, 2009, Brueggemeier sent Szeinbach a letter reporting that in May 2008 OSU had adopted a new research policy to supplant the Interim Policy, which no longer prohibited "other practices that seriously deviate from those that are commonly accepted within the relevant scholarly community".  (*Id.* at 2-3.)  Consequently, Brueggemeier stated, as the finding against Szeinbach had been based on a practice which was no longer prohibited, he did not feel that the matter warranted further investigation.  (*Id.* at 3.)  The 04 Process thereafter did not go forward.

In June 2007 Szeinbach submitted a correction note, which was published in the *Primary Care Respiratory Journal*, stating that she and the other authors of the 2007 article "were remiss" in not acknowleding that the article used the same data set as the 2005 article, and in not making reference to the 2005 article.  (Doc. 122-4 at 5.)  In the same issue, the publishers of the *Journal* issued an editorial chastising Szeinbach and the other authors of the 2007 article for failing to cross-reference the two.  (Doc. 160-2 at 15.)  On August 13, 2007, Balkrishnan emailed a copy of the editorial to the entire COP faculty, accompanied by a note that he was "extremely saddened to report that a major clinical journal has published this.  This is a matter of great shame and disrepute" to COP.  (Doc. 127-1 at 21.)  Szeinbach sent a rebuttal to the faculty on August 21,

---

of, Szeinbach for self-plagiarism.  (*Id.*)

2007 containing a copy of an email from the editor of the *Journal* commenting that Balkrishnan had mischaracterized their editorial, and stating that Balkrishnan had sent his email to further retaliate against her and Seoane.  This was followed by another email from Balkrishnan stating that he had not even mentioned Szeinbach or Seoane by name in his email, and that his concern had simply been that the "reputation of the college has been compromised".  (*Id.* at 20.)

At a September 4, 2007 faculty meeting to discuss graduate teaching assistantship allocations, Balkrishnan and Szeinbach argued about TA qualifications. Finally, Balkrishnan exploded at Szeinbach, shouting at her and calling her a "bitch". (Doc. 118-13 at 5.)  On September 17, 2007, Brueggemeier sent a letter to Balkrishnan, informing him that his actions at the meeting had been "very unprofessional, extremely rude, and totally unacceptable."  (Doc. 119-2 at 2.)  He stated that Balkrishnan's actions would not be tolerated, and that he had told him before not to engage in discussions or interactions with Szeinbach, Seoane, or their graduate students outside of classes. "The last time that I emphatically made these points was in early August 2007 following the exchange of e-mails between you and Dr. Szeinbach that were sent to the entire College faculty."  Brueggemeier restricted access to Balkrishnan's endowed chair development funds, except for the purpose of finding a "coach or mentor".  He urged Balkrishnan to seek anger management assistance from OSU's HR office.  (*Id.*) Balkrishnan eventually received counseling.  (Doc. 119 at 13-14.)

Finally, on October 12, 2007, Szeinbach filed a second charge with the EEOC, citing the research misconduct investigation and Balkrishnan's outburst at the September 4, 2007 faculty meeting.  On August 27, 2008, she filed this lawsuit.

Balkrishnan left OSU to move to the University of Michigan in Spring of 2009.

**Summary judgment**.  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (concluding that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence).  In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations [. . .] but [. . .] must set forth specific facts

showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see Celotex*, 477

U.S. at 324.  Furthermore, the existence of a mere scintilla of evidence in support of the

nonmoving party's position will not be sufficient; there must be evidence on which the

jury reasonably could find for the nonmoving party.  *Anderson*, 477 U.S. at 251; *see*

*Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or

implausible inferences to be insufficient to survive summary judgment).

      **Title VII retaliation**.  As noted above, Szeinbach has claimed that OSU

retaliated against her for filing complaints with OSU HR and with the EEOC, and that it

retaliated against her for supporting Seoane's actions in filing complaints with OSU HR

and with the EEOC.[6]  "A plaintiff in a Title VII . . . action may establish retaliation either

by introducing direct evidence of retaliation or by professing circumstantial evidence that

would support an inference of retaliation.*"  Imwalle v. Reliance Med. Prods.*, *Inc.*, 515

F.3d 531, 543 (6th Cir. 2008).  Where, as in this case, a plaintiff presents only

circumstantial evidence of retaliation, a court will examine the claims under the burden-

shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See*

*Chen v. Dow Chemical Co.*, 580 F.3d 394, 402 (6th Cir. 2009) (Title VII retaliation

claims analyzed under *McDonnell Douglas*).  Under this framework, a plaintiff has the

initial burden of establishing a *prima facie* case of Title VII retaliation by establishing

that: (1) she engaged in protected activity; (2) the defendant knew of this exercise of

---

[6]  Plaintiff alleged also in her Second Amended Complaint that OSU had
discriminated against her because of her support of Seoane.  (Doc. 98 at 16.)  However,
it appears from Plaintiff's memorandum contra summary judgment that her claims are

protected rights; (3) the defendant thereafter took adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491-92 (6th Cir. 2010).  If the plaintiff establishes a *prima facie* case, the burden of production then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for" the actions it took.  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant does so, the burden then shifts back to the plaintiff to demonstrate that the defendant's "proffered reason was not the true reason for the employment decision" – *i.e.*, that it was merely pretextual.  *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007).  "The burden of establishing a prima facie case is not an onerous one and is easily satisfied." *Russell v. Univ. of Toledo*, 537 F.3d 596, 609 (6th Cir. 2008).  Making such a showing, however, is not merely perfunctory, and a plaintiff must satisfy all of the elements of the *McDonnell Douglas* test.

**Adverse employment action**.  Central to any *prima facie* retaliation claim is the requirement that the plaintiff must have been subjected to an adverse employment action.  An adverse employment action, in the context of a retaliation claim, is any action that "well might have dissuaded a reasonable worker from making or supporting a claim of discrimination."  *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal citation and quotation omitted).  Such actions are not limited to actions directly related to employment or actions taken at the workplace itself.  *Id*. at 64.

However, the *Burlington Northern* Court cautioned, not all actions which could be

now based entirely upon a theory of retaliation.  *See* Doc. 130.

16

construed as retaliatory in motive are materially adverse; the statute is intended to

protect an employee only "from retaliation that produces an injury or harm." *Id.* at 67.

> We speak of material adversity because we believe it is important to
> separate significant from trivial harms.  Title VII, we have said, does not
> set forth "a general civility code for the American workplace."  An
> employee's decision to report discriminatory behavior cannot immunize
> that employee from those petty slights or minor annoyances that often
> take place at work and that all employees experience.  The antiretaliation
> provision seeks to prevent employer interference with "unfettered access"
> to Title VII's remedial mechanisms.  It does so by prohibiting employer
> actions that are likely "to deter victims of discrimination from complaining
> to the EEOC," the courts, and their employers.  And normally petty slights,
> minor annoyances, and simply lack of good manners will not create such
> deterrence.

*Id.* at 68 (citations omitted).  *See also Garner v. Cuyahoga County Juvenile Court*, 554

F.3d 624, 640 (6th Cir. 2009) (producing an "injury or harm" a fundamental requirement

for demonstrating retaliation).  This is an objective test, and "should be judged from the

perspective of a reasonable person in the plaintiff's position, considering all the

circumstances." *Burlington Northern*, 548 U.S. at 71.  "[T]he significance of any given

act of retaliation will often depend upon the particular circumstances.  Context matters."

*Id.* at 69.

A substantial body of Sixth Circuit caselaw exists concerning materially adverse

actions.  Many of these decisions followed an older, more restrictive, standard which

*Burlington Northern* abrogated for claims of retaliation.  *See, e.g., Primes v. Reno*, 190

F.3d 765, 767 (6th Cir. 1999).  Others, however, postdate *Burlington Northern* or are

earlier decisions which have not been abrogated.  These generally give guidance as to

what sort of employment actions should qualify as adverse.  For instance, in *Michael v.*

*Caterpillar Financial Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007), the court found

that the brief placement of an employee on paid administrative leave and the establishment of a performance plan for her could meet the "relatively low bar" established by *Burlington Northern*. In *Wharton v. Gorman-Rupp Co.*, 309 Fed.Appx. 990, 997-98 (6th Cir. 2009), the court found a threatening confrontation with a superior in a parking lot to be a materially adverse employment action. In *Halfacre v. Home Depot, USA, Inc.*, 221 Fed.Appx. 424, 425 (6th Cir. 2006), the court found that low employee performance evaluation scores could constitute an adverse employment action if they actually impacted the employee's wages and professional advancement.

However, in *James v. Metropolitan Gov't of Nashville*, 243 Fed.Appx. 74, 79 (6th Cir. 2007), *cert. denied*, 552 U.S. 1140 (2008), the court found that an employee who had received bad employment evaluations, had been denied a lateral transfer, and had had work quotas imposed upon her, had not suffered an adverse employment action because none of these had significantly impacted her professional advancement. *See also Vaughn v. Louisville Water Co.*, 302 Fed.Appx. 337, 348 (6th Cir. 2008) (although negative performance evaluations could be materially adverse actions, an employee must show that his salary or professional advancement was affected). In *Hunter v. Secretary of U.S. Army*, 565 F.3d 986, 996-97 (6th Cir. 2009), the court found transfer to a different work unit not to be an adverse employment action where the plaintiff did not allege that it had "resulted in significantly different responsibilities, a change in benefits, or any other negative effect."[7]

---

[7] Other circuits have interpreted *Burlington Northern*'s requirement of an "injury or harm" in a similar fashion. *See, e.g., Devin v. Schwan's Home Service, Inc.*, 491 F.3d 778, 786 (8th Cir. 2007) (false reports of poor employee performance are not materially adverse where they do not cause any significant harm).

18

This court has previously held that receiving verbal warnings concerning employee misconduct or the dismissal of an employee's grievance related to a performance evaluation do not amount to an adverse employment action, if an employee cannot demonstrate that these actions significantly impacted her professional advancement. *Covert v. Monroe County Dep't of Job and Family Servs.*, 2010 WL 2346550 at *8-9 (S.D. Ohio June 8, 2010). *See also Taylor v. H.B. Fuller Co.*, 2008 WL 4647690 at *8-9 (S.D. Ohio Oct. 20, 2008) (verbal warning with no accompanying detrimental effect on career not an adverse employment action). Furthermore, in one case where a professor at Ohio State University claimed that he had been retaliated against for complaining of race discrimination by having his dean file a complaint against him, this court found that "the mere lodging of a complaint cannot reasonably chill an employee from himself complaining of discrimination." *Alexander v. Ohio State Univ. College of Social Work*, 697 F.Supp.2d 831 (S.D. Ohio 2010).

In *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177 (6th Cir. 2004), a professor of medicine who had continued to work after the age of sixty-five alleged that he had suffered adverse employment actions, including a reduction in his allotted research lab space, the revocation of his mentor status, the loss of his graduate research assistant, a proposed (although unimplemented) reduction in pay and reassignment, the forced review of his grant applications, the removal of an administrative responsibility, and the university's failure to select him as medical director of clinical laboratories.[8] *Id.* at 182.

---

[8] The plaintiff in *Mitchell* alleged that the proposed reassignment, removal of administrative responsibility, and failure to select him as medical director were actions in retaliation for failing a discrimination charge with the EEOC, and that the remaining actions constituted age discrimination. *Id.* at 180.

The court found that most of these were *per se* not materially adverse employment action. It also found that his employer's internal review of his grant applications, about which it had become concerned, was "properly considered good institutional administration rather than a materially adverse employment action", and that the proposal to reduce his pay did not cause him to suffer an adverse employment action because it was never implemented. *Id.* Plaintiff has specifically urged the Court not to rely upon *Mitchell*, in part because it "should refrain from superimposing pre-*Crawford* and *Burlington* decisions onto *Burlington*'s flexible evolution of what constitutes an 'adverse employment action.'"[9] (Doc. 130 at 6.) Defendant, however, argues that *Mitchell* has not been overturned, and that this and other courts have both cited and followed it after *Burlington*.[10] The Court, for its part, is bound to follow the precedent of the Sixth Circuit Court of Appeals (which appears to still include *Mitchell*) regardless of its opinions upon the flexible evolution of the law. *See Freeman v. Potter*, 200 Fed.Appx. 439, 443 at fn1 (6th Cir. 2006) (Sixth Circuit still bound to follow *Mitchell*).

Finally, and significantly in this case, "[t]he law in our circuit is that actions that are not implemented are not adverse employment actions." *Scott v. Metropolitan Health Corp.*, 234 Fed.Appx. 341, 348 (6th Cir. 2007), citing *Mitchell*, 389 F.3d at 182. Where potentially harmful actions are merely contemplated, or are taken but then immediately

---

[9] Plaintiff refers to *Crawford v. Metro Gov't of Nashville and Davidson City*, 129 S.Ct. 846 (2009), which addresses questions of when a plaintiff's participation in the discrimination claims of a third party can give rise to his own claim for retaliation.

[10] Defendant refers to *Scott v. Metropolitan Health Corp.*, 234 Fed.Appx. 341 (6th Cir. 2007) (citing *Mitchell*), *Graham v. Johanns*, 2008 WL 3980870 (S.D. Ohio Aug. 21, 2008) (citing *Mitchell*), and *Somoza v. Univ. of Denver*, 513 F.3d 1206 (10th Cir. 2008) (citing *Mitchell* and noting that it appeared to have survived *Burlington*).

rescinded, the employee has not suffered an adverse employment action. *Id*. These attempts to modify an employee's position, especially where they do not rise to the level of credible threats by a decision maker, do not amount to an "injury or harm" sufficient to satisfy *Burlington Northern*.

**Allegations in this case of adverse employment actions**. In its motion for summary judgment, OSU asserts that Szeinbach cannot demonstrate the existence of any genuine issues as to material fact in support of her claims in this action. In response to this challenge, Szeinbach states that "OSU inflicted at least the following 11 adverse employment actions against Plaintiff Sheryl Szeinbach". (Doc. 130 at 1.) She then identifies these specific allegations:

(1) the suspension of student enrollment in an OSU's [sic] graduate program which largely eliminated Szeinbach's ability to perform research with graduate students;

(2) defamatory attacks on Szeinbach's character and qualifications both at OSU and nationally that caused Szeinbach to suffer physical and psychological harm that warranted treatment by medical professionals;

(3) retaliatory merit pay increases that resulted in past and future loss of wages and benefits;

(4) retaliatory investigations into Szeinbach's academic publications and activities at OSU filed with the intention of terminating Szeinbach's protected activities;

(5) attempted termination of Szeinbach [sic] employment;

(6) prohibition against Szeinbach advising graduate students of OSU College of Pharmacy ("COP") faculty member Rajesh Balkrishnan ("Balkrishnan") after Balkrishnan left the employ of OSU;

(7) reducing Szeinbach's ability to perform research with graduate students and/or to attract new graduate students by reducing Szeinbach's required classroom exposure to graduate students;

21

(8)  attempted prohibition against Szeinbach's teaching required COP courses and/or advising COP PhD students;

(9)  attempted cancellation of Szeinbach's scheduled classes;

(10)  attempted elimination of funding to Szeinbach's teaching assistants;

(11)  attempted limitations on Szeinbach's ability to participate in COP promotional votes.

(Doc. 130 at 1-2.)[11]

These alleged adverse employment actions are generally divisible (based upon the facts which Szeinbach cites in support of them) into actions allegedly performed by Dr. Balkrishnan, other alleged actions performed by OSU itself, and the research misconduct investigation.[12]  The Court will deal with these three categories separately.[13]

**Retaliation by Dr. Balkrishnan**.  Szeinbach attributes to OSU several alleged adverse employment actions performed by her coworker, Dr. Balkrishnan.  Where a

---

[11]  *See also* a similar list, relating to Balkrishnan specifically, at Doc. 130 at 46.

[12]  The Court will address also other allegations made by Szeinbach in her memorandum contra summary judgment where relevant, although it is not obligated to search the record for other evidence demonstrating genuine issues of material fact (especially where, as here, a party has explicitly articulated its arguments).  As to these enumerated arguments, Szeinbach has cited to the sections of her memorandum contra which address these arguments, and cited in those sections to the portions of the record which she states support them.  *See* Doc. 130 at 1-2.

[13]  The Court notes that a great deal of Plaintiff's narrative in her memorandum contra is devoted to the alleged failure of Dean Brueggemeier and others to reprimand or punish Balkrishnan for what Szeinbach characterizes as his retaliatory actions against her, or for his complaints that he had been unfairly accused.  The relevance of this material would be limited to the question of whether OSU condoned, encouraged, or inadequately responded to Balkrishnan's actions or the question of pretext, not what adverse employment actions Szeinbach herself might have suffered.  A failure on OSU's part to deal with Balkrishnan as harshly as Szeinbach might have wished was not, of course, itself an employment action adverse to her.

Title VII claim of retaliation is based on the conduct of a plaintiff's coworker, an
employer is only liable where:

> (1) the coworker's retaliatory conduct is sufficiently severe so as to
> dissuade a reasonable worker for making or supporting a charge of
> discrimination, (2) supervisors or members of management have actual or
> constructive knowledge of the coworker's retaliatory behavior, and (3)
> supervisors or members of management have condoned, tolerated, or
> encouraged the acts of retaliation, or have responded to the plaintiff's
> complaints so inadequately that the response manifests indifference or
> unreasonableness under the circumstances.

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008).  The first element
in the *Hawkins* test implies two prongs: that the co-worker's conduct amounted to an
adverse employment action, and that it was retaliatory in nature.  *Owen v. Peake*, 2008
WL 4449011 at *4 (S.D. Ohio Sept. 26, 2008).  Szeinbach alleges that Balkrishnan
committed several adverse employment actions, that they were retaliatory, and that
OSU is liable for them.

However, the actions she claims Balkrishnan committed amount for the most part
to his ineffectual complaints about Szeinbach, her work, and her students, and her
characterizations of them appear to be exaggerated.  Based upon the evidence she
cites in support of them, no reasonable finder of fact could determine, even under the
*Burlington Northern* standard, that they amounted to conduct sufficiently severe so as to
dissuade a reasonable worker from making or supporting a charge of discrimination,
rather than commonplace academic in-fighting or griping.  Moreover, there is for most of
her allegations against Balkrishnan no basis to conclude that OSU "condoned,
tolerated, or encouraged the acts of retaliation", aside from Szeinbach's repeated
implication that the dean and others should have replied to Balkrishnan's emails with

explicit condemnations of his complaints against her.

Her claim (No. 8) that there was an attempt to prohibit her from teaching required COP courses or advising doctoral students is based upon an August 6, 2007 email Balkrishnan sent to Dr. Patrick Osmer, dean of graduate studies, on which he copied Hayton, Bruggemeier, Nahata, and Carnes.  In it, he claimed that Szeinbach had lodged a complaint that he had been barring his students from taking a required course Szeinbach taught.  Balkrishnan denied the accusation, but alleged in turn that his students had been reporting that Szeinbach's class was incompetently taught.  Citing the research misconduct allegations against Szeinbach as well, he stated:

> Please tell me how in good conscience I can advise my students . . . to take this course with a faculty member who is the first one not to practice what she is supposed to teach our students? . . . How can we have such faculty teach and mentor our graduate students? . . . How can we have such faculty teach important required courses and advise PhD students?

(Doc. 118-12 at 57-58.)  This hectoring by one of Szeinbach's colleagues, which she does not allege ever resulted in any action, cannot reasonably be construed as an "attempted prohibition" OSU imposed on her teaching or advising.  Szeinbach furthermore does not explain how OSU encouraged or condoned this "attempt", except to note that "nobody except Dean Osmer suggested Balkrishnan's email might be inappropriate."  (Doc. 130 at 39.)  As to Osmer, she simply cites his email response of the next day that complaints of academic misconduct were handled through the university's process, and that any action concerning academic misconduct had to await the outcome of that process.  (Doc. 118-12 at 59.)

Szeinbach's claim (No. 9) that there was an attempt to cancel her scheduled classes is similarly based upon a June 18, 2007 Balkrishnan email to several colleagues

24

relating to graduate teaching assistant stipends. At the end, he noted concerning Dr. Szeinbach: "Also she is teaching 326 this summer with only 1 student enrolled. Is that being allowed?" (Doc. 127-1 at 14.) She again does not allege that this inquiry led to any action against her, and instead simply asserts that "none of the recipients of this email suggested that it was in any way inappropriate." (Doc. 130 at 37.) However, this email is not plausible support for the proposition that OSU condoned or supported an effort by Balkrishnan to have Szeinbach's classes cancelled. It is also not clear why this email, though it might have been intended to annoy Szeinbach, would have of itself posed an inappropriate inquiry; at most, it amounts to *de minimis* academic squabbling or bureaucratic tattling.

The allegation of an attempt to eliminate funding to Szeinbach's teaching assistants (No. 10) is based upon a series of emails Balkrishnan sent to Nahata, Pedersen, Brueggemeier, and/or Hayton complaining about actions or inactions on the part of Szeinbach's TAs, such as failure to do enough teaching work, full-time employment other than at COP, and failure to participate in graduate student activities. (Doc. 118-11 at 1-2, 11, 14.) Finally, on February 22, 2007, Balkrishnan sent an email to Brueggemeier with a copy to several colleagues, complaining about an apparent failure on the part of some of Szeinbach and Seoane's graduate students to attend a mandatory graduate seminar due to the lack of refreshments. (Doc. 118-12 at 1.) He claimed that some of his students wanted to know how two of Szeinbach and Seoane's graduate students "who openly flout the rules of good standing" were permitted to keep their TA slots, and suggested that the three unprofessional students not be eligible for funding for the coming year. Balkrishnan noted that nobody should be treated specially

25

"just because they are falsely alleging discrimination and harassment", which Szeinbach states demonstrates that Balkrishnan's attempt to eliminate funding for her TAs was motivated by retaliation.  (*Id.* at 2.)

Hayton responded to this email by stating that risking graduate students' good academic standing over attendance at the seminar would be a non-trivial change that the faculty would have to decide upon and make clear to the students.  He also commented, "[h]as the eligible faculty . . . made the decision that seminar attendance is precondition to holding a GTA and has that been communicated to students?"  (*Id.* at 1.) Szeinbach characterizes this tepid response as "Hayton told Balkrishnan his plan to eliminate funding for Szeinbach and Enrique's teaching assistants was premature . . . But, Hayton proposed a modification of COP rules so Balkrishnan could accomplish his goal."  (Doc. 130 at 29.)  No reasonable finder of fact could give credence to this interpretation of Hayton's statement.  In any case, once again, Szeinbach has not presented any evidence to suggest that funding for her TAs was ever affected by this email.

Finally, Szeinbach's allegation of "attempted limitations on Szeinbach's ability to participate in COP promotional votes" (No. 11) is based upon a June 14, 2007 email from Balkrishnan to Brueggemeier, Nahata, and a Dr. Dasta stating his opinion that, given his pending HR complaint against Szeinbach, she should excuse herself from participating in any review of Balkrishnan's professional accomplishments, and noted that he himself had done so with respect to Dr. Seoane.[14]  (Doc. 118-12 at 16.)

---

[14]  Szeinbach alleged in her second amended complaint that Balkrishnan had been barred from participating in Seoane's four-year review.  (Doc. 98 at 6.)

Szeinbach notes that "[n]either Dean Brueggemeier nor Nahata told Balkrishnan that his email was inappropriate." (Doc. 130 at 37.) However, it is not clear why this request – which appears on its face to propose a typical and reasonable policy of recusal – would be inappropriate. So trivial an exclusion from the administrative business of COP would not amount to an adverse employment action, and Szeinbach again presents no evidence that Balkrishnan's request was ever honored.

Listed action No. 2, Balkrishnan's defamatory attacks on Szeinbach's character that caused her to suffer physical and psychological harm, encompasses a broad range of communications and actions by him. The Court notes initially that the existence, extent, and nature of medical treatment which Szeinbach allegedly sought as a result of such defamatory attacks is not relevant to the question of whether the attacks were, as a matter of law, an adverse employment action. This is because *Burlington Northern* imposed an objective standard evaluating what distress an action would cause a "reasonable worker", not a subjective standard evaluating what effect an action actually did have on a particular plaintiff. The issue at hand, therefore, is whether Balkrishnan's alleged "defamatory attacks" were themselves an adverse employment action.

Szeinbach refers in part to Balkrishnan's emails relating to the publication misconduct controversy, the alleged poor quality of her teaching, or of her graduate students' alleged lack of professionalism. (Doc. 130 at fn 2.) She also refers to a September 20, 2007 email from Balkrishnan to a student advising him that he had explicit instructions not to interact with students of Drs. Seoane and Szeinbach, "based on complaints filed by these faculty and their students against me for harrassment and discrimination, a charge I strongly deny." (Doc. 118-12 at 24.) Furthermore, on October

27

8, 2007, Balkrishnan sent an email to Larry Lewellen, an OSU HR investigator, refusing to cooperate further with his investigation and referring Lewellen to his lawyer.  In this, Balkrishnan described Szeinbach's allegations against him as "harrassment" and "discrimination" based on "false allegations by disgruntled faculty whose previous allegations . . . have proven to be false."  (Doc. 119-2 at 12.)  The "defamatory attacks" in these emails appear to amount to little more than denials of Szeinbach's allegations, and are *de minimis.*[15]

Balkrishnan's dislike of Szeinbach, however, led to at least one public confrontation at a September 4, 2007 faculty meeting concerning TA appointments for graduate students.  According to the account of Dr. Carnes, who was present:

> Dr. Balkrishnan began making loud comments about "irresponsible behavior" on the part of one of the students . . . I don't recall the other particulars of his outburst, other than it was very loud and very harsh in the terms used to describe the student.
> [. . .]
>
> Dr. Szeinbach (advisor to the student described by Dr. Balkrishnan) very calmly stated that her student was a more senior student and had completed some of the courses requiring TA support [. . .]
>
> Dr. Balkrishnan leapt to his feet (chair went backwards) and facing Dr. Szeinbach pointed his finger at her and appeared to be shaking with rage (my interpretation from the back) and highly agitated.  He was shouting at this point and accused her of lying and called her a "bitch".  He also stated that we should not reward irresponsible behavior.  Dr. Nahata interrupted him and calmly told him to "sit down" and that "this is not appropriate behavior".  Dr. Balkrishnan did in fact sit down, but started to get up again almost immediately.  I told him "that's enough" and he remained seated

---

[15] In the case of Balkrishnan's email to the student, Szeinbach argues that the statement that he had instructions not to interact in any way was an exaggeration, and that students had not, in fact, filed any complaints against him.  Circulating an unfounded story that other faculty and students had complained about him, however, would seem to cast Balkrishnan himself in a worse light than Szeinbach.

and silent thereafter.

(Doc. 118-13 at 4-5.)  According to Carnes, Szeinbach then addressed Balkrishnan's

arguments further and made some additional points about graduate student policy.

Following some additional discussion and a faculty vote, most of the professors left;

Szeinbach remained to see the results of the vote and to discuss TA positions with

Carnes.  (*Id.* at 5.)

  This outburst, though Defendant concedes it was unprofessional and

unacceptable, amounted, even viewed in the light most favorable to Szeinbach, to a

heated argument between two colleagues.  In *Somoza v. University of Denver*, 513 F.3d

1206 (10th Cir. 2008), the court found that incivility at a university faculty meeting,

including colleagues rolling their eyes at a professor and laughing at him, were unlikely

to deter a reasonable employee from making a charge of discrimination.  *Id.* at 1206.

The *Somoza* court referred to several prior precedents in its circuit which addressed the

principle that unruly behavior in a meeting, derogatory e-mails, and ridicule and angry

outbursts by co-workers would not of themselves support a retaliation claim.  *See*

*Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006); *Duncan v.*

*City & County of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005); *Petersen v. Utah Dept.*

*of Corr.*, 301 F.3d 1182, 1190 (10th Cir. 2002).  This court agrees.  A reasonable person

in Szeinbach's position would not have been deterred by being shouted at by a person

inferior in academic rank from making or supporting an allegation of discrimination.

  In addition, Plaintiff argues that Balkrishnan's January 25, 2007 complaint to

OSU HR about being harassed by false allegations was an adverse employment action.

 (Doc. 130 at 26.)  However, as this court has held before, "the mere lodging of a

29

complaint cannot reasonably chill an employee from himself complaining of discrimination." *Alexander*, 697 F.Supp.2d at 852. Szeinbach cannot reasonably complain that Balkrishnan's engagement in the protected activity of filing an HR complaint was an action which would have dissuaded her from filing her own; it appears, in fact, that seeing another file a false report with which she disagreed would make a reasonable worker *more* likely to file her own. Moreover, as noted below, an internal investigation unaccompanied by any significant ramifications does not inflict an injury or harm amount to material adversity.

It is abundantly clear from the record that Dr. Balkrishnan disliked Szeinbach. He appears to have made repeated efforts to annoy or embarrass her, by publicizing the research misconduct allegations against her, complaining about her graduate students and their TA positions, and not concealing his opinions that she was unworthy of her academic position. These are, however, the "personality conflicts at work that generate antipathy" which the *Burlington Northern* Court said that Title VII would not police. *Id*. at 68. That professors in research universities will criticize each other – even savagely — or try to steal each others' research funds is not news to a reasonable person in Szeinbach's position. She has, in her allegations, exaggerated this course of rude and unprofessional activity – which the evidence shows consisted mostly of Balkrishnan complaining about her to anyone who would listen, to no apparent effect – into an organized and widespread campaign to destroy her. Title VII, as the *Burlington Northern Court* stated, does not set forth "a general civility code for the American workplace." *Id*. The presence of protected activity will not elevate griping emails and shouting matches into materially adverse employment actions.

30

**Other actions taken by OSU**.      Szeinbach testified at deposition that she believes that "throughout this whole ordeal I got less than the average raise."  (Doc. 111 at 59.)  Her memorandum contra summary judgment was accompanied by a sealed exhibit containing salary information for fellow COP faculty; she compares herself to:

> The first group is Balkrishnan and Nahata who engaged in similar publication practices as Szeinbach yet never suffered a wage loss caused by a CII investigation and/or retaliatory conduct.  The second group is comprised of COP faculty Bennett and Buerki both of which [sic] had fewer publications than Szeinbach while receiving higher pay increases.

(Doc. 130 at 67.)  She alleges that Dean Brueggemeier, who was responsible for awarding salary increases, diminished her raises in retaliation (No. 3).  However, she does not present any other evidence that, for example, at a time when she was informed of her raise for the upcoming year, she was informed that it had been decreased due to her being under an academic misconduct investigation.

Defendant argues, and the Court agrees, that Nahata and Bennett are not comparable members of faculty.  Nahata is the chairman of her division; due to his presumed administrative responsibilities, he is not directly comparable to Szeinbach in the way in which his accomplishment is evaluated or in the nature of his role at the COP.  Bennett is a clinical track professor, a group for whom research and scholarship – including number of publications – are not weighted as importantly as clinical activities.  (Doc. 134-16 at 22.)

The valid comparators therefore are Buerki and Balkrishnan (who left OSU in 2009).  To summarize the data presented:

31

2008:
  Buerki:     1 publication, 2 grants.  4.50% raise.
  Balkrishnan:   27 publication, 2 grants.  3.25% raise.
  Szeinbach:    3 publications, 0 grants.  3.00% raise.
2009:
  Buerki:     4 publications, 1 grant.  2.75% raise.
  Balkrishnan:   20 publications, 5 grants.  3.00% raise.
  Szeinbach:    3 publications, 0 grants.  2.00% raise.

2010:
  Buerki:     2 publications, 0 grants.  2.25% raise.
  Szeinbach:    5 publications, 0 grants.  2.00% raise.

(Docs. 146-1 at 1; Doc. 161 at 3-10.)  The evidence Szeinbach has presented about pay raises, however, is insufficient to demonstrate adverse employment action against her.  In none of the years at issue did Szeinbach suffer a decrease in pay.  That other faculty received raises greater than her by a percentage point or less in almost every case is *de minimis*, especially given the differences amongst the three professors in base salary upon which these percentages were imposed and the importance attributed by the COP to the ability of faculty to obtain grant funding and the volume of their publication.[16]  This alleged loss of past and future wages therefore is insufficient to amount to an adverse employment action.

Listed action No. 6 alleges that Szeinbach was prohibited from advising Balkrishnan's graduate students after he left OSU.  This is based upon an August 4, 2008 email sent by Balkrishnan, part of an email chain to several persons concerning Balkrishnan's new appointment at the University of Michigan.  Balkrishnan was addressing the matter of his current graduate students, some of whom would be going

---

[16]  Defendant points out in its reply memorandum that, for instance, the 2008 raise resulted in salaries of $89,255 for Buerki, $95,845 for Balkrishnan, and $114,715 for Szeinbach.  (Doc. 160 at 53-54.)

32

to Michigan with him, and others of whom would be staying at OSU.  Balkrishnan stated

that Nahata would be advising Jun, one of his students, and Kathy Brooks, the

Graduate Program Coordinator, responded that Nahata did not have the necessary

"Category P" status to advise students.  Balkrishnan replied:

> Can we change Dr. Nahata's status?  Can I advise my students who have
> passed qualifiers once I leave the school till they defend?  Can we please
> check with the grad school on this?  I will NOT have my students advised
> by either Dr. Szeinbach or Seoane.

(Doc. 119-2 at 20.)  Nahata responded: "I will submit my CV for P status.  It is my

understanding that GRC does not meet during the summer but they can consider it at

one of their autumn quarter meeting [sic]."  (*Id.*)

Szeinbach argues that Balkrishnan and Nahata "made sure Szeinbach could not

engage in research with any of Balkrishnan's students."  (Doc. 130 at 46.)  Although

Nahata did not say in his reply that he intended to do so, drawing all inferences most

strongly in Szeinbach's favor could support a conclusion that Nahata intended to assist

not merely with the effort to advise Jun but with Balkrishnan's idea of his former

students not being advised by Szeinbach or Seoane.  However, Szeinbach has again

presented no evidence that Nahata (and Balkrishnan) ever succeeded in barring

Szeinbach from advising any of Balkrishnan's former students.  Moreover, although

Szeinbach asserts generally that the alleged prohibition "reduced" her "ability to work

with graduate students", she does not present evidence that, or even allege that, she

had any interest in working with any of Balkrishnan's former students and was

prevented from doing so.  Failure to receive a benefit of employment in which one has

expressed no interest does not constitute a materially adverse action.  *Louisville Water*

33

*Co.*, 302 Fed. Appx. at 348.

Szeinbach makes two allegations related to structural changes in the programs at the COP. First, her claim that her ability to perform research with graduate students and attract new students was reduced because her required classroom exposure was reduced is based upon the actions of Brueggemeier's MS Task Force, which he organized in February 2008 to make recommendations regarding the MS in Health System Pharmacy program (No. 7). The MS Task Force eventually made several recommendations:

· Reduce the number of credit hours for Pharmacy 821 by two credit hours.

· Reduce the number of credit hours for Pharmacy 824 by two credit hours.

· Reduce the contact time for seminar to 30 hours/year to reflect the assigned credit. Move the seminar to the OSUMC seminar series for residents effective Autumn 2008, with involvement of College of Pharmacy faculty. This should be re-evaluated at the end of the next academic year.

· Require a human resources course (HSMP 870.05) which is a two credit hour course, currently taught in Winter quarter.

· Require a course in Leadership (PH 894) taught by Dr. Nahata as a one-credit hour elective this past year. Expand to a two credit hour course for the coming year.

· Continue the projects, using a broader pool of participating faculty from the College of Pharmacy as advisors. Establish a "Project Oversight Committee" with representation from college advisors and each participating hospital to ensure consistent quality of the projects.

(Doc. 133-1 at 10.) Szeinbach contends that the task force's recommendations were intended to retaliate against Szeinbach and Seoane "to keep Balkrishnan happy", because Szeinbach and Seoane taught Pharmacy 821 and 824.

34

Second, Szeinbach alleges that she suffered from the suspension of student enrollment in an OSU graduate program which largely eliminated her ability to perform research with graduate students (No. 1).  This is a reference to the fact that, on October 24, 2008, Carnes, the director of pharmacy administration graduate programs, announced that admission of graduate students to the PPAD graduate program was suspended "until there are additional faculty to support this program."  (Doc. 53-3.)  According to Szeinbach, this decision only affected her and Seoane, because they were the only full-time COP faculty connected to the program.[17]

A claim of retaliation requires that the defendant "took an adverse employment action *toward him*".  *Fox v. Eagle Distributing Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007) (emphasis added). The filing of EEOC complaints does not utterly insulate a member of a university faculty from unfavorable administrative changes to courses or programs.  The definition of adverse employment action, while it is not limited merely to direct and obvious changes in the conditions of employment such as demotion, does not encompass any action whatsoever an organization might take which discomfits or inconveniences a person engaging in protected activity.  For a company to fire an employee could certainly amount to an adverse employment action, but for that company to instead close the factory at which the employee works cannot rationally be deemed an adverse employment action directed at a single employee.  For a college,

_____

[17] According to Nahata's deposition testimony, the fact that there were only two full-time faculty left for the PPAD program was itself the reason why the program had to be suspended.  (Doc. 53 at 11.)  Szeinbach does not dispute that, at the time when the suspension was announced, Balkrishnan, Pedersen, and Schneider had all in recent years left the program, and had not been replaced.  *Id.* at 10.

35

as here, to periodically review the curriculum of required courses and make moderate alterations is, in the words of the *Mitchell* court, "properly considered good institutional administration rather than a materially adverse employment action."  *Mitchell*, 389 F.3d at 182.  Likewise, a court cannot rationally consider a college's failure to keep open a graduate program with only two remaining faculty an adverse employment action taken against the remaining instructors.[18]

Finally, Szeinbach alleges generally that there was an "attempted termination" of her employment (No. 5).  In her memorandum contra, Szeinbach referred by this not to the academic misconduct investigation, but to a body called the PPAD Visions and Strategy Group ("VSP").  This was a group of faculty organized in 2007 in response to the competing claims of discrimination filed by Szeinbach, Balkrishnan, Seoane, and Dr. Jessie Au, "to explore options for taking action against disruptive behaviors . . . and to discuss ways to change the culture of the division."  (Doc. 133-1 at 24; see also Doc. 53-1 at 84.)  Szeinbach points out that the membership of the VSP consisted entirely of persons who had complained in writing in June 2006 to Dean Brueggemeier about Szeinbach, and notes a September 29, 2007 email in which the OSU HR staff member coordinating the VSP emailed Dean Brueggemeier asking him to speak at the next meeting about the "feasibility of moving Dr. Szeinbach" and the "process for enacting

_____

[18]  At her deposition, Plaintiff stated:

Q.    You consider that personal discipline of you, the suspension of the graduate program PPAD?
A.    It's taking away students from me personally and my resources and the ability to work with and help students.

(Doc. 110 at 14.)

36

Faculty Rule 6-04".  (Doc. 133-1 at 24.)  However, despite what could be inferred as its hostility to her interests, the VSP, whether or not it attempted to do so, did not terminate Szeinbach's employment, and Szeinbach has presented no evidence of any injury or harm she suffered by its actions.

**Research misconduct investigation**.  The investigation into Szeinbach's two correlated publications involves an action which actually took place and which was directed at Szeinbach.  The target of this allegation is not precisely specified.  In her amended complaint, Szeinbach alleged that Balkrishnan, Nahata, Brueggemeier, Pedersen, Schneider, and/or Hayton "formulated strategies in 2007 regarding how to use Plaintiff's Publications as a venue for retaliating against Plaintiff", which she deems the "Retaliation Plan".  (Doc. 98 at 8.)  It therefore appears that Plaintiff intends this to be a claim of co-worker discrimination on the part of all the listed faculty.  This allegation of conspiracy blurs the line somewhat between co-worker retaliation and employer retaliation, given the positions of Brueggemeier and Nahata, although Szeinbach also alleges that a wide variety of other OSU employees and officials were involved in the effort to retaliate against her (and that they deliberately failed to pursue similar investigations against other faculty).

In the case of Balkrishnan, who actually discovered the correlation between the two publications, notified the editors, sent emails to colleagues concerning the matter, and filed the whistleblower complaint which formally began the process, his activities with respect to the investigation are obvious.  However, even drawing all reasonable inferences in Szeinbach's favor, the evidence she cites in her memorandum contra does not support the proposition that Nahata, Brueggemeier, Pedersen, Schneider, or

Hayton – the other alleged participants in the "Retaliation Plan" – performed or conspired to perform the adverse employment action of subjecting Szeinbach to a research misconduct complaint.  As far as the Court can tell, Plaintiff only alleges that Hayton and Pedersen were involved in the process to the extent that Balkrishnan once forwarded an email to them from one of the editors of Szeinbach's publications and discussed over email with them whether any subsequent investigation should involve the student co-author of the publication.  (Doc. 130 at 55.)  She does not appear to make any concrete allegation at all concerning Schneider.  (Doc. 130 at 53-65.)  These contentions appear either to be meritless or to have been abandoned.  Szeinbach likewise does not appear to make any allegation that Nahata was involved in Balkrishnan's misconduct complaint, except again to the extent that Nahata was copied on Balkrishnan's emails announcing what he had discovered and vague assertions that Balkrishnan discussed the whole matter with his colleagues before filing his complaint.

Brueggemeier, according to Szeinbach's memorandum contra, "provided life support" to Balkrishnan's "dead in the water" complaint when he concluded that the matter might meet the definition of misconduct under the Interim Research Policy and should be referred to a Committee of Initial Inquiry.  (Doc. 130 at 56, citing Doc. 102-1 at 16.)  "Then, before the CII was organized, Brueggemeier torpedoed Szeinbach's attempts to resolve the dispute via . . . alternative dispute resolution." (*Id.*, citing Doc. 68-1 at 177.)  This refers to Brueggemeier's recommendation to Vice President McGrath that the matter be referred to a CII instead of to alternative dispute resolution.

In any case, as before, the fundamental question is whether the investigation constituted an adverse employment action at all.  On its face, of course, being

38

investigated for potential research misconduct is not an experience which any worker would care to face. Plaintiff cites to *Franko v. City of Cleveland*, 654 F.Supp.2d 711, 719 (N. D. Ohio 2009) and *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Dist. 1996), for the proposition that a worker placed under investigation suffers an adverse employment action. In *Franko*, the plaintiff was a police officer who was placed on restricted duty for eight months and denied overtime or secondary employment during the pendency of an investigation. In *Berry*, the plaintiff was a worker who had criminal charges filed against him and who was later acquitted.

These cases, however, do not support a proposition that any internal investigation of an employee by her employer is an adverse employment action. Courts have certainly held that suspensions coupled with a loss of pay, even where the monetary harm is later cured, constitute adverse employment actions. *See, e.g.*, *Burlington Northern*, 548 U.S. at 72-73; *see also Michael*, 496 F.3d at 596 (placement on paid administrative leave and 90-day performance improvement plan upon return constituted adverse employment actions). However, persons who have engaged in protected conduct do not thereby become sacrosanct and immune from review or evaluation. In *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007), another circuit court of appeals concluded that placement of an employee upon paid administrative leave pending the outcome of an investigation was not an adverse employment action. In *Couch v. Board of Trustees of Memorial Hosp. of Carbon County*, 587 F.3d 1223, 1238 (10th Cir. 2009), the court concluded that a doctor who had been the subject of two investigations for disruptive conduct at a hospital had not suffered an adverse employment action. Moreover, in *Mitchell*, 389 F.3d at 182,

39

subjecting a professor to a forced review of all grant applications he prepared did not rise to the level of an adverse employment action.

Szeinbach, even with all inferences of fact drawn in her favor, alleges only that Balkrishnan filed a research misconduct report against her, that it was processed in accordance with OSU's Interim Research Misconduct Policy, and that the investigation was later dismissed without referral to the 04-Process.  Although she presents evidence that use of this investigative process was rare, and alleges that some of her colleagues should have undergone it at well, Szeinbach was not subjected to an imposition unreasonable enough to a university research professor that it might well have deterred her from engaging in protected conduct.  *Burlington Northern* requires an objective evaluation "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances", and provides that "the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters." *Burlington Northern*, 548 U.S. at 69, 71.  Aside from harm to her pride or reputation, about which there is little evidence, in the context here Szeinbach suffered little injury or harm from having OSU investigate the academic significance of conduct which she admitted having done.[19]

---

[19]  Szeinbach's deposition testimony that she had no interest in job search contacts from the headhunters who periodically called her, and that she had not looked for any other jobs, and that she was happy to remain at OSU (Doc. 111 at 64), is at odds with her statement in the affidavit accompanying her memorandum contra that she had not attempted to leave OSU because its retaliation had damaged her national reputation, that her job search was crippled, and that she intended to seek a new job as soon as "the taint of the aforementioned retaliatory conduct is cleared".  (Doc. 135-5 at 6.)  Her affidavit appears to present her subjective (and conclusory) opinion as to whether her ability to obtain a new job has been affected by the conduct she alleges.  In deposition, however, she was asked for objective facts concerning whether she had

**Failure of retaliation claims**.  As all of the evidence which Szeinbach presents concerning actions taken by Balkrishnan, even viewed in the light most favorable to the plaintiff, demonstrates only ordinary incivility, typical academic infighting, and fruitless complaints not amounting to adverse employment actions by her employer, Defendant is entitled to judgment as a matter of law on Szeinbach's claims that it is liable for retaliatory conduct on the part of Balkrishnan.  Likewise, because the research misconduct investigation and OSU's other alleged actions against Szeinbach do not qualify as adverse employment actions, Defendant is entitled to judgment as a matter of law on Szeinbach's claims that it retaliated against her.

The *Burlington Northern* Court, though it expanded the application of Title VII's retaliation provision beyond an employer's actions directly affecting terms, conditions, or status of employment, nevertheless found that it "protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Id.* at 67.  As noted above, Szeinbach has presented no evidence that she suffered any palpable damage to her career from actions taken by Balkrishnan or OSU.  She was not forced out or subjected to the faculty termination process, and did not suffer any cut in pay or academic rank. There is also no evidence from which a finder of fact could reasonably infer that Szeinbach had suffered diminished pay increases.  Any actions taken by OSU which altered her conditions of employment were the result of administrative changes

---

actually attempted to look for a new job and why.  A party opposing summary judgment "may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009), quoting *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

on a division- or college-wide scale, and her teaching load has not substantially changed since 2005. She remains a tenured professor, "happy here" at OSU. Consequently, the evidence that she has suffered no "retaliation that produces an injury or harm" which "well might have dissuaded a reasonable worker from making or supporting a claim of discrimination" sufficient to meet the standard of *Burlington Northern* and the law of this circuit is "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-25 (1986). Defendant is accordingly entitled to summary judgment.

**Conclusion**. Because the Court concludes that Defendant is entitled to judgment as a matter of law on Plaintiff Sheryl Szeinbach's claims against it for retaliation in violation of Title VII due to Plaintiff's failure to demonstrate the presence of adverse employment actions taken against her, it is unnecessary for the Court to address Defendant's argument that certain of Plaintiff's claims are barred as falling outside the scope of her October 16, 2007 EEOC charge.

Accordingly, Defendant's motion for summary judgment (Doc. 122) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment for the Defendant, and to close this case.

s/Mark R. Abel
United States Magistrate Judge