IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Sheryl L. Szeinbach, | : | |
| Plaintiff | : | Civil Action 2:08-cv-822 |
| v. | : | |
| The Ohio State University, | : | Magistrate Judge Abel |
| Defendant | : | |

# ORDER

Plaintiff Sheryl L. Szeinbach brings this action alleging that defendant OSU retaliated against her, in violation of 42 U.S.C. § 2000e, *et seq.*, for engaging in protected activities and for her support and association with her then colleague Dr. Enrique Seoane-Vazquez. This matter is before the Court on defendant The Ohio State University ("OSU")'s September 1, 2010 motion to exclude the testimony of plaintiff's expert witnesses, Miguel Roig, Ph.D. and Bruce J. Dolnick, Ph.D. (doc. 163).

### I.  Background

The amended complaint alleges that OSU retaliated against Dr. Szeinbach for her support of a colleague's EEOC complaint by, among other things, investigating her for alleged research misconduct under OSU Research Committee's Interim Policy and Procedures Concerning Misconduct in Research or Scholarly Activities ("Interim Policy")(Roig Dep., OSU Ex. 189, Doc. 150-33, PageID 14794-98). The events leading up to this investigation for violation of the Interim Policy are pleaded to have begun with

Dr. Milhap Nahata, Chair of the Division of Pharmacy Practice and Administration ("the Division") of OSU's College of Pharmacy ("College"), appointing Assistant Professor Enrique Seoane-Vazquez to a search committee to fill a faculty position. Seoane, and other search committee members had concerns about the qualifications and background of one of the finalists, Dr. Rajesh Balkrishnan. These included his admission that he had conflicts with his colleagues at the University of Texas. Nahata, who like Balkrishnan is of Indian national origin, hired Balkrishnan without a hiring recommendation from the search committee. Further, Nahata told Balkrishnan that Szeinbach and Seoane opposed his hiring.

Shortly after Balkrishnan joined the College faculty, conflicts arose between him and Szeinbach. In 2005, Szeinbach wrote to the College dean expressing concerns about the prejudicial and discriminatory materials in Balkrishnan's annual review of Seoane. From 2005 through 2007, Balkrishnan told some students not to take courses from Seoane. Balkrishnan, Nahata and Professors Philip Schneider and Craig Pedersen discouraged students from working with Seoane and Szeinbach. Seoane filed discrimination complaints with OSU and the EEOC. Szeinbach supported Seoane's filing and prosecution of his EEOC complaint. In December 2006, Szeinbach filed a complaint with OSU-HR that College of Pharmacy Dean Robert Brueggemeier had retaliated against her for her support of Seoane's EEOC complaint by giving her a lower 2006 salary increase than other similarly situated faculty members. (Amended Complaint, ¶¶ 11-38, PageID 5053-58.)

On April 27, 2007, Balkrishnan went to a presentation by one of Szeinbach's graduate student who discussed the differences and similarities between two publications Szeinbach co-authored: "Influence of Patient Care Provider On Patient Health Outcomes In Allergic Rhinitis," *Annals of Allergy, Asthma and Immunology* Vol. 95, pp 167-174 August 2005 and "The Impact Of Allergic Rhinitis On Work Productivity," *Journal Primary Care Respiratory Journal*, Vol. 16, Number 2, pp. 98 – 105, 2007. The next day Balkrishnan sent an email to the editor of one of publications stating that the two articles contained "identical results just analyzing the data slightly differently." (Id., ¶¶ 39-40 and Ex. 5, Doc. 98, PageID 5057-58 and 5080-81.) Balkrishnan engaged in these and related activities in retaliation for Szeinbach's support of Seoane's EEOC complaint. (Id., ¶¶ 45 and 51.)

In May 2007, Dr. Rajesh Balkrishnan filed a whistleblower complaint with OSU's HR Office alleging, among other things, that Szeinbach's publication of the 2007 article that failed to cite her 2005 article violated OSU's Interim Policy. On May 31, 2007, the editors of one of the publications investigated and rejected Balkrishnan's allegations that the publications amounted to duplicate publications. Rather, the editors found Szeinbach's reuse of a data set without a cross reference was an "oversight [that] was not intentional." (Amended Complaint, ¶¶ 52 and 53 and Ex. 9, Doc. 98, PageID 5060 and 5092.)

Balkrishnan also filed allegations of research misconduct against Szeinbach with OSU's Office of Research Compliance's Research Misconduct. (November 6, 2007

3

Preliminary Report of the Committee of Initial Inquiry, p. 1, Roig Dep., Ex. 460, Doc. 150-5, PageID 14508.) On June 5, 2007, Office of Research Compliance's Research Misconduct Administrator Jennifer S. Moseley formed a Committee of Initial Inquiry ("CII") to investigate allegations that Szeinbach violated the Interim Policy. (*Id.*, ¶ 54). The CII was directed to make a preliminary determination as to whether there was sufficient evidence of possible misconduct to warrant a further investigation under OSU's disciplinary Rule 3334-5-04. The CII considered four allegations and concluded that only one allegation–the failure to cite the 2005 article in the 2007 article– might constitute misconduct. Before any subsequent investigation was instituted. The research misconduct policy was changed to eliminate the "serious deviation" portion of the definition of research misconduct. As a result, the referral for further investigation of the possible misconduct did not result in any further investigation or proceedings.

    II.        **Arguments of the Parties**

      A.        **Defendant**

Defendant OSU seeks an order excluding the testimony of plaintiff's proffered expert witnesses, Miguel Roig, Ph.D. and Bruce J. Dolnick, Ph.D . Defendant argues that the opinion testimony of Drs. Roig and Dolnick does not satisfy the requirements of Federal Rule of Evidence 702, and, as a result, their testimony should be excluded.

With respect to Dr. Roig, defendant argues that his testimony should be excluded because his opinion is based on a definition of research misconduct that is fundamentally different from that used in the Interim Policy. Dr. Roig acknowledged

4

that his testimony concerning "text reuse" was not a basis for a finding of misconduct, so his testimony concerning this practice should be excluded. Dr. Roig's testimony concerning the publication practices of other faculty members should be excluded because he does not opine that they committed research misconduct even under his definition.

The Court must exclude any proposed expert whose testimony is neither reliable nor relevant, and, according to defendant, the testimony of Dr. Roig should be excluded because his opinions are not relevant. Plaintiff attempts to use Dr. Roig's testimony to show that the Dean and other faculty engaged in research misconduct similar to that of Dr. Szeinbach. Because Dr. Roig's opinions are not based on the definition of research misconduct contained in the Interim Policy, his testimony has no relevance to whether anyone else committed misconduct under the policy. Defendant argues that expert testimony is not relevant and should be excluded when the expert applies the wrong standard or test relevant to the issues in dispute.

In his deposition, Dr. Roig admitted that he did not rely on the Interim Policy in forming his opinions as to whether misconduct occurred. He was not sure that he had seen the policy for purposes of his report. He was not aware "offhand" how the policy defined research misconduct. Dr. Roig applied his "interpretation of research misconduct" based upon what he believed the proper conduct of science should be. (Roig Dep. Tr. 154:23-24-155:12; 241:16-17.) According to defendant, Dr. Roig repeatedly stated that his opinion as to what constituted research misconduct was not based upon

5

whether they engaged in a practice that seriously deviated from those commonly accepted, but rather whether the publication was ultimately misleading to the reader.

Defendant also argues that Dr. Roig's testimony concerning "text reuse" should be excluded because he admits that engaging in this practice is no basis for finding misconduct even under his definition. Defendant maintains that Dr. Roig's testimony concerning the publication practices of Drs. Balkrishnan, Nahata and Lee should be excluded because he does not opine that they committed research misconduct even under his definition.

With respect to Dr. Dolnick, OSU argues that his testimony fails all three requirements of Rule 702. First, he is not qualified to provide opinions about OSU's application of its Interim Policy. Second, his opinions are not relevant. Finally, his testimony is not reliable. Dr. Dolnick's testimony relates solely to Dr. Lee's involvement in seeking funding for the R01 grant and the SBIR grant. Dr. Dolnick opined that Dr. Lee committed misconduct by failing to properly disclose the R01 grant in the SBIR grant funding process, thereby misleading the National Cancer Institute to fund the SBIR grant.

According to OSU, Dr. Dolnick does not have the qualifications to testify about OSU's application of the Interim Policy because he lacks sufficient scientific, technical or other specialized knowledge about research misconduct issues or about research misconduct polices or their application. Dr. Dolnick does not purport to be an expert in research misconduct or research misconduct policies. OSU maintains that Dr. Dolnick's

6

testimony is not relevant because (1) Dr. Lee is not a comparator to Dr. Szeinbach; (2) Dr. Dolnick disclaims any opinion as to whether OSU should have investigated Dr. Lee under its Interim Policy; (3) the relevance of his testimony is based on the false assumption that OSU knew of Dr. Lee's alleged failure to disclose the overlap in the SBIR grant review process when the Interim Policy was in effect; and (4) Dr. Dolnick's definition of misconduct does not comport with the definition of research misconduct under the Interim Policy.

### B. Plaintiff

Plaintiff argues that the Interim Policy's prohibition against engaging in practices that seriously deviate from those that are commonly accepted in the relevant scholarly community is not defined and expert testimony is necessary to explain these terms that are outside the scope of a jury's knowledge. Plaintiff argues that their testimony is necessary to establish that OSU improperly relied on the Interim Policy to ruin her professional reputation, terminate her tenure, and eliminate her ability to engage in protected activities. Their testimony will permit the jury to evaluate whether OSU applied the Interim Policy in an equitable fashion.

Plaintiff argues Drs. Roig and Dolnick's proposed testimony falls squarely within the admissibility requirements of Rule 702. They are qualified by knowledge, skill, experience, training, or education. Their testimony is relevant in that it will assist the trier of fact to understand the evidence or to determine a fact in issue. Their testimony is also reliable.

Plaintiff maintains that Interim Policy had never previously been used to prosecute a publication concern prior to the investigation of her. When the CII was formed, Szeinbach raised concerns that Brueggemeier had a conflict of interest with the CII members. The CII recommended that Szeinbach be subjected to OSU's 04-Process that could trigger her termination. The recommendation was solely based on Szeinbach's failure to cite her 2005 publication in her 2007 publication. Szeinbach appealed the CII's finding.  Szeinbach complained that OSU never investigated Dean Brueggemeier, Balkrishnan, or Nahata under the Interim Policy even though they had engaged in similar publication practices.

Plaintiff maintains that a review of Brueggemeier's publications  following an anonymous complaint unearthed major problems. To avoid embarrassment, OSU ensured that Brueggemeier was cleared for any wrongdoing. Plaintiff also maintains that OSU never investigated the publication practices of Balkrishnan, Nahata, and Lee despite concerns with their publication practices.

Plaintiff argues that Dr. Roig's testimony is relevant because it relates directly to OSU's inequitable application of the Interim Policy. Dr. Roig reviewed the publications of Balkrishnan, Brueggemeier, Nahata, Lee and Szeinbach. He concluded that the Interim Policy was not applied consistently. He concluded that there was something wrong with a procedure that found wrongdoing with respect to Szeinbach but not with Brueggemeier. In his opinion, both individuals present old data as if it were new. Dr. Roig also opined that Balkrishnan was given special treatment. The CII rejected

independent evidence showing that Szeinbach made an honest mistake, and with Balkrishnan, OSU rejected independent external evidence showing he in engaged in misconduct.

Plaintiff argues that Dr. Roig and OSU interpreted the Interim Policy in the same manner. Dr. Roig based his expert report on publication rules and guidelines that identify the standard publication practices of academics such as the College of Pharmacy faculty. Plaintiff also argues that Dr. Roig's testimony is reliable and his opinion of what constitutes research misconduct is consistent with the Interim Policy. Plaintiff maintains that distorting the scientific record and misleading the public is clearly something that seriously deviates from commonly accepted publication practices at OSU. Dr. Roig's expert report details how OSU ignored the commonly accepted publication practices of the greater scientific community when it cleared Dr. Brueggemeier of wrongdoing. Plaintiff also maintains that Dr. Roig's opinions were consistent with those of several OSU employees. CII member Vandre agreed that Dr. Brueggemeier may have mislead readers into thinking that his publication contained new data, and CII member Brooks believed it was important for authors to comply with journal publication guidelines cited in Dr. Roig's report.  Brooks stated that violating journal publication guidelines corrupted the process of scientific communication.  Dr. Kinghorn, a member of College of Pharmacy faculty and consultant to the CII, stated that what Dr. Brueggemeier did was not okay. Caroline Whitacre, Vice President of

Research for OSU, stated that the journal concerns about Dr. Brueggemeier's publications were not frivolous as claimed by the CII.

Plaintiff also argues that Dr. Roig addresses OSU's double standard with regard to evaluating Balkrishnan's publications. Dr. Roig noted that one of Balkrishnan's publications breached an ethical obligation to cite an earlier paper than ran contrary to the stated hypothesis of the later paper, for which he was reprimanded by the editors of the journal. With respect to Nahata and Lee's publications, Dr. Roig determined that they engaged in what is called "salami slicing"– that is, taking a large piece of research and chopping it up into different publications.

Dr. Roig opined that if OSU had applied the Interim Policy in an objective manner it would have established a CII to investigate Balkrishnan, Nahata and Lee's publications, and the resulting CII would have issued findings substantially similar to the findings of the CII that reviewed Szeinbach's publications.  Plaintiff argues that Dr. Roig's testimony is necessary to assist the jury in evaluating whether other professors were permitted to violate the Interim Policy without repercussions or whether OSU prosecuted Szeinbach for something that never warranted an investigation.

Plaintiff maintains that in July 2004, OSU learned that the Department of Health and Human Services, ("DHHS") began investigating Dr. Lee based on the submission of two grants. The first grant was submitted by Dr. Lee through OSU. The second grant was submitted through a company partially owned by Dr. Lee, Sibyl Pharmaceutical, Inc. Following the investigation, investigators recommended that the National Cancer

Institute disallow and initiate action to recover $94,959.00 from Sibyl. With respect to the grant submitted through OSU, investigators recommended that the National Cancer Institute disallow and initiate action to recover $151,408.00 from OSU.

Plaintiff argues that Dr. Dolnick possesses the technical and specialized knowledge necessary to render an opinion on whether Dr. Lee's grant improprieties seriously deviated from those commonly accepted within the scholarly community that submits grants to the National Cancer Institute. Dr. Dolnick has served on numerous grant review panels and trains students on how the grant review process works.

Plaintiff argues that the relevancy of Dr. Dolnick's testimony is supported by the testimony of OSU administrators who admitted that Dr. Lee's grant improprieties could have violated the interim policy. Plaintiff also maintains that OSU's claim that it lacked knowledge of the grant improprieties is completely unfounded. According to plaintiff, OSU unearthed enough problems with regard to the OSU grant to launch an Interim Policy investigation. Plaintiff maintains that Dr. Lee engaged in improper billing of the federal grant and fabricated research data, which should have triggered an investigation by OSU.

Plaintiff argues that OSU's assertion that no one was deceived into awarding any grant because of improper overlap is without merit. The demand that Sibyl repay the government demonstrates that there was deception. Despite knowledge of the deception, OSU has failed to initiate a research misconduct investigation against Dr. Lee. According to plaintiff, rather than investigate Dr. Lee, OSU "unleashed the fury of

11

the Interim Policy onto Szeinbach merely because she accidently forgot to cite her own publication in a subsequent publication." (October 1, 2010 Memo Contra, p. 44 (footnote omitted), Doc. 168, PageID 16321.)

Plaintiff argues that Dr. Lee is a proper comparator because courts do not seek exact correlation but rather relevant similarity. Plaintiff need only show that the comparator's conduct was of comparable seriousness. Plaintiff maintains that the formal complaint filed against Szeinbach did not specifically ask that she be subjected to an Interim Policy investigation. Plaintiff maintains that OSU made the decision to prosecute her only after it reviewed the complaint and consulted with Dean Brueggemeier. Nothing constrained OSU's ability to investigate Dr. Lee when the investigation began in 2005. In 2006, OSU received a formal written complaint about Dr. Lee's grant improprieties that could have triggered an investigation.

Plaintiff argue that Dr. Dolnick's opinion regarding Dr. Lee's violation of the Interim Policy is admissible. Dr. Dolnick opined that Dr. Lee's actions departed from the generally accepted practices within the research community. He reached this conclusion by consulting the Interim Policy. Plaintiff also maintains that Dr. Dolnick's testimony is reliable and will assist the jury to understand OSU's inequitable application of the Interim Policy. Dolnick explains how grant reviewers review overlapping grant applications.

**III.        Discussion**

Rule 702 of the Federal Rules of Evidence states:

12

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Here, defendant maintains that Dr. Roig's testimony is simply not relevant because he failed to consider OSU's policy governing the investigation.

The Interim Policy defined research misconduct to include fabrication, falsification, plagiarism and "other practices that seriously deviate from those commonly accepted within the relevant scholarly community." (Roig Dep., Ex. 153, p. 4, Doc. 150, PageID 14487.) The Interim Policy states that "[a]n individual may be found to have committed 'misconduct' or 'misconduct in research or scholarly activity' when he or she acted with the requisite state of mind and engaged in prohibited practices." (*Id.*, p. 3, PageID 14486.) An individual acts with "the state of mind necessary to establish misconduct when he or she:"

- acted or failed to act, with the intent of deceiving or misleading others regarding the content of the work . . . ; or
- acted or failed to act with gross disregard for the accuracy or integrity of the research data or results that one can infer an intentional indifference to the accuracy or integrity of the research involved.

(*Id.*, p. 4, PageID 14487.) Further, "[h]onest error or honest differences in interpretations or judgments about data or the meaning of data do not constitute misconduct." (*Id.*, p. 3, PageID 14486.) The CII considered whether Dr. Szeinbach's failure to cite a 2005 article

authored by her in her 2007 article violated the "other practices" prohibition under the

Interim Policy:

> The committee finds that the 2005 and 2007 articles are strongly linked in that they both use the same data set and that the 2007 article largely is constructed from the text of the 2005 article. Based on the definition of prohibited practices and the extensive experience of the committee in the publication of scientific findings, the committee believes that the failure to quote the 2005 article in the 2007 article deviates from commonly accepted practices within the research community and as such represents misconduct. The committee fails to understand that citation of the 2005 article in the 2007 article would not occur as a required action of the senior author who not only had written the 2005 article but used its text and data extensively in preparation of the 2007 article. Based on the evidence presented to the committee, we find that an error is likely not an honest error in conduct or interpretation of the research. Rather the committee sees the omission as a probable mechanism to hide the clear relationship between these articles.

(November 6, 2007 Preliminary Report of the Committee of Initial Inquiry, p. 4, Roig

Dep., Ex. 460, Doc. 150-5, PageID 14511.)

Dr. Roig readily acknowledged that he did not consider the Interim Policy in

reaching his conclusions regarding whether Szeinbach and other faculty engaged in

research misconduct:

> Q. . . .[D]o you have an opinion as to whether - - whether [Szeinbach's] conduct violated Ohio State's research misconduct policy?
> A. I'm not familiar with the policy
> . . .
> A. I don't - - I didn't use OSU's policy in generating my report.
> Q. Okay. You understand that for purposes of deciding whether Szeinbach's activities violated the Ohio State research misconduct policy they were looking at a particular prong of the definition of research misconduct. Are you aware of that?
> A. Not offhand.

14

Doc. 150-1 at 45. Roig Dep. 175:12-176:12. Dr. Roig further testified that he agreed with the conclusion that the CII reached with respect to Dr. Szeinbach's conduct:

> Q. Do you have an opinion as to whether or not the CII acted properly or improperly in concluding that they would forward one finding of misconduct to the next level of inquiry?
> A. You're asking me whether I agree with - - based on my recollection of this, yeah, I mean there was a lapse, and the lapse should have been investigated fully.
> Q. And why do you say that was a lapse when you don't even know what the Ohio State research misconduct policy defines as research misconduct?
> A. Because she failed to provide a citation as to the earlier publication. It's a clear case of salami publication, right?
> Q. Right. But you don't know whether salami publication is under - - is under research misconduct - -
> A. It doesn't matter - - I view this - - in other words, I saw my role as providing a - - an opinion on the actions that have been taken. That was wrong in my view.
> Q. All right. You think she did something wrong, but you have no idea - -
> A. Correct.
> Q. - - whether that wrongness is what's defined as wrong under the Ohio State research misconduct policy?
> A. I did not consult the Ohio state policy.

Doc. 150-1 at 46; Roig Dep. 178:19-179:24.

Dr. Roig acknowledged that there was not a clear cut standard that applied to Dr. Brueggemeier's case:

> Q. Okay. Now, would you would agree that the scientific community - - that there is at least a split of authority in the scientific community or at least no consensus as to when proceedings need to be cited, correct?
> A. I suspect that there probably isn't a consensus, but, you know, I don't know enough to know that.
> Q. Okay. Would you say that even among journal editors there is agreement that failure to cite prior true primary literature, stuff that's even identified as primary literature, is - - is more of a lapse

15

|   |   |
|---|---|
|   | than failing to cite a proceeding that's self-identified as a proceeding but may be primary literature based upon your view? |
| . . . |   |
| Q. | I'm just trying to judge from even if they differentiate kind of on the scale of violating journal practices between failing to cite primary literature versus failing to cite proceedings and that failing to cite primary literature is - - is "worse" than failing to cite proceedings? |
| A. | Generally true, but let's remember about the idea is not to follow these rules but to make sure that the reader gets enough information about what is being addressed in the paper. So you know the idea is to let the reader know what's happening, so transparency, to be transparent about the state of knowledge of the particular area that is being discussed, talked about, or so on. |

Doc. 150-1 at 51; Roig Dep. 198:21-200:8. Dr. Roig further testified that he did not consider the Interim Policy when evaluating whether or not Dr. Brueggemeier engaged in misconduct. *Id.* at 52.

Here, Dr. Roig's testimony is simply not relevant. Although plaintiff argues that Roig based his on publication rules and guidelines that represent standard publication practices for academics at institutions like the OSU's College of Pharmacy, he did not ground his opinion in the Interim Policy. Indeed, he never read it and was not familiar with it. His testimony will not help the trier of fact to understand the evidence or to determine a fact in issue. In her response to defendant's motion for summary judgment, plaintiff maintains that she was unfairly and improperly subjected to a CII investigation and other faculty members were not. Dr. Roig testified, however, that he agreed with the CII finding that plaintiff engaged in misconduct based on his own definition. His testimony sheds no light on whether other faculty members, including Drs. Brueggemeier, Balkrishnan, Nahata, and Lee engaged in misconduct under the Interim

16

Policy. He maintains that they engaged in misconduct under *his* definition of what constitutes misconduct, but he provided no testimony with respect to any overlap between his definition and the Interim Policy. Plaintiff maintains that his testimony is necessary to demonstrate that OSU's reasons for subjecting her to an inquiry was pretextual because they failed to investigate or make similar findings with respect to other faculty members. But Dr. Roig's testimony cannot be used to demonstrate that other faculty members also violated the Interim Policy when he testified that he did not consider the policy whatsoever in determining whether they engaged in misconduct. As a result, his testimony is simply not relevant.

Although not relevant to my decision, I observe that Dr. Roig found that Szeinbach engaged in academic misconduct, as he defines its. Further, Szeinbach herself tacitly acknowledged to the CII that her failure to cite the 2005 article seriously deviated from commonly accepted scholarly practices:

> [T]he lack of a reference in the 2007 article to the 2005 article was a genuine, honest oversight. As the authors stated in the correction, "we were remiss in not acknowledging the use of the same data source, data collection, background literature, and referencing the study addressing a different issue relating to lifestyle productivity that was published in the Annals of Allergy, Asthma & Immunology, 95:167-174, 2005." The editors of the two journals agree that there was no intentional misconduct here.

(October 9, 2007 Memo from Szeinbach to CII, p. 2, Doc. 112-17623.) Dr. Roig's testimony about whether the practice seriously deviated from scholarly practices would not assist the finder of fact in making its decision. The disputed question is not whether Szeinbach should have cited the 2005 article but whether the CII had good reasons to

17

find that her failure to do so was possibly a violation of the Interim Policy because she did so intentionally or with grossly negligent disregard of scholarly practices. Expert testimony would not assist the fact finder in determining whether the CII had good reason to conclude that Dr. Szeinbach may have intentionally failed to cite 2005 article or was grossly negligent in failing to cite it.

OSU argues that Dr. Dolnick's testimony should be excluded because he is not qualified to provide expert testimony about the application of its Interim Policy. Dr. Szeinbach seeks to present Dr. Dolnick's opinions relating to the alleged improprieties of Dr. Lee's grant applications to demonstrate that the decision to investigate allegations against Dr. Szeinbach was retaliatory in nature. Dr. Dolnick, however, lacks sufficient scientific, technical or other specialized knowledge concerning research misconduct and research misconduct policies and their application. At his deposition, when questioned about whether Dr. Lee should have been subjected to an investigation under OSU's research misconduct policy even though the NIH found no basis to deny funding to either grant based upon inappropriate overlap, Dr. Dolnick responded:

> I did read the OSU policy looking as I was reading the grants for things
> that would correspond to that. I don't remember the policies in detail and
> I don't consider myself an attorney, so I don't consider myself an expert
> on OSU's policies. And - - and the way things work in my institute, and I
> don't know if they work the same at OSU despite reading the policy, is
> that any issues involving misconduct are usually investigated at the
> institute level before NIH gets involved with investigating misconduct.

Doc. 149-1 at 60; Dolnick Dep. 235:10-20. Dr. Dolnick also testified that he did not know whether Dr. Lee's June 2003 disclosure was adequate to alert the NIH of possible

18

overlap between the grants. Doc. 149-1 at 59; Dolnick Dep. at 232:1-9. Dr. Dolnick further testified that he was not aware of any instance of an individual being investigated for allegations of overlapping grant funds when the funding agency ultimately concluded that there was no overlap. *Id.* at 60; 236:2-7. Dr. Dolnick's testimony would not assist the trier of fact understand the evidence of determine a fact at issue.

Furthermore, the circumstances surrounding the conduct of Drs. Lee and Szeinbach differ significantly. The alleged misconduct of Dr. Lee does not shed any light onto whether the investigation of Dr. Szeinbach was appropriate or retaliatory in nature. The allegations concerning the OSU grant impacted OSU directly, and it was necessary for OSU to respond to the allegations in the manner it deemed most appropriate. There is no evidence to indicate that OSU should have handled the NIH allegations in the same way that they would handle allegations of research misconduct of a faculty member by another faculty member.

For the reasons stated above, defendant The Ohio State University ("OSU")'s September 1, 2010 motion to exclude the testimony of plaintiff's expert witnesses, Miguel Roig, Ph.D. and Bruce J. Dolnick, Ph.D. (doc. 163) is GRANTED.

s/Mark R. Abel  
United States Magistrate Judge
