IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Sheryl L. Szeinbach,                          :

                Plaintiff                 :        Civil Action 2:08-cv-822

    v.                                         :

The Ohio State University,                 :        Magistrate Judge Abel

                Defendant             :

**DECISION**

This matter is before the Court on defendant The Ohio State University's  May

22, 2013 renewed motion for summary judgment (doc. 123).

## I. Overview

Szeinbach came to OSU's College of Pharmacy ("COP") from the University of

Mississippi in 1999, starting as a full professor with tenure. (Szeinbach Dep.; Doc. 122-17

at 3.)  Szeinbach is currently employed in COP's Division of Pharmacy Practice and

Administration ("PPAD").  In 2002, COP hired Dr. Enrique Seoane-Vazquez ("Seoane"),

a native of Spain, as an assistant professor.[1]  In 2005, it hired Dr. Rajesh Balkrishnan

("Balkrishnan"), a native of India, as an associate professor with tenure.  Prior to Bal-

krishnan's hiring, Szeinbach had met him at a meeting and formed an opinion that he

was rude and disrespectful.  (*Id*. at 10.)  At the faculty meeting to approve Balkrishnan's

---

[1]  Dr. Seoane-Vazquez' allegations of discrimination on the part of OSU were the
subject of other litigation.  The facts regarding Dr. Seoane set forth in this analysis are
drawn from the pleadings and briefs which have been filed in the instant case.

tenure, Szeinbach voiced her concerns about him, and she was displeased when he was hired. (*Id*. at 8, 10.)

In 2005, Dr. Milap Nahata ("Nahata"), the chairman of PPAD, appointed Balkrishnan to prepare and present Seoane's February 9, 2005 annual review to PPAD's promotion and tenure committee. According to Szeinbach, she had observed Balkrishnan and Nahata discriminating in favor of students of Indian origin. (Doc. 135-1 at 3.) At Seoane's review, Balkrishnan apparently made plain his opinion that he was not a productive member of the COP faculty. (Doc. 98 at 4; 98-1 at 7.) The next day, Szeinbach sent an email to Robert Brueggemeier, the dean of COP:

> Dear Bob: I attended the P & T meeting yesterday. I have questions regarding the fairness of the evaluation that was performed for Enrique Seoane-Vazquez. I felt the presentation of the evaluation was intentionally very biased against Enrique – there was a lot of discussion as well. I was wondering if Enrique should be evaluated at all given his extensive illness, where his recovery took several months. Also, I wanted to provide a message *a priori* so there is an awareness of the situation –
>
> I would not send this message unless I felt very strongly that something is not right –

(Doc. 98-1 at 7.) In the following months, Szeinbach deliberately got to know Seoane better, and "wanted to work with him so that . . . I could find out . . . where's all this coming from, maybe the faculty is right, maybe there's something wrong with this guy." (Doc. 110 at 56.) She concluded that there was "absolutely nothing wrong with Enrique" and that "for some reason people were really trying to sabotage his efforts to

do research . . .  that's when I became concerned and said, whoa, this – this has to stop."
(*Id*.)

On August 22, 2005, Seoane submitted an internal complaint at OSU, alleging
"discrimination and retaliation."  (Doc. 98 at 4.)  Szeinbach did not help him file it, and
was not aware at the time that Seoane had filed the complaint.  (Doc. 110 at 55-56.)  She
provided Seoane with a copy of her February 10, 2005 email to Dean Brueggemeier, but
did nothing else in particular to support his complaint except that she "listened to him."
(*Id*. at 56.)  The COP's investigation committee investigated Seoane's OSU-HR com-
plaint, interviewing numerous faculty, including Szeinbach, Balkrishnan, Cynthia
Carnes ("Carnes"), Craig Pedersen ("Pedersen"), and Phillip Schneider ("Schneider").
Szeinbach told the committee that Balkrishnan had attempted to change the ranking of
one of Seoane's students, that students had reported to her that Balkrishnan did not
want Seoane's students to do as well as his, and that an Indian graduate student had
been told to switch to an advisor of Indian national origin.    (Doc. 135-5 at 4.)  An OSU-
HR investigator separately, in October 2005, interviewed Szeinbach, Seoane, Schneider,
and two graduate students concerning Seoane's racial discrimination claims.  Szeinbach
told the OSU-HR investigator that Nahata and Balkrishnan were working together to
end Seoane's employment, and that some COP students were being told not to take her
classes.  She also told the investigator that Nahata had falsely reported that she had
voted in favor of a negative annual review for Seoane.  (*Id*.)

On November 3, 2005, Szeinbach sent an email to Dr. James Dalton ("Dalton"), the chairman of the promotion and tenure committee, complaining of several inaccuracies and omissions in materials which Nahata had recently circulated for Seoane's fourth-year review. (Doc. 98-1 at 9-10.) Dalton responded to this email, noting that Brueggemeier had recently announced that the college would be restarting Seoane's review and discarding all existing materials. (*Id*.)

Balkrishnan and Szeinbach clashed repeatedly. Pedersen testified at deposition that he had seen Szeinbach and Balkrishnan "go at it pretty good in faculty meetings"; they would "typically raise their voice at each other. And they would typically not treat the other one with respect." He opined that they were both equally to blame for their personal conflicts, and that "they were both very good at raising the ire of the other one." (Doc. 109 at 58.) Brueggemeier testified that for three years in a row he had to inform Balkrishnan that he was receiving a lower annual raise because of "his lack of ability to . . . appropriately interact with students and faculty in the Division". He referred to disagreements Balkrishnan had with Szeinbach, Seoane, Pedersen, and Schneider. (Doc. 116 at 6-7.)

On February 16, 2006, Balkrishnan sent an email to Dean Brueggemeier and Nahata complaining about teaching assistantship ("TA", "GA", or "GTA") position allocations, and stating that he nevertheless understood if the department was funding "unqualified GAs" "for fear of additional 'discrimination' law suits, which are as usual, totally baseless." (Doc. 118-11 at 2.) In May and June 2006, Balkrishnan allegedly ad-

4

vised his students not to participate in a research program Szeinbach advised, and complained about Szeinbach to a group of peers at a national conference. (Doc. 132 at 4; Doc. 130 at 15.) On June 23, 2006, Balkrishnan sent an email to Brueggemeier and Nahata alleging that a faculty candidate had been contacted several times by Szeinbach and advised not to come to the COP, because of discrimination there and the bad influence of Balkrishnan himself. (Doc. 118-11 at 6.) He alleged further that she had complained to a prospective PhD student that he was a "slavedriver" and "an evil person", and that the candidate should work with her instead. Finally, he claimed that Szeinbach had slandered him and the COP at the recent International Society for Pharmacoeconomics and Outcomes Research meeting, and that she had falsely reported to OSU-HR that he was harassing her students. (*Id*.) On July 14, 2006, Balkrishnan sent an email to Brueggemeier complaining that in one of her classes Szeinbach gave her students the answers to exam questions the day before the exam. (*Id*. at 9.)

Several of Szeinbach's colleagues (although not including Balkrishnan), sent Brueggemeier a letter on June 6, 2006, "to express the collective frustration and dissatisfaction of several Senior members of [PPAD] with . . . Dr. Sheryl Szeinbach." (Doc. 127-1 at 32.) They complained that she rarely attended division meetings, and that when she did so she disrupted the proceedings and was disrespectful of others, "so much so that several members refuse to attend the meetings, and most dread them." The writers alleged specifically that Szeinbach had done a poor job teaching individual classes, and that three graduate students had asked to have their advisor reassigned.

5

They stated that "[n]one of us feel that . . . the Graduate Program [is] better now than when she came", and stated that the complaints they were addressing were known to colleagues around the country, reflecting poorly on COP's reputation.  (Doc. 127-1 at 32-33.)

On September 6, 2006, Seoane filed a charge of discrimination against OSU with the Equal Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC"). Szeinbach again did nothing specific to assist Seoane with filing this charge. (Doc. 111 at 27.) On the same day, Szeinbach sent Balkrishnan an email claiming that one of her graduate students reported that Balkrishnan had been harassing her to join his research instead.  (Doc. 118-11 at 10.) Balkrishnan forwarded this email on to Brueggemeier and Nahata, stating that he was tired of baseless allegations and "harassment" from Szeinbach, and that "she also has a tendency to storm into my office and say things which do not make any sense".  (*Id*.)  He then forwarded the email to Ms. Chitra Iyer, an HR officer at OSU, accompanied by a lengthy complaint against harassment on the part of Szeinbach.  (Doc. 122-5 at 22.)  Balkrishnan alleged the harassment had included:

> email communication, unsolicited entry and harassing verbal communication in my office, defamation and slander in public at faculty meetings as well as to other colleagues, racially tinged remarks, and false allegations of harassing her students (she also has filed a false complaint in this regard with OSU human resources).

(*Id*.)  Balkrishnan claimed further that Szeinbach had been misusing her senior faculty rank to harass and intimidate him, and that she had told him that she wanted him to

leave as soon as possible. (*Id*.) Later that day, Brueggemeier sent a follow-up email to Vice Provost Barbara Snyder, Iyer, and Nahata, stating:

> I have "defused" the situation at this time. It is clearly an issue between two tenured faculty who refuse to resolve their conflicts and would rather "throw bombs" at each other.

(*Id*. at 21.)

Later, on September 8, 2006, Balkrishnan sent an email to Brueggemeier reporting that two of Szeinbach's students who held TA positions also worked full-time elsewhere, and complaining that this was unfair to his students. (*Id*. at 11.) On September 21, 2006, he sent another, complaining that Szeinbach's graduate students were being permitted to keep their TA positions despite having failed to enroll in a compulsory seminar. (Doc. 118-11 at 14.) On September 26, 2006, Balkrishnan sent another email to Iyer in response to her voice mail, complaining again of false allegations leveled by Szeinbach and Seoane, and claiming that he and his students had been harassed. (Doc. 118-10 at 6-7.)

In 2004 and 2005, Szeinbach had received 2.75% salary increases. (Szeinbach's July 10, 2010 Deposition, p. 408, Doc. 111, PageID 7396.) But in 2006 she received just a 1% salary increase. (*Id*., pp.419-20 and 424-25, PageID 7399 and 7400.) In November 2006, Szeinbach filed an EEOC charge against OSU. In it, she stated:

> In August 2006 and prior, I complained to Bob Brueggemeier, Dean, of his discriminatory treatment of a male colleague. In September 2006, I received a below average performance rating and a low salary increase, although previous wage increases were higher and performance ratings were good.

I believe I was retaliated against because of my sex, female, and opposing of discriminatory practices in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. 122-2 at 2.)

In December 2006, Szeinbach filed an internal complaint with OSU's Office of Human Resources ("OSU-HR"), alleging that Brueggemeier had retaliated against her for her support of Seoane's EEOC complaint.[2] On January 25, 2007, Balkrishnan filed a formal internal complaint with OSU-HR against Szeinbach and Seoane, alleging that he had been discriminated against and harassed on the basis of his national origin, race, and comparatively superior academic productivity. (Doc. 118-10 at 5.) He claimed that the mistreatment had lasted for over two years, and that his previous complaints had not led to "an agreeable solution".

On February 13, 2007, Balkrishnan sent an email to Brueggemeier and Nahata claiming that one of his research collaborators had reported to him that Szeinbach had called to complain at length about Balkrishnan and to report that he had been discriminating against Seoane. Balkrishnan commented that "[t]hese obviously seem to be the rantings of someone who is quite discontent and unhappy here". (Doc. 118-11 at 48.) He sent several more emails throughout 2007 complaining about Szeinbach, Seoane, their graduate students, and their alleged misconduct. (*See* Doc. 118-12 at 1-2 (un-

---

[2] The parties concur that Szeinbach cannot recover for retaliation occurring more than 300 days prior to her October 12, 2007 EEOC charge. (Doc. 130 at fn 12.) The plaintiff has therefore conceded that she generally cannot recover for conduct dating from before December 15, 2006.

8

professional TA conduct); Doc. 118-12 at 16 (Szeinbach should recuse herself from tenure decisions about him); Doc. 118-12 at 17 (Szeinbach teaching a course with too few students enrolled); Doc. 118-22 at 57-58 (Szeinbach promised everyone in a course A grades).)

On or about April 25, 2007, Priscilla Hapner concluded her investigation of an internal OSU civil rights complaint Szeinbach made against Balkrishnan.  (Priscilla Hapner's April 25, 2007 Letter to OSU Associate Legal Counsel Mary G. Menkedick Ionna, Doc. 131, PageID 11222.) No later than May 8, 2007, Balkrishnan had learned that Hapner had concluded her investigation. (Balkrishnan Dep. Ex. 146, Doc. 118-12, PageID 9785.)

On April 28, 2007, Balkrishnan sent an email to Dr. Mark Levy, editor of *Primary Care Respiratory Journal*, concerning an article which Szeinbach had co-authored[3] and which his journal had recently published.  Balkrishnan stated that the 2007 article had reported "exactly identical results just analyzing the data slightly differently" from a 2005 article Szeinbach had co-authored in a different journal, and that the 2007 article had failed to reference the 2005 article.[4]  (Doc. 98-1, PageID 5081.)  The same day, he

---

[3]The 2007 article was co-authored by Szeinbach and three other individuals, including Seoane and a graduate student.

[4] Balkrishnan's email read:
I am writing to you in confidence to point this out. I have come across 2 research reports, one published in 2005 and the other in 2007 (in your journal) in different journals with exactly identical results just analyzing the data slightly differently. Is this something which is OK? Both papers and abstracts are attached for your reference. Also the 2007 paper does not

emailed Nahata with the same allegations, although Balkrishnan characterized this email as seeking Nahata's advice on the situation given his experience as editor of (an unrelated) journal.  (*Id.*, PageID 5083.) Balkrishnan apparently forwarded his correspondence with Dr. Levy to Nahata and Brueggemeier, as well as to Dr. Craig Pedersen ("Pedersen"), a professor in PPAD, and Dr. William Hayton ("Hayton"), OSU's Associate Dean of Research.  (*Id.*, PageID 5085.)  On May 1, 2007, Balkrishnan also sent his email correspondence about the alleged duplicate publications to a group of professors at other universities, adding an allegation that Szeinbach had presented this research at the 2005 International Society for Pharmacoeconomics and Outcomes Research meeting, and that she planned to present it again in 2007.  (*Id.*, PageID 5089.)  Pedersen responded, recommending that Szeinbach's graduate student co-author be kept out of the investigation.  Balkrishnan responded, stating that "I will defer to the rest of the group for the final decision, but I will respectfully disagree with Craig about this".  (*Id.* at 16.)

Balkrishnan testified that he conferred with Brueggemeier, Nahata, and other faculty before filing his "whistleblower" complaint. (Balkrishnan Dep., Doc. 118, p. 355, PageID 8784.) Sometime in early May, he filed the complaint charging Szeinbach with research misconduct.[5]  This formally activated the investigative procedure set out in

> reference the 2005 paper. I am surprised that this was not picked up in
> your peer review.

(*Id.*)

[5] Balkrishnan's complaint was undated.  (Doc. 132, PageID 11430.)  The Preliminary Report of the Committee of Initial Inquiry did not identify the date Balkrishnan filed the complaint.  (Doc. 122-7 at 5.) Balkrishnan did email Hayton a copy of his com-

OSU's "University Research Committee Interim Policy and Procedures Concerning Misconduct in Research or Scholarly Activities" (the "Interim Policy").  (*See* Doc. 99-3.) This policy prohibited, and defined as misconduct, activities which included "other practices that seriously deviate from those that are commonly accepted within the relevant scholarly community".  (*Id*. at 4.)  The Interim Policy stated that misconduct charges could be filed by anyone, and that anyone receiving such charges should immediately refer them to the Office of the Vice President for Research.  Upon such referral, the Office of the Vice President for Research, the Dean of the relevant college, and the Coordinator designated by the university to administer the policy, were to conduct a preliminary review and investigation of the charges, to determine whether sufficient evidence existed to warrant an inquiry, and whether the complained-of activity fell within the definition of misconduct.  (*Id*. at 5.)  If the Dean and Coordinator were to determine that the charges contained sufficient evidence to warrant an inquiry and that the charges fell within the definition of misconduct, they were to reduce them to writing and meet with the accused researcher to present the charges and advise them of the pending investigation.  Then, the Vice President for Research would form a Committee of Initial Inquiry ("CII"), to consist of at least three persons.  (*Id*. at 7.)  The purpose of the CII was to make a preliminary evaluation and investigation of the

---

munications with the editor of the *Primary Care Respiratory Journal* on May 1, 2007. (Hayton Dep., 136-37, PageID 18843 and Ex. 486, PageID 18985.) There are also notes indicating that Hayton, Brueggemeier, Guttman and Moseley may have met on May 25, 2007 to decide whether to form a CII. (*Id*. and Ex. 487, PageID 18986; Moseley Dep., 153, PageID 33517.)

11

evidence and determine whether there was sufficient evidence of possible scientific misconduct to warrant an investigation under OSU's disciplinary rules.  It was then to prepare a Preliminary and a Final Report.  If the CII were to determine that sufficient evidence existed to warrant an investigation, then it would trigger a lengthy and complex faculty discipline process established by University Rule 3335-5-04 (the "04 Process"), which could ultimately result in a faculty member's termination.  (*Id*. at 10.)

Upon initial review, Dean Brueggemeier determined that the similarities between the two articles might meet the definition of research misconduct under the Interim Research Policy and should be referred to a CII.    (Guttman Dep., 57, Doc. 102-1, PageID 5942.)  He recommended to Vice President McGrath that the matter not be resolved through alternative dispute resolution.  (Moseley Dep., 177-78, Doc. 68-1 PageID 3541-42.)  McGrath organized a CII, charging it with determining whether Balkrishnan's allegations contained sufficient evidence of possible misconduct to warrant further investigation under the disciplinary rules.  (Doc. 122-7 at 6.)  The CII first met on August 15, 2007, and again in September and October 2007.  On November 16, 2007, it produced its preliminary report.  The CII considered four potential areas of misconduct.  It rejected three of these (duplicate publications, authorship, and self-plagiarism), but found potential misconduct in Szeinbach's failure to cite her 2005 article in her 2007 article. The committee did find that "most of the prose in the 2007 article has been directly taken from the 2005 article", and concluded that "the practice of using large sections of previous work, particularly without citation, represents the

12

poorest of scholarly practices . . . ." (*Id.*, p. 4.) The report noted that both articles used much the same data set and found many of the same conclusions, but the focus of the articles were different. While "extensive sections of the two articles were identical and obtained from the first publication," additional scholarship was performed to reach the conclusions drawn in the 2007 article. (*Id.*, at 3-4.) The report stated the committee's belief "that the failure to quote the 2005 article in the 2007 article seriously deviates from commonly accepted practices within the research community and as such represents misconduct."[6] (*Id.* at 8.)  The committee reasoned that Szeinbach, "who not only had written the 2005 article but used its text and data extensively in preparation of the 2007 article . . . ", had to have known that citation to the 2005 article was required. (*Id.*)

After reviewing objections from Szeinbach, including evidence that she argued showed that other faculty such as Brueggemeier and Balkrishnan had engaged in similar practices, the CII issued a substantively similar Final Report on January 9, 2008.  (*Id.* at 26.)  Dr. Kinghorn, a professor in the College of Pharmacy, dissented from the finding that there was sufficient evidence of research misconduct to warrant further investigation. (*Id.* at 25.) By majority vote, the CII's final determination was that sufficient evidence existed to warrant an investigation under the 04 Process.  Moseley testified that this is the only occasion she knew of where a CII found sufficient evidence of a failure

---

[6] The Preliminary Report rebuked, although it did not find misconduct on the part of, Szeinbach for self-plagiarism.  (*Id.*)

to cite a previous publication to warrant a further disciplinary investigation. (Moseley Dep., 166, Doc. 68-1, PageID 3530.)

However, no further investigation was ever conducted. On February 19, 2009, Brueggemeier sent Szeinbach a letter reporting that in May 2008 OSU had adopted a new research policy to supplant the Interim Policy. That policy did not contain a provision prohibiting "other practices that seriously deviate from those that are commonly accepted within the relevant scholarly community".  (*Id*. at 2-3.)  Consequently, Brueggemeier stated, as the finding against Szeinbach had been based on a practice which was no longer prohibited, he did not feel that the matter warranted further investigation.  (*Id*. at 3.)

In June 2007 Szeinbach submitted a correction note, which was published in the *Primary Care Respiratory Journal*, stating that she and the other authors of the 2007 article "were remiss" in not acknowledging that the article used "the same data source, data collection and back and background literature that was used in our previous study addressing a different issue" published in 2005. They further acknowledged that they were "remiss in not referencing the previously published *AAAI* paper in the manuscript" they submitted to *PCRJ*.  (Doc. 138-1, PageID 13175.) In the same issue, the publishers of the *Journal* issued an editorial chastising Szeinbach and the other authors of the 2007 article for failing to cross-reference the two. The editorial stated, in relevant part:

14

> The journal recently published an article which, unknown to the editors–
> there was no author declaration of any previous related publications–
> presented an analysis of data previously used to answer a different re-
> search question in an earlier paper published in another journal. . . . [I]t is
> the responsibility of authors to ensure that previous publications, partic-
> ularly those using the same data, are cross-referenced when reporting.
> This did not occur in this instance, and resulted in a third party complaint
> . . . . A full investigation ensued . . . .
> We have concluded that the paper submitted to the *PCRJ* was not a dup-
> licate publication . . . . However, there is no doubt that substantial parts of
> the text of the *PCRJ* paper - including parts of the introduction, methods,
> results and discussion sections - are extremely similar to the paper pub-
> lished previously in the *AAAI*.  In addition, the authors had not declared
> to the editors . . . of the *PCRJ* the fact that the *AAAI* paper - in which they
> had used the same dataset - had been published. Furthermore, in not
> referencing the *AAAI* paper they did not permit readers of the *PCRJ* to put
> the later *PCRJ* paper in context. A correction is published in this issue of
> the *PCRJ*.

(*Id.*, PageID 13173.) On August 13, 2007, Balkrishnan emailed a link to the editorial to

the entire COP faculty, accompanied by a note saying he was "extremely saddened to

report that a major clinical journal has published this.  This is a matter of great shame

and disrepute" to COP.  (Doc. 127-1, PageID 10945.)  Szeinbach sent a rebuttal to the

faculty on August 21, 2007 containing a copy of an email from the editor of the *Journal*

commenting that Balkrishnan had mischaracterized their editorial, and stating that

Balkrishnan had sent his email to further retaliate against her and Seoane.  (Doc. 118-8,

PageID 9485.) This was followed by an August 21 email from Balkrishnan to the entire

COP faculty stating that he had not even mentioned Szeinbach or Seoane by name in his

email, and that his concern had simply been that the "reputation of the college has been

compromised".  (Doc. 132-1, PageID 11479.) The email further included cut and paste

attachments which Balkrishnan stated included "a copy of my letter to Dr. Levy and concerned authorities in the OSU whistleblower report form . . . ." (*Id.*)

At a September 4, 2007 faculty meeting to discuss graduate teaching assistantship allocations, Balkrishnan and Szeinbach argued about TA qualifications.  During the argument, Balkrishnan exploded at Szeinbach, shouting at her and calling her a "bitch". (Doc. 118-13 at 5.)  On September 17, 2007, Brueggemeier sent a letter to Balkrishnan, informing him that his actions at the meeting had been "very unprofessional, extremely rude, and totally unacceptable."  (Doc. 119-2 at 2.)  He stated that Balkrishnan's actions would not be tolerated, and that he had told him before not to engage in discussions or interactions with Szeinbach, Seoane, or their graduate students outside of classes.  "The last time that I emphatically made these points was in early August 2007 following the exchange of e-mails between you and Dr. Szeinbach that were sent to the entire College faculty."   Brueggemeier restricted access to Balkrishnan's endowed chair development funds, except for the purpose of finding a "coach or mentor".  He urged Balkrishnan to seek anger management assistance from OSU's HR office.  (*Id.*)  Balkrishnan eventually received counseling.  (Doc. 119 at 13-14.)

Finally, on October 12, 2007, Szeinbach filed a second charge with the EEOC, citing the research misconduct investigation and Balkrishnan's outburst at the September 4, 2007 faculty meeting.  On August 27, 2008, she filed this lawsuit.  Balkrishnan left OSU to move to the University of Michigan in Spring of 2009.

## II.    Allegations in the Second Amended Complaint

Plaintiff Sheryl Szeinbach met OSU Assistant Professor Enrique Seoane-Vazquez ("Seoane") when he was hired on August 19, 2002. (May 5, 2010 Second Am. Compl. at ¶ 9.) Seoane's national origin is Spanish. *(Id.* at¶ 10.) Dr. Milap Nahata is the Chair of the Division of Pharmacy Practice and Administration of OSU's College of Pharmacy. In 2004, Nahata appointed Seoane as a member of a search committee to fill a faculty opening.  *(Id.* at¶ 11.) During the faculty search, plaintiff, Seoane and other search committee members developed concerns about the qualifications and background of one of the finalists, Dr. Rajesh Balkrishnan based on his admission that he had experienced conflicts with colleagues where he was currently employed.  *(Id.* at¶ 12.) Nahata with plaintiff and Seoane's concerns from the search committee and hired Balkrishnan without a hiring recommendation from the committee.  *(Id.* at¶ 13.) Balkrishnan and Nahata's national origin is Indian.  *(Id.* at¶ 14.)  Plaintiff believes that Nahata told Balkrishnan that plaintiff and Seoane opposed his hiring.  *(Id.* at¶ 15.)

Shortly after Balkrishnan joined the Division of Pharmacy Practice and Administration, plaintiff and Seoane observed Nahata's preferential treatment of faculty and students of Indian national origin and his detrimental treatment of faculty of Spanish origin. Nahata told one of Seoane's Indian students that because he was Indian, he should be working with Balkrishnan. *(Id.* at¶ 16.)

During meetings in 2004, Nahata and Balkrishnan consistently dismissed plaintiff's suggestions and concerns regarding Seoane and other issues. As a result,

17

plaintiff attended fewer meetings. (*Id.* at¶ 17.)  In 2004, plaintiff only received a 2.75% salary increase in retaliation for her support of Seoane even though similarly situated faculty salary increased received increases of at least 3.5%. (*Id.* at¶¶ 18-19.)

Nahata asked Balkrishnan to prepare and present Seoane's 2005 annual review to the Division. (*Id.* at¶ 20.)  Because the review contained prejudicial and discriminatory materials, plaintiff sent Dean Robert Brueggemeier an email expressing her concerns about Balkrishnan's conduct. (*Id.* at¶ 21.) On August 22, 2005, Seoane filed a complaint alleging discrimination and retaliation. (*Id.* at¶ 22.) Plaintiff supported the filing and prosecuting of Seoane's complaint. (*Id.* at¶ 23.)

In 2005, Plaintiff received a lower salary increase compared to similarly situated faculty members. (*Id.* at¶ 29.) On September 6, 2006, Seoane filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC"). (*Id.* at¶ 32.)  On November 3, 2006, plaintiff sent an email to OSU employee James Dalton who chaired Seoane's four-year review highlighting Nahata's discriminatory and retaliatory involvement in the review process. (*Id.* at¶ 34.)

In December 2006, plaintiff filed a complaint with OSU's Office of Human Resources alleging Brueggemeier retaliated against her for her support of Seoane's EEOC complaint. (*Id.* at¶ 36.)  In 2006, plaintiff received a 1% salary increase, which was lower than other similarly situated faculty members. (*Id.* at¶¶ 37-38.)

On April 27, 2007, Balkrishnan attended a presentation of one of plaintiff's grad-uate students. Differences and similarities between two publications authored in part by plaintiff were discussed. (*Id.* at ¶ 39.) On April 28, 2007, Balkrishnan sent an email to the editor of one of plaintiff's publications stating that the articles contained identical re-sults but analyzed the data slightly differently. (*Id.* at ¶ 40.) Balkrishnan sent the email in retaliation for plaintiff's support of Seoane's protected activities. (*Id.* at ¶ 42.) Prior to sending the email, Balkrishnan asked Nahata to advise him on how to address the art-icles. (*Id.* at ¶ 43.) On May 1, 2007, Balkrishnan emailed Nahata, Brueggemeier, Pedersen and OSU Associate Dean of Research Dr. William Hayton stating that he would defer the final decision regarding how to use plaintiff's publications to them. (*Id.* at ¶ 46.) Plaintiff's publications were used as a venue for retaliating against her for supporting Seoane's protected activities. (*Id.* at ¶ 47.) Balkrishnan emailed professors at several universities informing them of the similar publications. (*Id.* at ¶ 48.)

In May 2007, Balkrishnan filed a complaint with OSU alleging that plaintiff's publications violated the Interim Policy and Procedures on Misconduct in Research or Scholarly activities. (*Id.* at ¶ 52.) On June 5, 2007, plaintiff was charged with violating the research misconduct policy. (*Id.* at ¶ 54.) On June 11, 2007, plaintiff's request that the charge be dismissed or resolved through the alternative dispute resolution provisions was denied, and Brueggemeier recommended that formation of a Committee of Initial Inquiry ("CII"). (*Id.* at ¶ 56.)

On August 12, 2007, plaintiff filed a complaint with Human Resources asking for an investigation into Brueggemeier, Hayton, Nahata and Balkrishnan's retaliation. (*Id*. at¶ 60.) Three days later, Balkrishnan sent an email to approximately 100 OSU employees stating that plaintiff's publications caused great shame and disrepute to the College of Pharmacy. (*Id*. at¶ 61.) Balkrishnan sent a second email on August 21, 2007 containing the correspondence with editors of publications that published plaintiff's articles. (*Id*. at¶ 65.) These emails violated the confidentiality provisions of the research misconduct policy. (*Id*. at¶ 65.)

During a September 4, 2007 meeting, Balkrishnan told plaintiff to shut up and stop being a bitch. (*Id*. at¶ 69.)

The CII concluded that plaintiff's publications were not duplicate publications but the reuse of a data set without a cross-reference warranted further investigation. (*Id*. at ¶ 71.) Plaintiff received a 3% increase in 2007, which was a lower salary increase than similarly situated faculty. (*Id*. at¶¶ 72-73.) OSU's failure to discipline Brueggemeier, Nahata, Balkrishnan, Moseley, and Lee for engaging in more egregious publication and/or grant submission practices demonstrates that the investigation in to plaintiff's publications was retaliatory. (*Id*. at¶¶ 75-78.)

### III.  Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the absence or presence of a genuine

20

dispute must support that assertion by either "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party may object that the cited material "cannot be presented in a form that would be admissible in evidence," and "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2); Fed. R. Civ. P. 56 advisory committee's note. If a party uses an affidavit or declaration to support or oppose a motion, such affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

While the court must consider the cited materials, it may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3). However, "[i]n considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v. Meldrum*, 489 F.3d 273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The central issue is 'whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.*, 489 F.3d at 279–80 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

## IV.  Discussion

### A.  Scope of the EEOC Charge[7]

Defendant OSU argues that it is entitled to judgment on all of Dr. Szeinbach's allegations and claims that are beyond the scope of the October 16, 2007 EEOC charge. OSU maintains that Dr. Szeinbach's claim of retaliation based upon her alleged support of Dr. Seoane was not raised in her second EEOC charge and is therefore beyond the scope of the charge.

Plaintiff's October 16, 2007 EEOC Charge, executed on October 12[8], states:

> I started working for Ohio State University on January 19, 1999; my most recent position is Tenured Professor at the College of Pharmacy. On June 5, 2007, false allegations were made against me. On September 4, 2007, I was harassed.

> On November 22, 2006, I filed an EEOC charge of discrimination and several internal complaints since that time against the Respondent. On June 5, 2007, I was charged with research misconduct by Dr. Brueggemeier (Dean of the College of Pharmacy) and Dr. Hayton (Dean for Research). On September 4, 2007, during a meeting of certain faculty and students of the College of Pharmacy, Dr. Rajesh Balkrishnan clenched his fists and screamed at me threateningly, "You just need to shut up and

---

[7]My December 10, 2010 Opinion and Order assumed, without deciding, that Szeinbach's claims were within the scope of her October 16, 2007 charge of discrimination against OSU. (October 12, 2007 Opinion and Order, at 42, PageID 17171.)

[8]Although executed October 12, the EEOC stamped the charge received October 16.

stop being a bitch." Dr. Robert Lee and Dr. Balkrishnan both engaged in research conduct similar to what I have allegedly done and no research misconduct proceedings were initiated against them.

I believe I have been retaliated against by being harassed for both filing a previous charge of discrimination with the EEOC and several internal complaints against the Respondent, in violation of Title VII of the Civil Rights Act, of 1984, as amended.

(Doc. 98-1, at 2, PageID 5071.)

In response to defendant's argument that the claims in her second amended complaint are not within the scope of her 2007 EEOC charge, plaintiff argues that her Allegations of Employment Discrimination Form ("AED Form") explicitly identified her support of Dr. Seoane as a basis for her retaliation claims. Szeinbach completed the AED Form on September 6, 2007 to support the second charge that she later filed with the EEOC. On that form, she stated that she had been retaliated against because she "engaged in protected activity by filing internal and EEOC Complaints and by testifying as a witness in an Ohio State University investigation of complaints brought by two others." (Doc. 135-5, PageID 12558.) She indicated that she had both filed a charge of discrimination on November 22, 2006 and complaints with the Ohio State University on October 9, 2006 and August 12, 2007, later amended on August 13, September 4, and September 6, 2007. *Id*. Szeinbach described the type of harm she had suffered in Attachment A to the AED Form:

My supervisors, Dean Robert Brueggemeier and Associate Dean for Research William Hayton of the Ohio State University College of Pharmacy, have taken retaliatory action against me for making and supporting charges of discrimination and retaliation by initiating formal proceedings

23

against me under Ohio State University's Research Misconduct policy without any legitimate basis.

*Id.*, PageID 12564. Her description of the events leading to the harm she suffered was set out in AED Form Attachment C:

> Beginning on June 5, 2007 I was subjected to retaliation for my support of complaints filed by a junior faculty member, Dr. Enrique Seoane-Vazquez, and for filing complaints myself.
>
> On June 5, 2007 I was charged with research misconduct (Document 10) by Dr. Brueggemeier . . . and Dr. Hayton . . . without any type of due process, prior knowledge of the complaint, and no opportunities to explain or have legal counsel present.
>
> Later, I learned that the complaint was initiated by Dr. Rajesh Balkrishnan. . . . Dr. Balkrishnan filed this complaint as an act of retaliation for the actions involving the internal OSU complaints and EEOC charges of discrimination against Dr. Balkrishnan that were filed earlier by Dr. Enrique Seoane-Vazquez and myself.
>
> Filing these complaints by Dr. Balkrishnan against me was intentional and initiated with malice. On April 28, 2007 Dr. Balkrishnan attended a seminar where the results of a certain study were presented and compared to a study that had been the subject of a different publication. These research papers were in the area of his discipline and he knew in advance that the publications were different. Nonetheless, on April 29, 2007 he filed a maliciously fraudulent complaint to the editors where the two papers were published one in 2005 and the other in 2007 claiming that the papers were duplicate publications. Then Dr. Balkrishnan sent email to key administrators at the Ohio State University and Drs. Brueggemeier, Nahata, Hayton, all of the College of Pharmacy. Despite the recommendations of the staff of the Office of Research Compliance, Dr. Jennifer Moseley and Dr. Robert McGrath that there was no basis for formal proceedings against me, Drs. Brueggemeier, Nahata, and Hayton pressured the Office of Research Compliance into proceeding with an inquiry as an act of retaliation against me for my support of Dr. Enrique Seoane-Vazquez, who is also a co-author of the paper that published in the Primary Care Respiratory Journal, and for prior complaints and charges that I have filed against Drs. Brueggemeier, Nahata, and Balkrishnan. OSU's Research Misconduct

24

> policy . . . provides that this process can be stopped at any time, yet these individuals continue to push this process forward.
>
> Moreover, on September 4, 2007, at a meeting of certain faculty and students of the College of Pharmacy, . . . Dr. Balkrishnan jumped out of his chair, moved directly in front of me, clenched his fists, and screamed at me threateningly, "You just need to shut up and stop being a bitch!" This was witnessed by numerous Pharmacy faculty and students, including Dr. Nahata, and represents the hostile environment to which I am being subjected.

(*Id.*, PageID 12566.) In response to the form's request for comparative data about how similarly situated persons were treated, Szeinbach alleged the following facts in AED Form Attachment D:

> The following individuals engaged in research conduct similar to what I have allegedly done: Dr. Robert Lee; Dr. Rajesh Balkrishnan. They were treated better than me because no research misconduct proceedings were initiated against them despite that they each published articles that are duplicative in the same ways that mine allegedly were. Neither of them has been retaliated against by having to defend themselves against a research misconduct investigation. In my case, that investigation is completely within basis and solely for retaliatory purposes.

(*Id.*, PageID 12567.) Plaintiff also contends that a review of the issues raised in the OSU-HR complaints demonstrates that Dr. Szeinbach informed the EEOC of her support of Dr. Seoane. Under the form's category of "Miscellaneous Information," Szeinbach set out a detailed time line of the acts of retaliation she alleged in AED Form Attachment F. (*Id.*, PageID 12569-71.) These events begin April 27, 2007 and end September 4, 2007. The events set out relate to Dr. Balkrishnan and his claim that Szeinbach's 2005 and 2007 articles were research reports with the same results that analyzed the data slightly differently and the responses of various OSU administrators to Balkrishnan's and

Szeinbach's positions and his emails. The events also specifically references Balkrishnan's emails to the journal, OSU faculty and administrators, and to other regarding his allegations about duplicate publications. It ends with Dr. Balkrishnan telling Szeinbach at September 7, 2007 meeting of COP students and faculty, "You just need to shut up and stop being a bitch." (*Id.*) Neither the October 16, 2007 charge of discrimination nor the September 6, 2007 AED Form allege a lesser wage increase or any other actions by Brueggemeier or Nahata, other than those they took or failed to take related to Balkrishnan's research misconduct charge against Szeinbach, as retaliation for her having filed an EEOC complaint and internal OSU discrimination complaints.

Defendant argues that none of the allegations in paragraphs 41-48 (Balkrishnan's false statements and emails about Szeinbach's publications) and 72-73 (a lesser pay raise for the 2007-08 academic year) of the amended complaint have any relation to the scope of the charge. Szeinbach's charge and AED Form do allege retaliation related to Balkrishnan's filing research misconduct charges against Szeinbach and OSU's failure to reject those charges and/or terminate the investigation of those charges. However, there are no allegations in the charge concerning Szeinbach's pay raise for the 2007-08 academic year or any other year.

Plaintiff argues that her 2006 internal OSU-HR complaint, referenced in her AED Form, alleged that Brueggemeier retaliated against her for her support of Seone's 2006 EEOC charge. The OSU-HR investigator summarized that 2006 complaint as alleging that Brueggemeier gave her a lower performance review and salary increase because of

her sex and her support of Seoane's discrimination complaint. (Priscilla Hapner's April 25, 2007 Letter to OSU Associate Legal Counsel Mary G. Menkedick Ionna, Doc. 131, PageID 11222.)

Szeinbach's October 16, 2007 charge alleges only retaliation by Balkrishnan, Brueggemeier, and Hayton related to the research misconduct charge. The references to Szeinbach's internal OSU complaints are not to the substance of those complaints. Rather, Szeinbach asserted the reason Brueggemeier permitted Balkrishnan's research misconduct charge to go forward was that she had filed EEOC and internal OSU civil rights complaints. When she described in the AED Form the harm she suffered as a result of the retaliation and the events leading to that harm, Szeinbach referred only to the research misconduct charge and Balkrishnan's treatment of her.

The charge and AED Form were prepared by Szeinbach's attorneys. (July 9, 2009 Deposition of Sheryl Szeinbach, Doc. 110, p. 196-97, PageID 7182-83.) Plaintiff's charge is clear about what allegedly prompted OSU's retaliation–Szeinbach's filing an EEOC charge and internal civil rights complaints–and the retaliatory conduct–permitting a research misconduct charge to go forward and tolerating Balkrishnan's retaliatory conduct.

A plaintiff asserting a Title VII claim must first file an administrative charge of discrimination with the EEOC or the Ohio Civil Rights Commission and cannot file suit until the administrative proceeding is terminated. 42 U.S.C. § 2000e-5(e)(1). Filing an administrative charge gives the employer notice of the claimed violation of Title VII,

gives the EEOC or Ohio Civil Rights Commission an opportunity to investigate the

charge, and provides the parties and the administrative agency an opportunity to settle

the claim without further litigation. *Younis v. Pinnacle Airlines, Inc.,* 610 F.3d 359, 361-62

(6th Cir. 2010); *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 534 (6th Cir.

2001). The Secretary's regulations provide:

> (a) Each charge should contain the following:
> . . .
>> (3) A clear and concise statement of the facts, including pertinent dates,
>> constituting the alleged unlawful employment practices: See § 1601.15(b);
> . . .
> (b) Notwithstanding the provisions of paragraph (a) of this section, a
> charge is sufficient when the Commission receives from the person
> making the charge a written statement sufficiently precise to identify the
> parties, and to describe generally the action or practices complained of. . . .

29 C.F.R. § 1610.12. A plaintiff's Title VII claims are "limited to the scope of the EEOC

investigation reasonably expected to grow out of the charge of discrimination." *EEOC v.*

*McCall Printing Corp.,* 633 F.2d 1232, 1235 (6th Cir. 1980);  *Younis*, 610 F.3d at 362; *Davis*

*v. Sodexho Cumberland* College, 157 F.3d 460 463 (6th Cir. 1998); *EEOC V. Bailey Co.,* 563

F.2d 439 446 (6th Cir. 1997); *Jackson v. Ohio Bell Telephone Co.,* 555 F. Supp. 80, 83 (S.D.

Ohio 1982). The rationale for this rule was discussed in *Davis*:

> One reason for the expanded rule is that charges are frequently filed by
> lay complainants, and the courts recognize that subsequent actions should
> not be restricted by the failure of a complainant to attach the correct legal
> conclusion to the EEOC claim, conform to procedural technicalities, or
> include "the exact wording which might be required in a judicial plead-
> ing." *Bailey,* 563 F.2d at 447; *see McCall Printing,* 633 F.2d at 1235. This
> expanded rule does not mean, however, that plaintiffs are excused from
> filing charges on a particular discrimination claim before suing in federal
> court.

> When the EEOC investigation of one charge *in fact* reveals evidence of a different type of discrimination against the plaintiff, a lawsuit based on the newly understood claim will not be barred. [*Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970).]
>
> . . .
>
> Similarly, where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged, claim, the plaintiff is not precluded from bringing suit on that claim. [*Farmer v. ARA Services Inc.,* 660 F.2d 1096, 1105 (6th Cir.1981).]

157 F.3d at 463. The *Davis* court held that an unrepresented employee who checked the "race" and "other" box on the form charge of discrimination could not plead an age discrimination claim when the EEOC did not investigate an age claim and the facts set out in the charge did not indicate that age was basis of the discrimination claimed. 157 F.3d at 464. Similarly, the court in *Younis*, 610 F.3d at 362-63, held that a plaintiff who did not check the "retaliation" box on the EEOC form and did not include facts that would place the employer on notice that he was asserting a retaliation claim could not plead a retaliation claim. See also, *Coleman v. Cardinal Health 200, LLC*, 2013 WL 5954428 (E.D. Mich. November 7, 2013)(Plaintiff could not bring a race claim when she checked the "retaliation" box, but not the "race" box on the EEOC form).

Retaliation that occurred before the plaintiff filed a charge should be included in the charge. *Spengler v. Worthington Cylinders,* 615 F.3d 481, 489 (6th Cir. 2010); *Ang v. Proctor & Gamble Co.,* 932 F.2d 540, 547 (6th Cir. 1991). Exhaustion of administrative remedies is a statutory prerequisite, but it is not a a limitation on subject matter juris-diction. *Spengler,* 615 F.3d at 489-90.

Here Szeinbach was represented by counsel when she filed her 2007 charge of discrimination. There is a split in authority about whether the liberal "expected scope of investigation" test applies when an employee was represented by counsel when she filed her charge with the EEOC. In *Ang*, 932 F.2d at 546, an employee, who was represented by counsel, checked only the EEOC form box for"national origin" discrimination, and his statement of facts did not allege discrimination based on race. The court held:

> Courts require this broad reading of the charge because most Title VII claimants are unschooled in the technicalities of the law and proceed without counsel. *See Sanchez,* 431 F.2d at 463; *Scott,* 595 F.Supp. at 526; *Obradovich,* 569 F.Supp. at 789. Ang, however, was assisted by counsel throughout the administrative investigation. Liberal construction is not necessary where the claimant is aided by counsel in preparing his charge. *Hawley v. Dresser Indus., Inc.,* 737 F.Supp. 445, 452 n. 3 (S.D.Ohio 1990)
>
> Because Ang's Asian race and Indonesian ancestry are closely related and may have both contributed to any discrimination he suffered, the district court could have concluded that an investigation could reasonably include discrimination based on race and national origin. The court, however, did not clearly err in concluding that Ang's failure to raise race discrimination in his EEOC charge was a fatal flaw as Ang was assisted by counsel in writing his charge, his charge did not specifically allege race discrimination, and the EEOC did not investigate race discrimination.

In contrast to *Ang*, the court in *Spengler*, 615 F.3d at 490, held that employees who were represented by counsel when they filed their EEOC charges are entitled to a liberal construction of the charge:

> Defendant argues that liberal construction of Plaintiff's EEOC charge is inappropriate because Plaintiff was represented by counsel. However, as this Court has previously stated, the fact that we liberally construe EEOC charges filed by *pro se* complainants "does not mean that a broad reading

30

may not, or should not, be given in cases where a plaintiff has counsel."
*Cleveland Branch, NAACP v. City of Parma,* 263 F.3d 513, 536 (6th Cir.2001);
*see also Johnson v. Cleveland City Sch. Dist.,* 344 Fed.Appx. 104, 109 (6th Cir.
2009). In a case such as this where a plaintiff clearly sets forth a retaliation
claim in the narrative of the EEOC charge such that both the defendant
and the EEOC were on notice of the plaintiff's retaliation claim, a broad
reading of the EEOC charge is appropriate regardless of whether the
plaintiff was represented by counsel when filing the charge. [Footnote
omitted.]

Since *Spengler* was more recently decided, I conclude that a charge filed by a

plaintiff who is represented by counsel should be liberally read.[9] Here Szeinbach

checked the "retaliation" box on the EEOC form. Further, although there are no facts set

out in either her charge or AED Form giving notice of her lesser pay raise retaliation

claim, Brueggemeier was alleged to have retaliated against Szeinbach by making the

decision to let the preliminary investigation go forward and by his condoning, tol-

erating, or encouraging Balkrishnan's retaliatory actions. In all of the cases deciding

whether a claim is within the scope of the investigation that could be expected to arise

out of the charge, the employee had not checked the EEOC form box for that claim.

Here Szeinbach did check the retaliation box, and a principal actor in the research

misconduct charge retaliation claim was the decision-maker who allegedly retaliated for

her engaging in protected activities by giving her a lesser salary increase. Consequently,

an investigation of the charge would likely have led to the lesser salary increase

---

[9]I also note that *Ang* does not necessarily preclude a liberal reading of the scope
of a represented plaintiff's charge. 932 F.2d at 546.

31

retaliation claim. I conclude that the claim is within the scope of the investigation that could be expected to arise out of the charge.

### B. Retaliation

Title VII prohibits employers from retaliating against employees for engaging in protected activity:

> It shall be an unlawful employment practice for an employer to discrim-
> inate against any of his employees. . . because he has opposed any practice
> made an unlawful employment practice by this subchapter, or because he
> has made a charge, testified, assisted, or participated in any manner in an
> investigation, proceeding, or hearing under this subchapter.

42 U.S.C.A. § 2000e-3(a). To prove a retaliation claim, a plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *University of Texas Southwestern Medical Center v. Nassar,* 133 S.Ct. 2517, 2533 (2013). This "but-for" test is stricter than the lessened "a motivating factor" standard of 42 U.S.C. § 2000e-2(m) that is applied to status based discrimination claims. *Id.* To make out a prima facie case of retaliation, a plaintiff must establish that: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Martin v. Toledo Cardiology Consultants*, Inc. 548 F.3d 405, 412 (6th Cir. 2008)(citing *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 552-53 (6th Cir.2002)). Once the plaintiff has established a prima

facie case of retaliation, the burden shifts to defendant to assert a non-discriminatory reason for its actions. After a showing is made by the defendant, plaintiff has the burden of demonstrating that the reason asserted by the defendant is not the real reason, but rather a pretext for discrimination. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713 (6th Cir.2007) (citing *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (holding that the *McDonnell Douglas* burden-shifting framework applies to retaliation claims)).

Title VII prohibits retaliation against someone so closely related to and associated with the person exercising his or her statutory rights that it would discourage or prevent that person from pursuing those rights. *Thompson v. North American Stainless, L.P.*, 131 S.Ct. 863, 870, 562 U.S. __ (2011). [10] A plaintiff may establish proof of a causal connection "indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by a defendant." *De Cintio v. Weschester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (internal quotations and citations omitted).

A plaintiff can establish a claim under Title VII by producing either direct or circumstantial evidence of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.

---

[10]Because the Sixth Circuit has not previously recognized a claim for third party retaliation, it is necessary to consider how plaintiffs have demonstrated a prima facie showing of third party retaliation in other circuits.

2004). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Once the plaintiff has produced credible direct evidence, the burden shifts to the employer to show that it would have taken the employment action of which the plaintiff complains even in the absence of discrimination. *Id*.

When a plaintiff relies on circumstantial evidence to support her claim, she has the burden of demonstrating a *prima facie* case of discrimination using the *McDonnell-Douglas* framework. *DiCarlo v. Potter*, 358 F.3d at 414. Once the plaintiff has shown a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the employment decision. *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003). If the defendant meets this burden, the plaintiff must demonstrate that defendant's stated reason is mere pretext for its true discriminatory motives. *Id*.

OSU argues that plaintiff cannot establish a prima facie case of retaliation under Title VII. OSU maintains that Dr. Szeinbach does not have a cause of action for associational retaliation based on *Thompson v. North American Stainless, L.P.* Defendant contends that Dr. Szeinbach cannot demonstrate that she engaged in protected activity on behalf of Dr. Seoane. Plaintiff simply alleges that she made a vague complaint or made comments about unfair treatment. To be sufficient, plaintiff must have addressed conduct made unlawful under Title VII. Defendant also argues that Dr. Szeinbach's alleged exercise of protected activity was not known to the relevant decision-makers and there

34

was no causal link between the alleged protected activity and any adverse employment action.

### 1. Research Misconduct

When coworker retaliation is at issue, an employer will be liable if the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008). Here, both parties focused on whether plaintiff could make a prima facie showing of retaliation and did not address the standard for co-worker retaliation as set out in *Hawkins v. Anheuser-Busch, Inc.* OSU argues that Balkrishnan's conduct was not retaliatory and that animosities existed between Balkrishnan and Szeinbach prior to Szeinbach engaging in any protected activity.

The Sixth Circuit concluded that the research misconduct investigation constituted an adverse action and that a reasonable jury could conclude that Brueggemeier and Nahata condoned, tolerated or encouraged Balkrishnan's acts of retaliation. On remand, this Court was instructed consider the other arguments advanced by OSU: (1) that there is no causal connection between the research misconduct investigation and any protected activity in which Szeinbach engaged, and (2) that the relevant decision makers during the research misconduct investigation had no knowledge of Szeinbach's

35

protected activity. This decision will focus on whether there is evidence of a causal connection between the research misconduct investigation and Szeinbach's protected activity and whether the relevant decision makers had knowledge of Szeinbach's protected activity.

Despite OSU's assertions to the contrary, there is little question that a trier of fact could conclude Balkrishnan was hostile to Szeinbach and "retaliated" against her for what he took as her attacks on him.[11] The evidence suggests that the relationship be-

---

[11] Whether this "retaliation" was unlawful under Title VII because it was based on plaintiff's protected activity or simple animosity between the two individuals is disputed by the parties. Plaintiff argues that Balkrishnan's actions were intended to stop Szeinbach from engaging in protected activity. Balkrishnan acknowledged his complaint was atypical because although he regularly looked for evidence of research misconduct, this incident was the first time her reported his concerns. (Doc. 134-20 at PageID 12148.) Plaintiff contends that the evidence shows that Balkrishnan did not file his report for the reasons he initially stated. Plaintiff argues that she has direct evidence demonstrating that Balkrishnan's actions were retaliatory in nature. Plaintiff relies on a January 24, 2008 draft email responding to a request that he discuss the possibility of an alternative dispute resolution of his allegations of research misconduct. Dr. Balkrishnan wrote:

I would expect the following from Dr. Szeinbach before consenting to withdrawing my allegations:
1. Dr. Szeinbach voluntarily withdraw from any process related to my promotion and review in the OSU College of Pharmacy and sign a written statement to this effect. This is needed to prevent the possibility of retaliation from her in these processes.
2. Dr. Szeinbach withdraw in writing baseless allegations of gender-based discrimination and sign a statement that she will not without due-cause and consultation with the chair/dean pursue such baseless complaints in the future.
3. Dr. Szeinbach also write an unconditional apology to me for her baseless and slanderous allegations made that the dean, chair, and myself had self-plagiarized in her response to the committee of inquiry.

Doc. 132-1 at PageID# 11491. This email may be direct evidence that Balkrishnan's con-

tween Balkrishnan and Szeinbach was fraught with discord from its inception and prior to any protected activity on the part of plaintiff. Plaintiff maintains that this discord resulted from Nahata and Balkrishnan's favoring faculty and students of Indian national origin over faculty of Spanish national origin. Without a doubt, however, there is evidence from which a reasonable trier of fact could conclude that Balkrishnan retaliated against plaintiff for her protected activity. There is also no dispute that Dean Brueggemeier and Assistant Dean Nahata had actual knowledge of Balkrishnan's conduct directed toward Szeinbach.[12] Brueggemeier and Nahata both received emails and other communications from Balkrishnan addressing his complaints about Szeinbach. The Sixth Circuit found that there was evidence creating an issue of material fact as to whether Brueggemeier or Nahata condoned, tolerated, or encouraged the acts of retaliation, and as a result, this issue is not before this Court.

In its motion for summary judgment, OSU maintains that the CII did not know of Szeinbach's exercise of her Title VII rights and that there was no connection between such exercise and the actions taken by the CII. Plaintiff argues that OSU's decision to subject her to a CII investigation did not strictly adhere to OSU's research misconduct

---

duct was retaliatory in nature. This email, standing alone, does not prove that Balkrishnan's supervisors or members of management condoned, tolerated, or encouraged his acts of retaliation, and Brueggemeier did not include Balkrishnan's proposal that Szeinbach withdraw her discrimination complaint when he presented his his alternative dispute resolution proposal to Szeinbach.

[12]Whether Brueggemeier and Nahata knew or should have known that the conduct was in retaliation for Szeinbach having filed an EEOC complaint against OSU and internal complaints with OSU is disputed. There is no direct evidence that they did.

policy and that Brueggemeier's rejection of ADR in favor of a CII investigation establishes pretext because the research misconduct policy had never been used to prosecute a publication prior to Balkrishnan's research misconduct charge against Szeinbach.

Plaintiff relies on the temporal proximity between her protected activity and the adverse action to demonstrate that the CII had knowledge of plaintiff's protected activity. Balkrishnan filed his May 2007 research misconduct report within a week of learning that Priscilla Hapner had completed her investigation of Szeinbach's civil rights complaint filed with OSU Human Resources. A few months later, Balkrishnan sent an email to Brueggemeier, OSU Dean of Graduate Studies Dean Osmer, College of Pharmacy Associate Dean William Hayton, Nahata and College of Pharmacy faculty member Cynthia Carnes asking how Szeinbach can be allowed to teach required courses and advise PhD students. (Doc. 132-1 at PageID 11474-5.) He warned that if the issue were not taken seriously, he would consider moving to a university that puts the interests of its students first. *Id.* In September 2007, Balkrishnan had an angry outburst at a faculty meeting when he accused Szeinbach of lying, called her a bitch and stated that irresponsible behavior should not be rewarded. (Doc. 132-1 at PageID 11492-93.) Plaintiff maintains these three incidents demonstrate causality.

These three incidents were known to Brueggemeier and Nahata, but they are not direct evidence that the CII was aware of plaintiff's protected activity. Even if these events showed that Balkrishnan was motivated to act based on plaintiff's protected

activity,[13] these incidents, standing alone, shed no light on the decision making process of the CII.

The other incidents relied upon by plaintiff–sending an email questioning how Szeinbach can be permitted to teach and calling her a bitch at a division meeting–also are not direct evidence that there is a causal connection between the CII and her protected activity. Szeinbach opposed the decision to hire Balkrishnan. Their relationship was strained from the outset. There is no doubt that Balkrishnan took actions that antagonized Szeinbach.

Plaintiff further argues that there is direct evidence of Brueggemeier's retaliation to satisfy the causation requirement to establish a prima facie case against OSU.[14] Plaintiff maintains that evidence that Brueggemeier proposed ending the research misconduct investigation if, among other things, Szeinbach agreed not to participate in Seoane's tenure review is direct evidence of retaliation. Plaintiff argues that this proposal would have terminated her ability to engage in the activities Title VII was designed to protect because she was the only person in division meetings who advocated for

_____

[13]Balkrishnan knew that Hapner was investigating plaintiff's allegations of discrimination and retaliation prior to the completion of her report because Hapner interviewed him during her investigation. Balkrishnan acted within days of his discovery of the alleged similarities between the publications, so the proximity in time to the release of Hapner's findings and Balkrishnan's contacting the journals with his allegation of duplicate publication might just be coincidental.

[14]Plaintiff appears to conflate the two methods of showing discrimination. Either a plaintiff can either show direct evidence of discrimination or she can show a prima facie case of discrimination.

Seoane's tenure. Szeinbach rejected the ADR terms in part because she wanted to protect Seoane from further retaliation. Plaintiff argues that the connections between Szeinbach's protected activities and Brueggemeier's proposals for closing the investigation establish direct evidence of retaliation because the proposals would have crippled her protected activities and her academic career. Plaintiff rejected Brueggemeier's proposals, and she was permitted to participate in Seoane's tenure process.

In his deposition, Brueggemeier testified that the rules governing the alternative dispute resolution required input from the complainant, Balkrishnan. The Dean met with Balkrishnan to discuss his numerous proposals, some of which were rejected out of hand, such as his proposal that Szeinbach dismiss her EEOC complaint. Balkrishnan proposed that Szeinbach not participate in Seoane's tenure review process. Brueggemeier testified that he incorporated this provision into the proposed resolution because Szeinbach and Seoane were co-authors on one of the publications at issue. Brueggemeier further testified that, in accordance with the conflict of interest statement, he recused himself from reviews of faculty members whom he had collaborated with. He recommended that other faculty members recuse themselves from reviews of faculty with whom they have had joint publications or grants, although the decision was left to the faculty members themselves. (Brueggemeier Dep. 512:12-517:1; Doc. 116 at PageID 8641-8642.)

In his deposition, Dr. Vandre was asked whether he was aware of the Dean's proposal and whether the proposal was problematic:

Q. Okay. Do you know that the dean's alternative dispute resolution proposal would have required, among other things, that Sheryl not participate in Enrique's promotion and tenure process?

A. No.

Q. Given what Kinghorn had told you about the conflict about the P&T committee -- the P&T process in Enrique's case, does it concern you the dean may have wanted to include this type of provision in the alternate dispute resolution process?
. . .
A. No.

Q. Why not?

A. Because I think because of the relationship of the authorship and involvement in the article that I think that would -- and, again, in my personal opinion that that would have been a reasonable request to kind of disassociate the two.

Q. And even though you said earlier that you agreed with Brooks when he said the all -- the authorship issue went away based on the testimony of Sheryl, why would it matter whether Sheryl participated in the P&T committee process for Enrique in your opinion?
. . .
A. In my opinion the second article is a tainted article. And there's -- it's tainted by association. Okay. That was in my understanding of where we're at with this and what was going on at the time, that's my opinion sitting here in this chair.

(Vandre Dep. 64:15-65:24; Doc. 114 at 7864-7865.)

Once Balkrishnan submitted a "Whistleblower Report Form" regarding the two articles, the University Research Committee Interim Policy and Procedures Concerning Misconduct in Research or Scholarly Activities (the "Interim Policy") required Jennifer Moseley and Dean Brueggemeier to determine whether Balkrishnan's charges indicated possible misconduct. There is evidence that the decision was principally Bruegge-

meier's. For example, Vice Provost Anderson testified that when there is an allegation of research misconduct, "the first step . . . is that the dean is contacted to deal with it." (Anderson Dep., 108, Doc. 134-6, PageID 11969.) Both Platz and Guttman testified that the dean has the first say on whether the allegation is sufficient to justify a preliminary investigation. If he does not, that is the end of the process. (Platz Dep., 41, Doc. 70-1, PageID 3889 and Guttman Dep., 86-87, Doc. 87-1, PageID 5949; compare, Moseley Dep., 151-56, PageID 3515-20.) Brueggemeier decided that there should be a preliminary investigation (Guttman Dep., 57, Doc. 102-1, PageID 5942) and recommended that the matter not be resolved through alternative dispute resolution.  (Moseley Dep., 177-78, Doc. 68-1 PageID 3541-42.)  The Vice-President for Research, Dr. Robert McGrath, was then required to form a Committee of Initial Inquiry ("CII"). (*See* Doc. 122-5 at PageID# 10416 ("If the Dean and Coordinator or the Vice President for Research determine under Section IV.B.3 or 4 of this Policy that the charges indicate possible misconduct, an Initial Inquiry shall be immediately initiated.")).

Plaintiff further argues that OSU sanctioned Balkrishnan's retaliatory violations of the confidentiality clause of OSU's research misconduct policy. The confidentiality clause required all those involved in the investigation to maintain the confidentiality of the investigation until the case was closed. In the event that confidentiality is breached, University officials must take reasonable steps to minimize the damage to the reputation of the subject of the investigation.

On May 1, 2007, Balkrishnan sent an email containing information he provided to the Office of Research to faculty members at four different universities involved in an upcoming academic conference where Szeinbach was to give a presentation. (Doc. 132-1 at PageID 11481-82.)[15] Plaintiff contends that Balkrishnan also breached the confidentiality clause a second time when he sent an email to Brueggemeier, Osmer, Hayton, Nahata and Carnes attaching confidential documentation provided to the Office of Research to support his complaint. (Doc. 132-2 at PageID 11474-5.) On August 21, 2007, Balkrishnan sent an email to everyone on the College of Pharmacy's faculty listserv discussing the documentation he provided to the Office of Research. (Doc. 132-1 at PageID 11479-80.)[16] In response to the email, Nahata told Balkrishnan that his email

---

[15]These are portions of an email chain Szeinbach apparently communicated to Jennifer Moseley. The portion of Balkrishnan's email sent to professors at other institutions reads:

This research is being presented as new research at the ISPOR 2007 meeting. Also this Identical research has been previously presented at an ISPOR meeting as well (2005).

I just wanted you all to be aware of this before if is presented again.

*Id.*, PageID 11481.

[16]Again this exhibit appears to contain a portion of an email Balkrishnan sent to COP faculty. It reads, in relevant part:

I think it is rather unfortunate that Dr. Szeinbach has taken this whole issue so personally. According to her email "I believe that Dr. Balkrishnan has chosen to bring this matter to your attention in an attempt to undermine the reputations of Dr. Enrique Seoane-Vazquez and me, and that this is a further example of Dr. Balkrishnan's discrimination and retaliation against us."

This is rather unfortunate because my email does not refer to Dr. Szeinbach or Dr. Seoane-Vazquez at all. Rather my concern is that in my opinion, the reputation of the college has been compromised when an

43

stirred the pot more than necessary. (Doc. 133-6 at PageID 1184.) On April 25, 2008,

Balkrishnan sent yet another email stating that Szeinbach was being investigated. This

email was directed to President Gee, Brueggemeier, the Office of Research, Human

Resources, and OSU attorneys. (Doc. 132-1 at PageID 11487-91.)

In November 2008, Balkrishnan sent an email to President Gee, Brueggemeier,

faculty member Anthony Young, Nahata and OSU attorneys that indicated that the CII

recommended that the 04 Process be invoked against Szeinbach. (Doc. 132 at PageID

11433-34.)

Plaintiff argues that Brueggemeier never implemented the recommendation

from Human Resources that Balkrishnan be disciplined for his inappropriate actions

toward Szeinbach. (Doc. 219, PageID 19151-57.) Plaintiff asserts that Brueggemeier

failed to discipline Balkrishnan because he also violated the confidentiality clause when

he sent a letter to the editor-in-chief of a journal that published one of his papers. (Doc.

133-1 at PageID 11692-93.) Plaintiff maintains Human Resources employees Donald

Gibson and Anne Massaro also turned a blind eye to Balkrishnan and Brueggemeier's

---

editorial is published in a major journal which states the following:
"However there is no doubt in our mind . . . . Furthermore in not
referencing the AAAI paper ...... later PCRJ context" [sic]

Also my initial email to the concerned authorities was in the interest of
scientific integrity and not to single out any particular faculty for
discrimination as the following emails will show.

I also enclose a copy of my exact letter to Dr. Levy and concerned
authorities in the OSU whistleblower report form . . . .

violations of the confidentiality clause. Szeinbach alleges that her ability to advance professionally was seriously impacted by OSU's decision to ignore Balkrishnan and Brueggemeier's breaches of the confidentiality clause.

In his deposition, Todd Guttman testified that although the Interim Policy contained a confidentiality provision, there was no corresponding enforcement mechanism to address breaches of the confidentiality provision. (Guttman Dep. 74:1-75:5; Doc. 102-1 at PageID 5946.) Because of this lack of an enforcement mechanism, OSU argues that there is no evidence that it failed to act in enforcing the confidentiality provision because there was simply no means for addressing any such breaches.

Massaro was tasked with implementing the recommendations from Human Resources following Szeinbach's complaints. Massaro conducted an organizational assessment with the assistance of the College of Pharmacy's Vision and Strategy Group ("VSG"). Plaintiff contends that the VSG faculty were biased against her protected activities. The VSG faculty, Carnes, McAuley, Schneider, Bennett and Knoell, complained about Szeinbach to Brueggemeier before their appointment to the VSG. Plaintiff maintains that the VSG members who signed the letter were on a mission to retaliate against her based on her protected activities. According to plaintiff, the VSG wanted the 04 Process to be employed against her, and despite his belief this was not appropriate, Brueggemeier took no steps to reprimand the VSG.

Plaintiff's reliance on the actions of the VSG to demonstrate a causal connection between her protected activity and the adverse employment action is misplaced. There

45

is no evidence of any connection between the VSG and the decision of the CII. More-

over, the Sixth Circuit held:

> Szeinbach presented insufficient evidence to support that OSU's reduction
> of her required class from four to two hours and suspension of student
> enrollment in the PPAD graduate program– structural changes in pro-
> grams at the COP that were implemented based on recommendations of a
> task force – qualify as adverse employment actions under *Burlington
> Northern*. The same is true of her six claims of co- worker retaliation by
> Associate Professor Balkrishnan, five of which were mere attempts on his
> part to interfere with or circumscribe Szeinbach's teaching and advising of
> students and her participation in promotion and tenure decisions, and the
> sixth, his internal complaint against her, which resulted in no action
> against her.

Doc. 186 at PageID 17492. Plaintiff's allegations concerning the VSG have no bearing on

her claims based on the research misconduct investigation.

Plaintiff further argues that a reasonable juror would likely conclude that Bal-

krishnan was a proxy of the College of Pharmacy management seeking to retaliate

against Szeinbach. Plaintiff maintains that although Brueggemeier learned of repeated

examples of Balkrishnan engaging in retaliation, violations of the research misconduct

policy, and behaviors that detract from the ethical and professional environment,

Balkrishnan was never subjected to the 04 Process. Nor was his behavior documented in

performance reviews or merit pay letters.

Plaintiff argues that Brueggemeier ignored recommendations from Human Re-

sources. In June 2006, OSU-HR consultant Carmen Yarbrough  reported on her investi-

gation of Seoane's complaint of discrimination against him based on race and national

origin. (Doc. 116-1, PageID 8524-35.)  Her report found insufficient evidence to support

46

Seoane's allegations that the University violated its non-discrimination policy. (*Id.*, PageID 8526-33.) She did advise that PPAD faculty and Seoane should be warned that they were not to retaliate for statements gathered during the investigation. (*Id.*, PageID 8534.) Yarbrough recommend that Balkrishnan be required to cease and desist:

> directly contacting other faculty members' students regarding advising and working on projects with him. Additionally, Professor Balkrishnan's behavior [regarding statements made to or in the presence of students] should be addressed as a part of his Annual Review letter.

(*Id.*, PageID 8535.) The report also recommended that Balkrishnan, Pedersen and Schneider's behavior be documented in their annual review letters and that a development plan be created for Nahata and addressed in his annual review letter. Shortly after publishing the report, Yarbrough discussed her findings and recommendations with Brueggemeier.[17] (Yarbrough Dep.,  113-15, Doc. 134-1, PageID 11909; Brueggemeier Dep., 321, Doc. 116, PageID 8413.)

Brueggemeier testified that he established a task force to address issues related to graduate students, an email was sent to faculty telling them they could not retaliate, he got Anne Massaro of HR involved in improving relations among faculty, and he decreased what would have been Balkrishnan's normal salary increase. (*Id.*, 321-30, PageID 8413-15.) Brueggemeier testified that Balkrishnan complained about his 3% salary increase in 2006, that was well-below the average 3.8% salary increase, and he explained that was because of his inability to relate well with students and faculty.

---

[17]Yarbrough could not remember any details of her conversation with Brueggemeier. (Yarbrough Dep.,  115-16, Doc. 134-1, PageID 11909.)

There is no documentation of that discussion. Balkrishnan complained again when his 2007 salary increase was less than he thought he deserved. (*Id.*, 331-34, PageID 8416.) Brueggemeier testified that there were continual ongoing conversations with Balkrishnan. (*Id.*, 336-37, PageID 8417.) He and Nahata told Balkrishnan that he could not talk about other faculty members in the presence of students. (*Id.*, 329, PageID 8415.) Brueggemeier instructed Balkrishnan that he could not contact other faculty members' students except when he was teaching them in the classroom.[18] (*Id.*)

Brueggemeier further testified that he talked with Nahata about a "development plan," but it is not discussed in Nahata's annual review letter and there is no other documentation of a plan. Nahata did participate in an academic leadership development program. Brueggemeier also talked with Nahata about general aspects of interacting with faculty, discussions, and regular meetings. (*Id.*, 326-28, PageID 8414-15.)

On July 3, 2007, Olga Esquivel-Gonzalez wrote Brueggemeier informing him that the investigation into the complaints of discrimination filed by Jessie Au, Seoane, Balkrishnan, and Szeinbach "found insufficient evidence to support a violation of university policy." (Doc. 153-50, PageID 15468.) She advised Brueggemeier that all the com-

---

[18]Balkrishnan testified that Brueggemeier and Nahata met with him "to go through what was required for me after the [Yarbrough] report, but they did not give me a copy . . ." of the report. (Balkrishnan Dep., 379-80, Doc. 118, PageID 8790.) Balkrishnan acknowledged that Brueggemeier had told him on more than one occasion not to talk with Szeinbach's or Seoane's graduate students. (*Id.*, 380.) Indeed, they advised him to avoid any type of interaction with students. (*Id.*, 384, PageID 8791.)

plainants should be notified not to retaliate in any way regarding the investigation of

the complaints. (*Id.*, PageID 15468-71.) She also recommend that Brueggemeier

> assess Dr. Balkrishnan's behavior since the issuance of the cease and desist
> directive related to inappropriate interaction with students and determine
> the impact that such behavior will have on his performance evaluation
> and/or merit raise.

(*Id.,* PageID 15471.) Esquivel-Gonzalez further recommended:

> In the event that Dean Brueggemeier is notified of faculty behaviors that
> detract from the ethical and professional environment, he will review the
> situation and determine if appropriate disciplinary actions should be
> issued up to and including following 504-Procedures. . . .
>                                    . . .
> Dean Brueggemeier and Division Chair Nahata are strongly encouraged
> to identify financial resources for Dr. Balkrishnan to retain a coach . . . .
>
> Dean Brueggemeier and Division Chair Nahata assess Dr. Balkrishnan's
> behavior since the issuance of the "cease and desist" directive [issued by
> Yarbrough] related to inappropriate interaction with students, and
> determine the impact that such behavior will have on your performance
> evaluation and /or merit raise.

(*Id.*, PageID 15470-71.)

In his deposition, Brueggemeier testified that he directed Balkrishnan not to

speak with Seoane and Szeinbach's students at all. (Brueggemeier dep. 510:9-16; Doc.

116 at PageID 8460.) He also testified that for three consecutive years Balkrishnan

received lower salary increases than he would have had he not had difficulty getting

along with his colleagues. (*Id.* at 330:2-334:24; Doc. 116 at PageID 8415-8416. ) In his

deposition, Balkrishnan testified that he had been disciplined for his behavior in the

faculty meeting when he called plaintiff a bitch:

49

> And I regret that I didn't use the appropriate words and, you know, and
> obviously that was my maturity, and after that I have been disciplined for
> my actions and I have sought counseling and help for it, but I did not
> mean that in any sort of negative way. I just -- that was a knee-jerk re-
> sponse reaction to the constant provocation from Dr. Szeinbach which I
> have regretted ever since.

(Doc. 119 at PageID 9899.) Balkrishnan also testified that immediately after his outburst,

Nahata told him to sit down and that his behavior was not appropriate. *Id.* at 9900.

Plaintiff maintains that the relevant decision makers were aware of Szeinbach's

protected activities because Kinghorn knew of Szeinbach's protected activity. Before he

filed an OSU internal civil rights complaint against Szeinbach, Balkrishnan emailed

Brueggemeier, Nahata, Hayton and other COP faculty members setting out his charges

against her. The email states, in relevant part: "I am also ccing all other senior faculty in

the College of Pharmacy with whom I have discussed this issue and sought counsel as

well as the chair of the committee on committees, Dr. Kinghorn." (Doc. 131, p. 14,

PageID 11184.) Kinghorn was also presumably a recipient of Szeinbach's August 2007

email to all COP faculty responding to Balkrishnan's August 13 email declaring that he

was "extremely saddened" by the editorial in the *Primary Care Respiratory Journal*

regarding her failure to cite her 2005 article which he viewed as "a matter of great

shame and disrepute to the Ohio State University College of Pharmacy." Szeinbach's

rebuttal stated that the editorial demonstrated the falsity of Balkrishnan's charge that

the 2007 article was a duplicate publication of the 2005 article, included a statement by

the editor of the journal that Balkrishnan "misinterprets and overstates the contents of

our carefully written editorial, which concluded that although there was an oversight,

this was not intentional", and concludes:

> I believe that Dr. Balkrishnan has chosen to bring this matter to your attention in an attempt to undermine the reputations of Dr. Enrique Seoane-Vazquez and me, and that this is a further example of Dr. Bal-krishnan's discrimination and retaliation against us.

(Doc. 118-8, pp. 45 and 47, PageID 9495 and 9497.) Plaintiff argues that because King-

horn was a recipient of the email, he may well have communicated the gist of the latter

comment to the other two members of the CII. Finally, Szeinbach also referenced her

protected activity when she appealed the preliminary report of the CII. (Doc. 135 at

PageID 12222.)

Plaintiff argues that "Kinghorn obviously told CII member Vandre about Szein-

bach's protected activities." (Doc. 219, p. 45, PageID 19158.) However, evidence, not

rhetorical assertion, is what controls a court's decision on summary judgment. Vandre

did testify that it was common knowledge that there were factions formed around the

upcoming tenure vote.[19] (Vandre Dep., Doc. 114, p. 41, PageID 7859.) Kinghorn told

---

[19]Vandre testified:
Dr. Kinghorn was the representative of the College, and he was quite aware of the back-and-forth e-mails that were going around. And so he informed us of that, what was occurring there. He also said that this had -- was kind of common knowledge in the College, the issues, and that there was issues related to -- at faculty meetings issues related to Dr. Seoane being an untenured faculty member and there was issues around support or lack thereof from different factions within the College or departments for supporting his P&T.
(*Id.*, 41.) Vandre was aware that some of the conflict centered on whether Seoane would get tenure. (*Id.*, 42-43.)

Brooks about friction between the faculty members and the retaliation issue. (Doc. 134-22 at PageID 12188.) Vandre testified that the CII was aware that Szeinbach, Seoane and Balkrishnan "were in controversy" and that Balkrishnan had disclosed his research misconduct charge against Szeinbach to third parties, but they "made every attempt to disassociate themselves from that information, and that was an internal political issue of the College and wasn't germane to the specific charges that the CII was trying to investigate." (*Id.*, 42-43, PageID 7859.) They viewed Balkrishnan's disclosure of information related to the CII investigation of the charge he filed against Szeinbach as "unprofessional conduct." (*Id.*, 44, PageID 7859.)

Vandre also testified that Klinghorn voted against a further investigation because he believed the editorial in the journal was alone sufficient punishment and that if the investigation moved forward it would be bad for COP. (*Id.*, 60, PageID 7863.) Alluding to the conflict between Szeinbach and Balkrishnan, Klinghorn "mentioned several times that he just wanted this all to go away" because of the damaging effect on the College of Pharmacy. (*Id.*, 61, PageID 7864.)

Drs. Vandre and Brooks testified that they were not aware of any alleged protected activity prior to issuing the final report. Dr. Vandre testified:

> Q.  Do you know that as part of the ultimate dispute resolution Raj would have required Sheryl to withdraw her gender-based discrimination complaint and sign a statement that she would not file a similar complaint without consulting with the dean and Dr. Nahata first?

A.     I had no idea that there was any complaint of that nature, so I had
       no knowledge of that.

(Vandre Dep. 62:13-21; Doc. 114 at PageID 7864.) In response to questions concerning

his opinion as to whether it was appropriate for Balkrishnan to propose such condi-

tions, Dr. Vandre further testified:

A. Does it concern me, yes.

Q. Why?

                                        . . .

A. My personal opinion is that I don't feel that he should have been dictat-
ing terms.

Q. I mean --

A. And -- and I don't think that you should have conditions that prohibit
someone from moving forward with any other kind of legal actions if
they're appropriate.

(*Id*. At 63:12-21; Doc. 114 at PageID 7864.) Dr. Vandre was clear in his testimony that

despite some knowledge of ongoing difficulties within the College of Pharmacy, he was

not aware of any allegations of discrimination or retaliation, whether by Szeinbach,

Seoane, or Balkrishnan:

Q. Okay. But you are unaware of any retaliation, discrimination claims
that Sheryl and/or Enrique had filed against specifically the dean, for
example?

A. I have no knowledge of any issues outside of what the CII looked at
and what I described of what I knew of the turmoil that was going on in
the department.

(*Id*. At 67:3-12; Doc. 114 at PageID 7865.)

In his deposition, Dr. Brooks testified that he was aware of discord at the College of Pharmacy and that he would not have been surprised that allegations of retaliation were being raised. Dr. Brooks testified:

> Q.    So at least with regard to you, when you served on the CII for Sheryl's publications, you were aware of difficulties at the College of Pharmacy relating to some faculty members fighting through rumors at the college, without identifying exactly -- through rumors at the university, without knowing exactly who it was you heard it from. Is that fair?
>
> A.    Yes, that's fair.

(Brooks Dep. 161:18-162:2; Doc. 112 at PageID 7550.) On the other hand, Dr. Brooks also testified that the CII was not influenced by any such conflicts within COP:

> Q.    And that there were civil rights issues being raised and batted around, too?
>
> A.    I didn't say that.
>
> Q.    Isn't that what those communications say to you, that --
>
> A.    I don't recall.
>
> Q.    All right. But you read them when you got them?
>
> A.    Correct.
>
> Q.    So they say what they say?
>
> A.    Yeah. If they say -- then I must be aware of it, but, again, I'll add that in our considerations we set those aside.

(Brooks dep. 158:2-14; Doc. 112 at PageID 7550.)

Plaintiff further argues that the CII was aware of her protected activity from her November 20, 2007 response to their preliminary report, in which she stated in a footnote to her argument that she had not seriously deviated from commonly accepted research practices because Brueggemeier, Balkrishnan, and other COP faculty used and re-used identical materials and data without citation to any earlier published source for the material:

> [T]his matter has arisen solely and entirely as the result of retaliation by Dr. Balkrishnan and others against me for my support of Dr. Enrique Secane-Vazquez in bringing his complaints of discrimination and harassment against Dr. Balkrishnan and others and for bringing complaints of discrimination and retaliation . . . .

(Doc. 135, p. 18, PageID 12222.)

Although Drs. Vandre and Brooks assert that they were unaware of and did not take into account any protected activity on the part of plaintiff in considering whether to recommend that there be an investigation into the research misconduct charges against Szeinbach and further that their conclusions that the research misconduct investigation should go forward were not in any way connected to protected activity, they did have communications with Kinghorn in which he told them about the conflict between Balkrishnan and Szeinbach. Further, Szeinbach herself alluded to her protected activity in her response to the preliminary report. It is up to the jury to determine whether Vandre and Brooks were aware of Szeinbach's protected activities and whether but for those activities they would not have voted for a further disciplinary investigation into Balkrishnan's charge of research misconduct.

OSU argues that it has offered sufficient evidence of its legitimate, non-discriminatory for its actions related to the research misconduct investigation. OSU followed all of the relevant policies and procedures in its investigation of the research misconduct charge against Dr. Szeinbach. Dean Brueggemeier decided not to initiate the 04 Process, and his decision resulted in Dr. Szeinbach's alleged research misconduct never being investigated by the University investigation committee.

Plaintiff relies on the following arguments to demonstrate that OSU's legitimate, non-discriminatory reason for the research misconduct investigation was pretextual:

- Balkrishnan's complaint and confidentiality breaches were intended to terminate Szeinbach's protected activity;

- Balkrishnan's ADR proposal demonstrates his complaint was in retaliation for Szeinbach's protected activity;

- OSU did not strictly adhere to its research misconduct policy;

- Brueggemeier rejected Szeinbach's pre-CII request for ADR;

- Brueggemeier subjected Szeinbach to a CII even though he knew that Lee was involved in substantial financial improprieties with respect to two overlapping federal grants;

- The CII investigating Szeinbach refused to evaluate concerns she raised about the publications of Brueggemeier, Nahata and Balkrishnan;

- The CII investigating Szeinbach was tainted with retaliatory bias;

- The CII ran afoul of the research misconduct policy; and,

- The Office of Research failed to properly handle Szeinbach's concerns about retaliatory bias.

OSU contends that it properly followed the Interim Policy and that once a complaint was filed it had no alternative but to follow that policy and investigate Balkrishnan's complaint. Plaintiff's attempts to show that OSU's legitimate, non-discriminatory reason is pretextual are unsuccessful.

However insignificant Szeinbach claims the alleged research misconduct to have been, the journals that published Szeinbach's article concluded it was necessary to publish a statement concerning her apparent oversight in failing to cite an earlier published article using the same data. Although Szeinbach attempts to minimize her alleged misconduct, her primary defense is that other faculty had engaged in worse misconduct. In apparent response to the complaint by filed Balkrishnan, at least two other complaints of research misconduct were lodged against Brueggemeier and Balkrishnan.

Plaintiff relies on a disclosure by Brueggemeier of the confidential investigation of the charge against Szeinbach to buttress her argument that OSU condoned, tolerated or encouraged Balkrishnan's breaches of confidentiality. On January 18, 2008, Seoane filed a complaint alleging research misconduct against Brueggemeier. On February 14, 2008, Dr. Kostenbauder, Szeinbach's husband, sent a letter to a number of journals making research misconduct allegations against Brueggemeier. (Kostenbauder Dep. Exh. 92; Doc. 216-14 at PageID# 18666-18668.) On May 11, 2008, Brueggemeier wrote to the *Cancer Letters* seeking information about the charges and defending his publications:

> During the course of a university investigation, I became aware of e-mail correspondence dated March 5, 2008 between you and Dr. H.B. Kosten-bauder regarding the subject of "publishing behavior" and allegations

made against me. The exact nature of the allegations sent to you were not included in the materials , although I can assume they are similar to the ones found in anonymous letters sent to the Ohio State University in late November 2007.

. . .

Furthermore, I ask you to consider the motives of Dr. H.B. Kostenbauder in this matter. Although Dr. Kostenbauder is not a faculty member at Ohio State University, he is the spouse of Dr. Sheryl Szeinbach who is a faculty member in the College of Pharmacy at Ohio State. Another faculty member submitted allegations via the OSU "whistle blower form" in May 2007 that Dr. Szeinbach published one manuscript in 2005 and another in 2007 in a different journal with no citation to the 2005 article, implying the appearance that the 2007 manuscript is new material. As required by University guidelines, I as a college administrator was a member of an initial committee of four individuals who reviewed the report form and subsequently referred the matter to a confidential faculty committee of inquiry for a full investigation. During the University investigation, Dr. Szeinbach published a correction and the editor of the journal containing the 2007 article published an editorial on the matter, both appearing in August 2007. A simple question - is there any connection of the Szeinbach investigation to any misleading or false allegations that have been made against myself and others involved in the University Process.

Brueggemeier's disclosures of the research misconduct investigation of Szeinbach's publications were a direct result of his attempt to respond to the allegations about him made by Dr. Kostenbauder. While arguably ill-advised, there is no direct connection between his disclosure and Balkrishnan's.

Plaintiff further argues that when Brueggemeier failed to discipline Balkrishnan for disclosing the CII's confidential investigation of his charges against Szeinbach, he violated Ms. Esquivel-Gonzalez's recommendation that he take appropriate disciplinary action when he learned of faculty behaviors that detracted from COP's ethical and pro-fessional environment.

58

Plaintiff also argues that Balkrishnan's ADR proposal demonstrates his complaint was in retaliation for Szeinbach's protected activity. In this case, however, plaintiff is required to show that OSU condoned, tolerated or encouraged Balkrishnan's acts. The uncontroverted evidence demonstrates that Brueggemeier never considered Balkrishnan's demand that plaintiff withdraw her discrimination complaint and refrain from filing future complaints. However, Brueggemeier did propose that Szeinbach withdraw from consideration of the decision about whether to grant Seoane tenure.

Plaintiff argues that OSU did not strictly adhere to its research misconduct policy. Plaintiff maintains that the first step in a research misconduct investigation is that the dean is contacted. The dean then determines whether the allegation is serious enough to recommend that a CII be formed. Plaintiff maintains that Brueggemeier made the decision to refer the allegations concerning Szeinbach to the CII in retaliation for her having filed an EEOC charge and internal OSU civil rights complaints. Brueggemeier also decided not to attempt to resolve the allegations through an alternative dispute resolution process. Plaintiff further argues that the fact that Interim Policy had never been used to investigate publication practices in the past demonstrates that Brueggemeier's position that the matter should be referred to a CII based on the statement made by the editors of the journal that published the article was not the real basis for his decision.

The fact remains that the editors of the journal believed it was necessary to publish an editorial highlighting the requirements relating to, and the ethics of, sub-

mission of manuscripts for publication in medical journals. (Doc. 138-1 at PageID 13173.) The journal also published a correction by the authors, which stated that they were "remiss in not acknowledging the use of the same data source, data collection and background literature that was used in our previous study addressing a different issue. . . . which was published . . . ." (Doc. 122-4 at PageID# 10382.) Given the belief of the editors of the journal of the need to publish their editorial in addition to the statement of the authors, OSU argues that Brueggemeier's reliance on their findings is not pretextual. However, that argument is best addressed to the jury. There are, viewed in the light most favorable to plaintiff, disputed facts that might lead a jury to conclude that Brueggemeier singled Szeinbach out for a research misconduct investigation because of her protected activities.

Plaintiff continues to argue that she can show pretext because Brueggemeier overlooked the research misconduct by other College of Pharmacy faculty. In my July 26, 2012 Order, I concluded:

> [T]he circumstances surrounding the conduct of Drs. Lee and Szeinbach differ significantly. The alleged misconduct of Dr. Lee does not shed any light onto whether the investigation of Dr. Szeinbach was appropriate or retaliatory in nature. The allegations concerning the OSU grant impacted OSU directly, and it was necessary for OSU to respond to the allegations in the manner it deemed most appropriate. There is no evidence to indicate that OSU should have handled the NIH allegations in the same way that they would handle allegations of research misconduct of a faculty member by another faculty member.

Doc. 194. at PageID# 17579. I remain unpersuaded by plaintiff's argument that differences between the manner in which allegations concerning Szeinbach and Lee were handled demonstrate pretext.

Plaintiff further argues that the refusal of the CII to investigate research allegations concerning Brueggemeier, Nahata and Balkrishnan demonstrates pretext. The members of the CII testified in their depositions that they were charged with investigating the allegations concerning Szeinbach and that allegations regarding other faculty members were simply not relevant to their inquiry. A November 27, 2007 anonymous letter to OSU President Gee charged Brueggemeier and his co-authors with self-plagiarism in seven published articles. (Doc. 216-13, PageID 18663-65.) The Office of Research Compliance initiated an investigation. In December 2007, Brueggemeier responded to the charge. (Doc. 116-2, PageID 8599-8603.) In February 2008, the Office of Research Compliance concluded that the "publications were appropriately referenced." (Doc. 113-1, PageID 7766.) However, on March 18, 2008, the editor of the *Journal of Clinical Endocrinology & Metabolism* wrote Brueggemeier:

> We have completed an initial review of 1) the specific allegations made regarding your dual publications of data and 2) your explanation to us. We conclude that there remaining two significant problems not satisfactorily explained by your response.
>
> First, you submitted as original work for your 2003 JCEM article data that had been previously published in a minimally different format in the Journal of Steroid Biochemistry & Molecular Biology [December 2001] 79:75-84.

Second, several figures first published in JCEM in 2005, subsequently
appeared with minimal revision in the Journal of Steroid Biochemistry &
Molecular Biology [May 2005] 95:129-136 and Anti-Cancer Agents in
Medicinal Chemistry [May 2006' 6:221-232. To our knowledge, you failed
to seek permission from our journal for use of this copyrighted material.
Although the JCEM publication is generally cited in the reference list, it is
not denoted in the legend to these figures.

 Consequently, we are taking the following actions. First, we request an
apology from you to the Journal and the Endocrine Society for your
actions. Second, we ask that you provide us with the name of the respons-
ible academic officer at Ohio State, so they can determine if these instances
were among those previously investigated by your institution. We will
leave further pursuit of these matters to them

(Doc. 98-1, PageID 5100.) Brueggemeier testified that he gave the requested apology to

the *Journal of Clinical Endocrinology & Metabolism*. (Brueggemeier Dep., 416, Doc. 116,

PageID 8437.) Brueggemeier maintained that his case was different from Szeinbach's

because she did not cite her 2005 article in her 2007 article, while he did cite his prior

JCEM article but failed to cite it in the figure legend. (*Id.*, 418.)

On January 18, 2008, Seoane filed a complaint alleging research misconduct by

Brueggemeier. On February 14, 2008, Dr. Kostenbauder, Szeinbach's husband, sent a

letter to the journals cited in Seoane's complaint, alleging research misconduct.  (Kos-

tenbauder Dep. Exh. 92; Doc. 216-14 at PageID# 18666-18668.) On February 18, 2008, Dr.

Anderson and Dr. Guttman conducted a preliminary review and concluded that

"Brueggemeier appeared to have properly referenced each of the publications" but

recommended that a CII be formed to determine whether there was sufficient evidence

of extensive re-use of data and analysis to warrant an investigation under the Uni-

versity's disciplinary rules. (Doc. 135-1, PageID 12328-29.) A CII was formed. It found insufficient evidence of research misconduct to warrant an investigation. (Doc. 220-1, PageID 19390-96.) Seoane sought reconsideration of that decision, which was denied. (Doc. 37-15, PageID 1635-37.)

On January 18, 2007, Seoane also filed a complaint alleging research misconduct by Balkrishnan. (Doc. 150-3, PageID 14497-98.) Dr. Anderson and Dr. Guttman reviewed the allegations of re-use of text and data without citing the prior publication and concluded that Balkrishnan had cited the previous article and that there was insufficient evidence to warrant further investigation. (Doc. 119-1, PageID 10032-33.)

Plaintiff argues that because Vandre had previously published articles with Brueggemeier and that Brooks had taught classes with him, they were inclined to treat him more favorably than Szeinbach.

Plaintiff argues that the CII's conclusion that plaintiff's error was unlikely to be an "honest error" is evidence of pretext based on Szeinbach's written testimony to the CII and the journal editor's characterization of the error as "unintentional." While the CII's task was not to determine whether Szeinbach committed misconduct, which would include a finding that she acted with the requisite intent, but whether there was sufficient evidence to warrant an investigation as required under the misconduct policy, it did affirmatively state that her error was unlikely to be an "honest error." (Doc. 122-7 at PageID# 10512.) The CII found that Szeinbach "used [the 2005 article's] text and data *extensively* in preparation of the 2007 article." (Doc. 122-7 at PageID# 10516 (emphasis

63

added)). The CII viewed this omission as a "probable mechanism to hide the clear relationship between these articles." *Id.* The editorial printed by Primary Care Respiratory Journal stated that "there is no doubt that substantial parts of the text of the *PCRJ* paper–including parts of the introduction, methods, results and discussion sections–are extremely similar to the paper published previously. . . . " (Doc. 138-1 at PageID# 13173.)

Plaintiff also contends that Moseley failed to follow through on her obligations to address plaintiff's allegations of retaliation. Moseley referred the matter to OSU attorney Neiger. There is no evidence that Moseley "violated her duty to make sure retaliation did not adversely impact Szeinbach's research misconduct investigation" as asserted by plaintiff. (Doc. 219 at PageID# 19171.) Plaintiff cannot show pretext by making unsupported assertions; she has not come forward with any evidence demonstrating Moseley failed to act in accordance with her obligations.

Plaintiff also argues that OSU's handling of reports of Brueggemeier's research misconduct establishes pretext. According to plaintiff, the CII investigating Brueggemeier should have recommended that he face an 04 Process investigation if the policy was enforced in a non-retaliatory manner. Szeinbach maintains that the investigation of Szeinbach was retaliatory because Brueggemeier and Balkrishnan were not subjected to the same scrutiny.  Plaintiff maintains that OSU insulated Brueggemeier and punished Szeinbach. She contends that OSU engaged in a retaliatory application of the research misconduct policy by providing everyone else a free pass to violate the policy or

64

prosecuting Szeinbach for something that did not warrant an investigation in the first place.

Plaintiff also argues that OSU's handling of research misconduct allegations regarding Balkrishnan and Lee establishes pretext. Balkrishnan engaged in publication practices that resulted in a public reprimand by a journal, but Brueggemeier did not recommend Balkrishnan face the CII investigation. Plaintiff also relies on OSU's handling of Lee's misuse of over $200,000 of federal grant funds to show pretext. Plaintiff seeks to renew her motion to reopen discovery with respect to the research misconduct of Terry Elton. *(See* doc. 200 & 204.)[20]

Dr. Carole Anderson and Dr. Todd Guttman conducted a preliminary review of the Seoane's allegations and concluded that the allegations lacked sufficient evidence to warrant further inquiry.  Brueggemeier played no role in the review of the allegations relating to Balkrishnan. (Brueggemeier Dec. ¶ 3; Doc. 220-2 at PageID# 19410.)

Out of this welter of argument, the following evidence offered by plaintiff convinces me that there is sufficient evidence for a jury to find by the greater weight of the evidence that but-for defendant retaliating against her for her protected activities Dean Brueggemeier would not have rejected alternative dispute resolution and authorized a

---

[20]Plaintiff fails to identify any new arguments to support her request for reconsideration of my April 1, 2013 Order denying her January 8, 2013 motion to reconsider my December 19, 2012 Order denying her motion for leave to conduct discovery concerning allegations of misconduct by Professor Terry S. Elton. Plaintiff's third request to reopen discovery with respect to Professor Elton is DENIED for the reasons stated in my April 1, 2013 Order. *See* doc. 211.

preliminary investigation into Balkrishnan's research misconduct charge and the committee would not have recommended the institution of a disciplinary investigation of the charge. To begin, there is evidence from which the trier of fact might conclude that Balkrishnan was hostile to Szeinbach and filed the research misconduct charge to retaliate against her for her protected conduct. Moreover, Brueggemeier, Nahata and other OSU administrators were well-aware of Balkrishnan's hostility to Szeinbach and the actions he took that negatively affected her. Balkrishnan, who was a recent recruit to COP with a good record for grants and publications, warned that he would consider moving to another university if his issues with Szeinbach were not taken seriously. Balkrishnan emailed Brueggemeier and other faculty members before filing his charge of duplicate publication seeking their advice. Balkrishnan testified that he conferred with Brueggemeier, Nahata, and other faculty before filing his "whistleblower" com-plaint. Balkrishnan disclosed that there was a charge of research misconduct against Szeinbach and that there was a confidential investigation of that charge, and Bruegge-meier and/or other OSU administrators took no steps to discipline him for doing so. Although Brueggemeier testified that he implemented many of the recommendations of the OSU-HR investigations about the conflicts between Balkrishnan and Szeinbach, there is no written documentation of most of those actions. For example, there is nothing in Balkrishnan's annual reviews regarding his conduct toward Szeinbach and no writings supporting Brueggemeier's testimony that he gave Balkrishnan lesser annual salary increases because of his conduct.

There is evidence from which a reasonable juror might conclude that Szeinbach was singled out for an investigation of the research misconduct charge because other faculty were not subjected to an investigation of similar charges. Brueggemeier made an apology to a journal for an arguably similar failure to cite a previous article, but a preliminary investigation cleared him. Szeinbach and, later, Brueggemeier are the only two professors ever subjected to a preliminary investigation for failure to cite a previous article; and Szeinbach is the only professors whose CII recommended a disciplinary investigation proceed to the 04 Process. Brueggemeier could have decided not to go forward with the preliminary investigation or to have attempted alternative dispute resolution before doing so, and there is evidence that he alone made the decision that caused the forming of the CII. Kinghorn knew of Szeinbach' protected conduct and Balkrishnan's hostility to her. Although he ultimately voted against a disciplinary investigation going forward, he did vote in favor of the CII's preliminary report. Further, he made communications to his fellow committee members about the conflict in COP between Balkrishnan and Szeinbach. Szeinbach herself alluded to her protected activities when she asked the committee to reconsider its preliminary report. The trier of fact might draw an inference from this testimony that the committee knew of plaintiff's protected activities when it made its decision to refer the charge for a disciplinary investigation.

## 2. Differential Salary Increase Claim

With respect to her claim based on the differential salary increase,[21] the only alleged comparator is Dr. Buerki. Defendants argues that no raises were within the scope of her Charge and that only the 2007 and 2008 raises were pled in the second amended complaint. Defendant contends that there is no evidence showing a causal connection between the raises and her protected activity.

Plaintiff offers no explanation for failing to plead salary claims for 2009 and 2010 in her second amended complaint. Plaintiff has "conceded that she could recover only for retaliation that occurred after December 15, 2006." *Szeinbach v. Ohio State University*, 493 Fed. Appx. 690, **4, fn. 4. Her second amended complaint, filed May 5, 2010, pled salary claims arising out of the 2006 and 2007 salary increase decision. But she had been advised in the Fall of 2008 and the Fall of 2009 what her salary increases would be for the succeeding academic years. Consequently, she had full knowledge of the facts underlying her claims for those years when she filed the second amended complaint. Her failure to include those claims in that pleading precludes her from making a claim of retaliation for the pay raise she got for those years.

Plaintiff argues that a reasonable juror would conclude that Szeinbach's salary differential claims are causally linked to the research misconduct investigation. Brueggemeier was responsible for awarding salary increases, and research and scholarship

---

[21] Plaintiff seeks discovery pursuant to Rule 56(d) with respect to her salary differential claims for 2010 and beyond. Plaintiff's request to reopen discovery is DENIED.

are the most important facts in determining salaries for tenure track faculty. Teaching also figures prominently into salary determinations. Plaintiff maintains that Brueggemeier's ADR proposal demonstrates his belief that the research misconduct investigation unearthed deficiencies in Szeinbach's research, scholarship and teaching.

Plaintiff relies on the following to demonstrate a causal connection between her protected activity and the adverse employment action:

1. Brueggemeier is responsible for awarding salary increases;

2. Research and scholarship are the most important factors in determining salary increases for tenure track faculty;

3. Teaching is a prominent factor into determining salaries;

4. Brueggemeier's ADR proposal evidences his belief that the research misconduct investigation unearthed deficiencies in Szeinbach's research, scholarship and teaching;

5. The criticisms of Szeinbach's research, scholarship and teaching caused Brueggemeier to give her a lower salary increase;

6. Brueggemeier's criticisms of Szeinbach are causally linked to the research misconduct investigation.

Plaintiff argues that OSU's proffered rationale for Szeinbach's salary differential lacks a basis in fact, did not actually motivate the decision to give her a lower salary increase, and is an insufficient basis for that decision. Plaintiff also argues that Balkrishnan engaged in similar publication practices as Szeinbach, yet he never suffered a wage loss

69

caused by a CII investigation. Plaintiff further contends that faculty members Bennett and Buerki had fewer publications than she did but still received higher pay increases. Plaintiff maintains that this Court already concluded that Balkrishnan is a proper comparator and asks the Court to reconsider its decision that Bennett is not a proper comparator. Plaintiff's request is denied. Because Bennett is a clinical track professor, a group for whom research, scholarship– including the number publications– is not weighted as importantly as clinical activities, Bennett is not a proper comparator.

Plaintiff argues that Balkrishnan engaged in similar publication practices as Szeinbach, yet he did not suffer a wage loss due to the CII investigation.

OSU argues that Szeinbach's salary increases were in line with her publications and grants:

> 2008:
>   Buerki:                          1 publication, 2 grants.  4.50% raise.
>   Balkrishnan:           27 publications, 2 grants.  3.25% raise.
>   Szeinbach:               3 publications, 0 grants.  3.00% raise.
>
> 2009:
>   Buerki:                          4 publications, 1 grant.  2.75% raise.
>   Balkrishnan:           20 publications, 5 grants.  3.00% raise.
>   Szeinbach:               3 publications, 0 grants.  2.00% raise.
>
> 2010:
>   Buerki:                          2 publications, 0 grants.  2.25% raise.
>   Szeinbach:               5 publications, 0 grants.  2.00% raise.

(Docs. 146-1 at 1; Doc. 161 at 3-10.)

Brueggemeier testified about the process he used to determine salary increases for faculty members. In addition to teaching, research, scholarly activities and service, Brueggemeier also considered issues of equity, excellence, professionalism and collegiality.  With respect to issues of equity, Brueggemeier testified that he looked at relative rank and salary dollars to address large discrepancies between people who have the same rank. Brueggemeier testified that new faculty were hired in with salaries higher or equivalent to junior faculty who had been at the College for five or six years, and he attempted to address that in making salary increases. He specifically testified that Buerki was the lowest paid full professor at the College of Pharmacy. Even after the 2009 salary increases, Buerki was making just 78% of the salary paid Szeinbach.

The evidence plaintiff offers regarding Brueggemeier in connection with her research misconduct investigation retaliation claim is equally applicable here. There are fact issues about Szeinbach's substantially lower salary increases for 2007 and 2008 that must be resolved by a jury.

Here, Dean Brueggemeier was solely responsible for determining plaintiff's salary increase. As previously discussed, he was well aware of plaintiff's protected activity and the fact that the research misconduct investigation was the result of discord between she and Balkrishnan, which a trier of fact may conclude was instigated because of her protected conduct. There is conflicting evidence as to whether Brueggemeier disciplined Balkrishnan for his role in contributing to the unprofessional atmosphere at the College of Pharmacy despite instruction to do so from Human Resources. Despite

Brueggemeier's testimony that he implemented many of the recommendations of the OSU-HR investigations about the conflicts between Balkrishnan and Szeinbach, there is no written documentation of most of those actions. Additionally, Brueggemeier was subjected to a CII as a result of the actions of Szeinbach's husband. There is evidence from which a reasonable juror might conclude that Brueggemeier's decision to provide her with a lower salary increase was in retaliation for her protected conduct.

For the reasons stated above, defendant The Ohio State University's May 22, 2013 renewed motion for summary judgment (doc. 123) is DENIED.


<u>s/Mark R. Abel</u>
United States Magistrate Judge