IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Sheryl L. Szeinbach,                                   :

                Plaintiff                         :        Civil Action 2:08-cv-822

      v.                                                 :

The Ohio State University,                        :        Magistrate Judge Abel

                Defendant                       :

**ORDER**

This matter is before the Court on defendant The Ohio State University's ("OSU") July 22, 2014 motion for a new trial or in the alternative, for a remittitur (doc. 359).

A jury trial commenced on June 3, 2014. The jury returned a verdict for plaintiff Sheryl Szeinbach on her claim that OSU was liable for coworker retaliation in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The jury awarded her damages in the amount of $513, 368.00.

I.      **Arguments of the Parties**

    A.   **Defendant The Ohio State University**

Defendant maintains that it should be granted a new trial because the jury verdict was unfairly influenced by the egregious misconduct of plaintiff's counsel. OSU argues that a new trial is warranted under Rule 59 of the Federal Rules of Civil

Procedure when a jury verdict has been influenced by pervasive misconduct of counsel. OSU's arguments assert the following facts. Plaintiff's counsel's improprieties permeated the entire trial. Despite the Court's efforts to negate the effect of counsel's repeated misconduct, a cautionary instruction could not effectively eliminate the prejudicial harm to OSU. Plaintiff's counsel displayed obstinate behavior and a disdain for the integrity of the court.

Plaintiff's counsel's misconduct. OSU argues that plaintiff's counsel impermissibly interfered with OSU's cross-examination of Sheryl Szeinbach. Mr. Rosenberg's pattern of prejudicial speaking objections, violations of the spirit of the separation of witness, and comments on the court's rulings began on the first day of trial. On the second day of trial, Mr. Rosenberg interfered with OSU's right to cross-examine Dr. Szeinbach with incessant speaking objections and outbursts. His most outlandish and prejudicial misconduct occurred at the end of the second day of trial when he accused OSU's counsel of altering exhibits in the presence of the jury.

OSU asserts that the redirect examination of Dr. Szeinbach was replete with leading questions and attempts to have her interpret what other people had written. During the direct examination of Jennifer Moseley and throughout the trial, Mr. Rosenberg testified despite the court's instruction that he could not testify, used depositions improperly, made speaking objections, failed to lay a proper foundation for refreshing a witness's recollection, asked leading questions, asked questions calling for speculation, put words in witness's mouth, and discussed other witnesses' testimony.

Plaintiff's counsel repeatedly insinuated that OSU and its witnesses were wasting the jury's time. He repeatedly attempted to justify his violations of evidentiary and trial practice rules to move things along, which sent a message to the jury that OSU was wasting their time rather than conforming with court rules.

OSU also contends that Mr. Rosenberg repeatedly blurted out comments that demeaned and discredited the court's rulings in front of the jury. Despite the court's frequent admonishments, Mr. Rosenberg's misconduct continued throughout the trial. OSU's attempt to present its case in an straightforward, professional manner was overshadowed by Mr. Rosenberg's flagrant disregard for the rules of court. His conduct was neither isolated nor inadvertent. Mr. Rosenberg routinely resorted to outbursts and improper questioning of the Court's rulings. OSU is entitled to a new, fair trial to "protect the due and orderly administration of justice and maintain the authority and dignity of the court." *Roadway Express v. Piper*, 447 U.S. 752, 764 (1980).

Damages. In the alternative, OSU argues that the amount of the verdict awarded by the jury exceeds the statutory cap of Title VII and is speculative. Dr. Szeinbach has remained employed by OSU as a full professor with tenure and has received a pay raise every year. Because she did not lose her job, OSU maintains that Dr. Szeinbach is not eligible for an award of front pay or back pay. Additionally, Dr. Szeinbach dismissed her salary differential claim. Plaintiff only sought to recover damages related to the harm to her reputation in her small academic community. During plaintiff's redirect examination testimony, Dr. Szeinbach testified that she is not asking to receive more

3

pay from OSU. Defendants argue that the jury's entire award of damages is for nonpecuniary losses including emotional distress and reputation harm, which cannot exceed $300,000 under the statute and must be reduced as a result.

OSU maintains that the award clearly exceeds the amount which, under the evidence in the case, was the maximum that a jury could reasonable find to be compensatory for the plaintiff's loss. According to defendant, the jury's award exceeded the damages cap imposed by § 1981a(b)(3) and is excessive based on the evidence. Furthermore, if the award is allowed to stand, it would result in a manifest injustice to OSU.

Because a general verdict form was used instead of a special verdict form, it is difficult to ascertain the elements of the jury's award. Defendant believes that the jury intended to award the maximum amount for compensatory damages under Title VII in addition to the $213,368 about which Dr. Schondelmeyer testified. Dr. Schondelmeyer opined as to the difference between what Dr. Szeinbach earns at OSU and what she could have earned if she chose to seek employment at another university between 2007 and 2014. Defendant maintains, however, that the undisputed evidence is that Dr. Szeinbach never sought or applied for positions outside of OSU. The only paid position that plaintiff testified about was at the University of Arkansas in or around 2006. Dr. Szeinbach testified that she had no offer of employment from the University of Arkansas and that on her own volition, she stopped pursuing a position there. She has no evidence that any such position was filled. Dr. Szeinbach further testified that she

4

had not really looked for a job until "this can be cleaned up." Vol. I, 163:11. Defendant argues that because of the absence of any evidence of any pecuniary amount for which OSU could be legally responsible, the $513,368 damage award can only constitute compensatory damages subject to the statutory cap.

OSU further argues that Dr. Schondelmeyer's comparison of the salaries at OSU with other universities as reported by the American Association of Colleges of Pharmacy ("AACP") is factually incorrect. Dr. Schondelmeyer's calculations were based on the salary surveys of calendar year institutions whose faculty have twelve-month contracts instead of academic year institutions like OSU, whose faculty have nine-month contracts. Dr. Schondelmeyer testified that with a nine-month contract, faculty teach in the fall and spring semesters and are off during the summer, at which time they are encouraged to bring in research projects on their own to pay their own salary and to compensate them, but they are not paid by the university.

Dean Brueggemeier confirmed that OSU tenure track faculty have nine-month appointments. As dean, he compared OSU salaries with Big Ten colleagues and the AACP reported salaries, and OSU salaries were typically in the mid-range for AACP for academic year appointments. Dr. Schondelmeyer's comparison of Dr. Szeinbach's salary with the calendar year data from AACP is like comparing apples and oranges. To make an accurate comparison of Dr. Szeinbach's OSU salary to that of other universities, Dr. Schondelmeyer should have used the AACP salary surveys for academic year institutions. Had he done so, Dr. Szeinbach's salary would have been in

the mid-range. As a result, OSU maintains that there is no factual basis to support Dr. Schondelmeyer's conclusion that Dr. Szeinbach's salary would have been higher at another institution.

Defendant argues that an award based upon Dr. Schondelmeyer's testimony is purely speculative. Dr. Szeinbach never looked for a position outside of OSU and has never applied for any of the positions reported by the AACP salary surveys. Additionally, there is no evidence that there were openings for positions in her field to which she could have applied.

OSU further argues that the amount of the award is excessive based on the evidence. The evidence indicates that Dr. Szeinbach had stressors in her life unrelated to OSU and that the stress about which Dr. Szeinbach testified emanated from the research misconduct investigation, and OSU prevailed on those claims. Plaintiff's medical records and her treating physician's testimony indicate that plaintiff was treated for stress related to the death of her husband and her lawsuit, neither of which is compensable. Plaintiff's husband was ill from July 2008 until his death in June 2010. The research misconduct investigation lasted from June 2007 to May 2008.

### B. Plaintiff Sheryl L. Szeinbach

Plaintiff argues that OSU has not met its heavy burden of presenting concrete evidence needed to secure a new trial. None of OSU's complaints rise to the level of objectionable conduct detailed in the case law relied upon by OSU. Plaintiff's attorney never deliberately prevented OSU from obtaining a fair and impartial trial or engaged

6

in conduct that had a controlling impact on the jury's verdict. Mr. Rosenberg simply sought to serve his client's interest zealously within the bounds of the law. Plaintiff argues that if OSU truly believed that it was prejudiced, it would have either asked for a mistrial or requested that the jury receive curative instructions to address any juror bias caused by Mr. Rosenberg. Plaintiff maintains that the Court administered the courtroom with a firm hand that prevented OSU from suffering any jury bias.

## II. Discussion

### A. Motion for a New Trial

OSU's complaints concerning Mr. Rosenberg's conduct fall into five general categories:

- Repeatedly using deposition testimony despite warnings and/or explanations regarding proper cross-examination techniques;
- Being discourteous to the judge;
- Blaming OSU's counsel for wasting the jury's time;
- "Testifying"; and,
- Speaking objections.

Before setting out the facts related to these five areas of alleged misconduct by plaintiff's counsel and considering the impact of the alleged misconduct on the jury's verdict, it is necessary to outline the issues determined by the jury at trial. Plaintiff presented three claims to the jury: (1) OSU retaliated against Dr. Szeinbach for her opposition to unlawful employment practices; (2) OSU retaliated against Dr. Szeinbach for her filing an EEOC charge; and (3) OSU condoned, tolerated or encouraged Dr. Balkrishnan's retaliation against Dr. Szeinbach for her support of Dr. Seoane Vazquez's

7

charge of discrimination and/or retaliation. The jury returned verdicts for defendant on plaintiff's first two claims and for plaintiff on her claim for coworker retaliation. With respect to plaintiff's claim based on coworker retaliation, the jury was instructed as follows:

> Plaintiff Szeinbach claims that Dr. Rajeesh Balkrishnan retaliated against her for supporting Dr. Seoane Vazquez's complaints that he was discriminated against because of his race and/or national origin and/or retaliated against because he made those complaints. Plaintiff maintains that defendant OSU condoned, tolerated, or encouraged Balkrishnan's alleged retaliation.
>
> To succeed on her claim, plaintiff Szeinbach must prove each of the following facts by the greater weight of the evidence:
>
> First: Szeinbach engaged in a protected activity;
>
> Second: Balkrishnan knew of Szeinbach's protected activity;
>
> Third: Balkrishnan retaliated against Szeinbach for her engaging in protected activity by filing a complaint of research misconduct against her and/or disclosing that complaint to others in violation of the University's confidentiality policy statement.
>
> Fourth: Balkrishnan's conduct was sufficiently severe to dissuade a reasonable College of Pharmacy faculty member from opposing unlawful employment discrimination;
>
> Fifth: Supervisors or members of management at OSU and/or the College of Pharmacy had actual or constructive knowledge of Balkrishnan's retaliatory behavior;
>
> Sixth: Supervisors or members of management at OSU and/or the College of Pharmacy condoned, tolerated, or encouraged Balkrishnan's retaliation.
>
> Seventh: Szeinbach suffered damages because of the adverse employment action.
>
> In the Verdict Forms that I will discuss later, you will be asked to answer questions about these factual issues.
>
> Protected activity: Reasonable, good faith belief. For the first element, Szeinbach claims that her protected activity was her opposition to an unlawful employment practice by providing information to those investigating Seoane-Vazquez's complaints that OSU discriminated against him because of his race and/or national origin and/or retaliated against him for making those complaints. That action is "protected

activity" if it was based on a reasonable, good faith belief that OSU discriminated against Seoane-Vazquez because of his race and/or national origin or retaliated against him for making complaints of discrimination.

<u>Good faith belief</u>. Plaintiff Szeinbach had a "good faith" belief if she honestly believed that OSU discriminated against Seoane-Vazquez because of his race and/or national origin and/or retaliated against him for making complaints of discrimination.

<u>Reasonable belief</u>. Plaintiff Szeinbach had a "reasonable" belief if a reasonable person would, under the circumstances, believe that OSU discriminated against Seoane-Vazquez because of his race and/or national origin and/or retaliated against him for making those complaints. Plaintiff Szeinbach does not have to prove that defendant OSU actually discriminated against Seoane-Vazquez because of his race and/or national origin and/or retaliated against him for making those complaints. But she must prove that she had a good-faith, reasonable belief that OSU did so.

<u>Adverse employment action</u>. For the third element, plaintiff Szeinbach claims that she was subjected to an adverse employment action against her when she was subjected to a research misconduct investigation and again when Balkrishnan communicated information about that investigation to others in violation of OSU's confidentiality policy statement. You must decide whether one or both of those acts was an adverse employment action.

An "adverse employment action" is any type of action that would have made a reasonable employee reluctant to make or support a charge of discrimination or retaliation. Put another way, if a reasonable employee would be less likely to complain about or oppose alleged discrimination because she knew that OSU would subject her to a research misconduct investigation and/or communicate information about that investigation to others in violation of its confidentiality policy, then that action is an adverse employment action. If the employment action would not make it less likely for a reasonable employee to make complaints about or oppose the alleged discrimination, it is not an adverse employment action.

<u>"But for" cause</u>. For the third element, if you find that Szeinbach engaged in protected activity and that Balkrishnan retaliated against her, you must decide whether Balkrishnan took that action because of Szeinbach's protected activity. That is, you must decide whether but for Szeinbach's protected activity Balkrishnan would not have taken the adverse employment action. To determine that Balkrishnan took an adverse employment action because of Szeinbach's protected activity, you must decide that Balkrishnan would not have taken the action had

9

Szeinbach not engaged in the protected activity but everything else had been the same.

For the sixth element, if you find that Szeinbach engaged in protected activity, that Balkrishnan took an adverse employment action against her, and that supervisors or members of management at OSU had knowledge of his retaliatory behavior, then you must decide whether OSU condoned, tolerated, or encouraged Balkrishnan's retaliation. If OSU responded to plaintiff's complaints about Balkrishnan's retaliatory conduct so inadequately as to be unreasonably or manifestly indifferent to them, then she has proven the fifth element.

I will now discuss each of the general categories of misconduct in turn and consider whether counsel's conduct introduced information or evidence to the jury in violation of the court's orders or the Rules of Evidence that should not have been before the jury and whether that information or evidence likely influenced the jury to reach a verdict that it otherwise would not have made.

<u>Repeatedly using deposition testimony despite warnings and/or explanations regarding proper cross-examination techniques</u>. OSU maintains that despite repeated instruction from the court, Mr. Rosenberg improperly cross-examined witnesses. For example, Mr. Rosenberg stated that Dr. Moseley had seen a document during her deposition. Vol. IV, 53:10-13. OSU maintains that he placed deposition transcripts on the video monitor prior to establishing a need to refresh a witness's recollection. *See* Vol. IV, 22:9-12.  OSU also cites to a portion of the trial transcript in which Mr. Rosenberg attempted to ask the same question that he asked during the deposition of witness without laying a proper foundation.[1]

---

[1]Here, Mr. Rosenberg was permitted to lay a proper foundation for his question, and OSU suffered no prejudice as a result. *See* Vol. IV. 78:1-3.

10

Mr. Rosenberg was instructed to take Dr. Moseley's deposition transcript off the monitor and the Court denied his requests to display the transcript. On none of the occasions OSU relies on was any evidence or information improperly introduced to the jury. Most often the witnesses were having difficulty remembering events from six or more years before. Mr. Rosenberg, instead of giving the witness an opportunity to read their deposition transcript to refresh their recollection, attempted to display the deposition transcript on the elmo or to read it to the jury. Once the witnesses had the opportunity to read or hear their deposition testimony, they reaffirmed that testimony. While displaying ignorance of the rules of evidence, Mr. Rosenberg's conduct was not calculated to improperly influence the jury's verdict. Further, he did not get evidence before the jury that was prejudicial in anyway to defendant. Nor did he cause the jury to hear testimony that the rules of evidence prohibited them from hearing. At worst, he prematurely presented to the jury facts that the witnesses then testified to once they had the opportunity to refresh their recollections. It is true that on occasion, Mr. Rosenberg was argumentative with witnesses and was reprimanded by the Court. But OSU fails to explain how Rosenberg's arguing with the witnesses and being reprimanded prejudiced it, rather than damaging him in the eyes of the jurors.

Being discourteous to the Judge. OSU asserts that Mr. Rosenberg repeatedly resorted to outbursts and improper questioning in response to rulings made by the Court. Specific statements objected to by OSU has been placed in italics in the excerpts below.

11

> THE COURT: Objection sustained.
> You need to move on, Mr. Rosenberg, because this case is not about a
> completed 04 process. This case is about a case where the CII
> recommended the beginning of the 04 process. It's not about a case where
> they had an 04 investigation, an 04 committee. That did not happen.
>
> MR. ROSENBERG: And, Your Honor, your ruling said that whether the
> case is opened or closed is a relevant factor. I'm just trying to get to the
> bottom of that issue.
>
> THE COURT: Right. And the question is -- you can't get at the bottom of
> that issue by asking about cases that closed after an 04 investigation
> because there was no 04 investigation in this case.
>
> MR. ROSENBERG: *I think we're talking apples and oranges, but I'll move on,
> Your Honor*. Thank you.
>
> THE COURT: You can ask all you want about whether, after the
> completion of the CII investigation and process --
>
> MR. ROSENBERG: I want to just finish with the closing, and I'll move on.
>
> THE COURT: Okay.

Vol. IV, 28:25-29: 19 (emphasis added). I did not take Mr. Rosenberg's "apples and

oranges" comment to be disrespectful or argumentative. He thanked the Court and then

moved on to another topic with the witness.

On several occasions, Mr. Rosenberg responded to rulings sustaining an

objection by repeating "sustained?" I agree that this questioning of evidentiary rulings

reflects poorly on Mr. Rosenberg, but I do not believe that his statements prejudiced

OSU.

In the following exchange, Mr. Rosenberg was examining a witness about an email (PX 166) Dr. Balkrishnan sent to College of Pharmacy faculty and administration that included his whistleblower complaint against Dr. Szeinbach. The email itself was admitted into evidence. Moreover, the point of this line of examination was to demonstrate that Dr. Balkrishnan violated the confidentiality provisions of the University's research misconduct policy; and when asked, the witness testified that it did. Vol. IV, 57:18-58:17.

> MR. ROSENBERG: And then he says what in this area? . . . And what does he do in the part of this email where I'm pointing here (indicating)?
>
> MS. GOLIAN: Objection, Your Honor. The document speaks for itself.
>
> MR. ROSENBERG: Well, we're talking about confidentiality clauses that were sent directly to the Office of Research, Your Honor. This is the whistleblower – exact letter he sent on the OSU whistleblower form.
>
> BY MR. ROSENBERG:
>
> Q. Is that what he said?
>
> MS. GOLIAN: It's a forward, Your Honor.
>
> THE COURT: Sustained.
>
> MR. ROSENBERG: *Sustained?*
>
> THE COURT: It's an exhibit.

*Id*, 56:24-25 and 57:3-16.

During his direct examination of Dr. Cynthia Carnes, who was an assistant professor the time of the events at issue in the trial and OSU's representative at trial,[2] Mr. Rosenberg attempted to impeach her with her deposition testimony:

MR. ROSENBERG:

Q. . . . Is it true that if Sheryl's publications involved heavy double publication you would not be opposed to her being removed from the college?

A.  In rereading that, I believe what I meant when I said I would not be opposed to her being removed from the college was in fact part of the duplicative publication but due to other reasons as well.

Q.  Do you remember in deposition I said if you didn't understand a question, you were going to ask me?

A. Absolutely.

Q.  You didn't ask me on that. There's no request for clarification, is that?

A.  I think there's enough vagueness in the way the questions were asked and the way I interpreted them that's the way I answered them at the time.

Q.  Is there–do you say prior to answering that question something like, Eric, I don't quire understand you, could you rephrase the question?

A.  I feel that you're taking that out of context.

MR. ROSENBERG: Can I publish, Your Honor?

MS. GOLIAN: Objection, Your Honor. She's answered.

MR. ROSENBERG: No. It's not out of context.

THE COURT: Well, where's the transcript so I can look at it?

MR. ROSENBERG: Page 83. You want me to bring you the page?

---

[2]As an assistant professor, Carnes had no involved in the CII that investigated the academic research charge Dr. Balkrishnan brought against Dr. Szeinbach. At the time of trial, she was an Associate Dean of the College of Pharmacy.

14

> THE COURT: I don't like one page. I'd like to the pages before and the pages after before I rule.
>
> MR. ROSENBERG: *I don't want to waste the jury's time. I think the point's made. I'll move on. I think they understand.*

Vol. V, 66:14-67:19. I find Mr. Rosenberg's abandonment of his attempted impeachment by telling the jury that he has made his point and that the jury understood it to be troubling. The comments were clearly impermissible.

To determine what impact the comments may have had on the jury it is necessary to look at the deposition testimony underlying plaintiff's counsel's attempt to impeach Dr. Carnes. During her deposition, Dr. Carnes testified that she wanted Szeinbach's duplicate publication academic misconduct charge resolved quickly, and that she recalled telling someone that "if there are findings that it's true, that [removal of Dr. Szeinbach from the College] would be the appropriate action." Carnes Dep., p. 83, Doc. 127, PageID 10842. Mr. Rosenberg then asked:

> Q. Okay. So if somebody engages in duplicate publication like Sheryl did, they should be removed from the College?
>
> A. You know, I–I'm not a party to that investigation. If it's true, heavy double publication of a majority of a paper, I think it's a serious problem.
>
> . . .
>
> Q. [I]f somebody believes they heard you say that they hoped–or that you hoped that this might be an opportunity to have Sheryl removed from the College, you don't recall saying that?
>
> A. Well, I–I would not be opposed to her being removed.

*Id.*, p. 83:2-22.

Defendant chose not to examine Dr. Carnes until the defense case. Then Dr. Carnes testified that she had been unhappy about Dr. Szeinbach's lack of collegiality and professional behavior during faculty meetings, her absence from the College of Pharmacy, and, in general, her failure to share the load of a faculty member by preparing for and participating in committee service and the workload of the Pharmacy Practice Division. Vol. XII, 53:19-54-25. In 2006, she and other faculty members took these concerns to Dean Brueggemeier. *Id.*, 53:14-18. Defendant's counsel then directly addressed the attempted impeachment:

> Q.  So you testified last week on cross . . . that you were not opposed to having Dr. Szeinbach removed for other reasons, I believe was your testimony. Could you please describe to what you were referring to?
>
> A.  There were multiple reasons that I felt that we would be better served to have a different faculty member there who would contribute to the life of the division, share the workload. One thing that happens with committee appointments is that we have certain committees in the college that do a lot of heavy work that oversee the different academic programs, for example. I have served on committees with Dr. Szeinbach and my observation was that frequently she was not prepared, did not -- had not read the minutes of the meetings, did not prepare by reading the agenda or the materials sent in advance,  frequently was asking for clarification. You know, I think for somebody who's new and, you know, I had admittedly been on the faculty part time for a short time and then for several months before she came, I guess I was surprised. The first few months I think it's fine but when it starts to extend and extend and extend, it feels to me like someone who's not really putting forth the effort. And what you see is the contributing members of the committees who are prepared and are getting more and more assignments over time.
>
> So that was one of my major concerns. Because typically you want the full professors to be carrying a good service load. We always talk about sort of protecting the junior faculty so they have time to develop their new research program to get going. So that was one of my concerns was related to sort of quality of service.

16

Being present to assist students or address student questions I think is also very important and, frankly, I felt like it was disruptive and distracting to me to frequently deal with these issues. Students looking for their faculty member that they were taking a course with. So that, that was another reason.

And then I would say one of my other concerns was related to conduct in meetings.

*Id.*, 57:10-58:21.

On balance, plaintiff's counsel's attempted impeachment of Dr. Carnes was consistent with the rules of evidence and defendant's counsel had the opportunity to present Dr. Carnes' explanation of her answer to the deposition question during their client's case. While inappropriate, Mr. Rosenberg's comment that he had made his point and that the jury understood it did not, even when considered together with other similar comments during the course of the trial, deprive defendant of a fair trial.

The next exchange cited by defendant is an example of Mr. Rosenberg failing to properly establish a foundation for impeaching a witness and failing to follow the Court's directions to let witnesses, who were struggling to recall events that occurred six or seven years before, review their deposition testimony to see if it refreshed their recollection before impeaching them. The witness Mr. Rosenberg was questioning, Dr. Kinghorn, had sat on committees that had investigated the research misconduct charges against both Dr. Szeinbach and Dean Brueggemeier. He was having trouble remembering in which case the committee did not get exhibits. Vol. V, 169:22-170:4. Mr. Rosenberg asked the witness whether one of the differences between the committees'

17

investigation and disposition of the charges against Dr. Szeinbach (recommended further investigation) and Dean Brueggemeier (recommended dismissal of the charges) was that Brueggemeier had just become the Dean. *Id.*, 170:19-24. When Dr. Kinghorn said he disagreed, Mr. Rosenberg asked to approach the witness:

> MR. ROSENBERG: May I approach, Your Honor?
>
> MR. McPHILLIPS: Objection. Lack of foundation.
>
> MR. ROSENBERG: Page 113, 6 through 11.
>
> May I approach? I'm sorry.
>
> THE COURT: Well, there is an objection.
>
> MR. ROSENBERG: Okay.
>
> THE COURT: The objection is sustained.
>
> MR. ROSENBERG: *Sustained?*
>
> THE COURT: It was lack of foundation.
>
> MR. ROSENBERG: Lack of -- okay.

Vol. V, 170:25-171:9. I did not view Mr. Rosenberg's interrogative as disrespectful. An attorney cross-examining a witness is processing a lot of information simultaneously. Mr. Rosenberg simply did not process that I had sustained the objection. When I explained the ruling, he accepted it and moved on.

The next example cited by defendant occurred during the examination of Dr. Cynthia Carnes, a faculty member at the time of the events at issue in the trial and now an Associate Dean of the College of Pharmacy and OSU's representative during the trial. Mr. Rosenberg was examining her about the email Dr. Balkrishnan sent to COP faculty and administrators about his research misconduct charge against Dr. Szeinbach:

18

MR. ROSENBERG:

Q. But you were surprised by this e-mail but you don't know if it's actually inappropriate, right?

A. I was surprised. I mean, I got a lot of e-mails from Dr. Balkrishnan. I have to confess I did not always read them all through to the end.

Q. But didn't you say that you don't know if it's inappropriate, that would be your words, you didn't know if it was inappropriate?

A. At this point I know it's inappropriate. At that point in time I wasn't that concerned about it.

Q. When I deposed you in 2009 didn't you tell me you thought it was–you weren't sure if it was inappropriate?

Vol. V, 84:11-22. At this point, defendant's counsel objected, and defendant now argues

that Mr. Rosenberg's response to the Court's ruling was disrespectful:

THE COURT: Objection sustained.

MR. ROSENBERG: *Sustained?* Can I approach to refresh at least?

THE COURT: You can use it for impeachment if you want. Show the witness what you're --

MR. ROSENBERG: Yeah.

BY MR. ROSENBERG:

Q. Did you use the words you didn't know if it was inappropriate?

A. Which e-mail is this referring to?

Q. It's referring to the one we're looking at now.

THE COURT: Please give her the entire transcript so she can look, not just a few lines.

MR. ROSENBERG: I don't recall having to show the entire transcript to the witnesses but I will look for it.

THE COURT: You're giving her four lines out of a transcript.

MR. ROSENBERG: And that's what OSU did. They put up a few lines on a page. I didn't ask that they give them the whole transcript to look at to see

19

if they were right. If OSU counsel thinks I'm stealing it from the wrong place, they can cross-examine later and say that I was wrong.

THE COURT: The witness doesn't have to rely upon your representation that the e-mail referred to and the four lines is the e-mail that you're trying to examine her about.

MR. ROSENBERG: That's what OSU's job on -- when they put her on the stand, if I'm a liar, please show me I'm a liar. But I'm not.

THE COURT: Please move on to another line of questioning.

Vol. V, 84:24-86:3 (emphasis added). Mr. Rosenberg did then follow the Court's direction and moved on to another line of examination, abandoning his attempt to impeach Carnes.

Mr. Rosenberg's statements were unnecessarily argumentative and failed to accord proper respect to the Court, but I fail to see how his statements prejudiced OSU even though his demeanor in the courtroom lacked professionalism. To the extent that OSU argues that the comments demeaned the Court in the eyes of the jury, I do not find that argument supported by the overall record of the trial. Mr. Rosenberg was not deliberately baiting the Court or trying to gain some tactical advantage by disagreeing with a ruling. In my view, he was merely floundering and trying additional arguments to see if the Court would reverse its ruling.

In my experience, disagreeing with a judge is not likely to gain the jury's approval. A judge is the authority figure in the courtroom. Jurors accept the judge as the person in charge and look upon the judge with respect. If anything, litigators lose points with the jury when they unnecessarily prolong a dispute about the Court's

20

ruling. Nothing in Mr. Rosenberg's conduct suggested that he was intentionally engaging in exchanges with the Court for the purpose of gaining favor with the jury.

At times, Mr. Rosenberg was discourteous to opposing counsel. The following example offered by defendant took place when defendant's counsel's cross-examined Dr. Au, formerly an OSU College of Pharmacy professor, who had testified on direct that she had been forced out of OSU. Vol., VII, 57:8-11. Defendant's counsel questioned Dr. Au about Optimum Therapeutics, her pharmaceutical research company which is located in California:

> MS. GOLIAN:
>
> Q. And Optimum was actually developed during your time at The Ohio State University, correct?
>
> A. Yes. It was an Ohio company.
>
> Q. It was developed during your time at Ohio State University, correct?
>
> A. Yes, with the full support of the Office of Research.
>
> Q. Yes. And, actually, the reason that some of the space was taken away is because the funding was going to Optimum, and not to Ohio State University, and Ohio State University didn't feel like they needed to give you space to do your company's work, correct?

*Id.*, 125:19-126:4. Plaintiff's counsel's objection to this question was overruled.  Dr. Au testified that work on some of the grants was done at OSU, but when OSU took away the space where she was doing the research she moved the equipment and research with the permission of the University to Optimum. 126:13-127:16. She testified that she

was now working on the grants at her own company, Optimum, because "I don't have

a job at Ohio State anymore." *Id.*, 128:1-8.

> MS. GOLIAN:
>
> Q. Well, your annual salary the last year at Ohio State was 231,000 and –
>
> MR. ROSENBERG: Objection, Your Honor.
>
> THE COURT: Sustained.
>
> MR. ROSENBERG: *Geez! Where are we going with this?*
>
> THE COURT: Mr. Rosenberg, it's not necessary.
>
> THE WITNESS: I can answer this one.
>
> My salary is less than half of what my better students are earning. By staying at Ohio State, I earn little money, but this is my love. I want to teach and do research.
>
> My students earn more, because this is what the market provides. There are multiple individuals in the University that earn 800,000. They're just faculty. They earn 800,000, 900,000. A lot of people earn that sort of salary.
>
> Do I think it's right? I think it's wrong. I think they are getting paid too much, but that's what the market does. Right?
>
> My student's earning 550,000, you know. I do that, but I'm not doing that because that's what I wanted to do.

Vol. VII, 128:11-15 (emphasis added). Once again, Mr. Rosenberg's comment was

inappropriate, and he was admonished. Defense counsel's line of questioning (aren't

you making more money now than you did at OSU) was at best marginally relevant to

the attempted impeachment, and it is difficult to see how Rosenberg's comment,

considered with other comments of a similar nature, unduly influenced the jury.

Despite repeated admonishments from the Court, Mr. Rosenberg did make more inappropriate statements:

> MS. GOLIAN: That's all I have, yes.
>
> MR. ROSENBERG: Your Honor, I have one. The policy was distorted.
>
> THE COURT: Well --
>
> MR. ROSENBERG: *Come on*.
>
> THE COURT: Mr. Rosenberg, "come on" is not how you address the Court.
>
> MR. ROSENBERG: I'm sorry, Your Honor. And I apologize profusely for that. I wouldn't be asking but the policy that he's referring to in the interim I just want to show one provision, one question, please.
>
> THE COURT: I'll let you have one question.
>
> MR. ROSENBERG: That's all I have. Thank you, Your Honor. I really appreciate it.

Vol. IX, 103:5-18(emphasis added). It is my practice to permit re-cross examination rarely. I followed that practice during this trial. Mr. Rosenberg's "come on" comment was totally unacceptable, and I immediately reprimanded him. He made an appropriate apology; and he limited his re-cross examination to the one question. *Id*., 103:21-104:3.

Mr. Rosenberg was firmly reprimanded when he was disrespectful to the Court. In the following exchange, Mr. Rosenberg attempted to continue to argue a ruling in the presence of the jury, and the Court directed him to come to sidebar. The witness, Dr. Milap Nahata, had been called by plaintiff as a witness in her case. Dr. Nahata was now testifying as a witness in the defense case.  Defendant's counsel objected to a question

on the cross-examination of Dr. Nahata about an email from Dr. Balkrishnan (PX22) on

the ground that the question was not within the scope of direct examination:

> MR. McPHILLIPS: Objection. Outside the scope of direct.

> MR. ROSENBERG: Your Honor, this is personality issues between Raj and Sheryl. I don't know why it wouldn't be within the scope of direct.

> THE COURT: Well, you had Dr. Nahata on direct last week. And the defense had him on direct this week. You must stay within the scope. Objection is sustained.

> MR. ROSENBERG: Okay. Well, this should be within the scope of direct because --

> THE COURT: Mr. Rosenberg --

> MR. ROSENBERG: What?

> THE COURT: -- come to the side bar.

> (Discussion at side bar as follows:)

> THE COURT: I don't want to hear you make another comment about the Court's ruling again in this trial.

> MR. ROSENBERG: What --

> THE COURT: I made a ruling that it wasn't within the scope. And the first thing you said was, Well, this should be within the scope.

> MR. ROSENBERG: I apologize.

> THE COURT: I don't want to hear that again --

> MR. ROSENBERG: Okay.

> THE COURT: -- ever.

> MR. ROSENBERG: All right.

> THE COURT: This has been going on and on and on. We are -- we have a responsibility to these jurors to try this case without all of the extra-curricular comments. Now, I don't want to hear it again.

Vol. XI, 144:12-145:16.

Although I agree with defendant's position that Mr. Rosenberg failed to accord proper respect to court rulings by improperly questioning or commenting on rulings, I cannot find any instances where Mr. Rosenberg introduced evidence or information to the jury as a result of his inappropriate comments. I recognize that Mr. Rosenberg frequently apologized once he was reprimanded, and I do not believe that his conduct prejudiced OSU. In fact, I find that conduct such as that exhibited by Mr. Rosenberg was just as likely to prejudice the jury against plaintiff rather than defendant.[3]

Blaming OSU's counsel for wasting the jury's time. OSU argues that plaintiff's counsel repeatedly tried to justify his violation of evidentiary and trial practice rules to move things along. OSU maintains that these statements sent the message to the jury that OSU was wasting the jurors' time when in fact OSU was conforming to court rules. This first example occurred during Mr. Rosenberg's cross-examination of Dr. Charles Brooks, who sat on the CII investigating a research misconduct charge Dr. Enrique Seoane Vazquez brought against Dean Brueggemeier. Mr. Rosenberg asked Dr. Brooks whether he ever asked anyone at OSU to look into retaliation issues raised in a letter Dr. Seoane Vazquez wrote that was attached to his complaint against Dean Brueggemeier. Dr. Brooks responded that he could not remember. Vol. V, 232:20-233:9. Mr. Rosenberg

---

[3]Although it in no way justifies his conduct, for which he was sharply reprimanded, Mr. Rosenberg has a small firm practice and was trying this case alone. He compounded his difficulties by coming into court most days with little sleep the night before. Because of the number of exhibits, how he had organized them, and his lack of sleep, Mr. Rosenberg frequently relied on his memory or other wise became confused about the fact relevant to his objections made to the admissibility of evidence.

then asked and obtained permission to approach the witness. He asked Dr. Brooks to

look at page 199, lines 12 through 14 of his deposition transcript. *Id.*, 233:11-14.

> MR. ROSENBERG:
>
> Q. Uh-huh. So, when I asked you the question: Did you ever ask anyone to look into the retaliation, you said, "No," right?
>
> A. On that--during the deposition, that was correct.
>
> Q. Okay.
>
> MR. McPHILLIPS: Is that the entire page you have?
>
> MR. ROSENBERG: What?
>
> MR. McPHILLIPS: I would just ask that the witness be shown the entire page, so he can get the context of the question he's answering.
>
> THE COURT: Yes. Does he -- he has the whole --
>
> MR. ROSENBERG: He has the whole two volumes. *If you want to take the jury's time and go through every single page*, I don't think it's -- the question was: Did you ask if anyone was looking into the retaliation issue? No. I don't know what more context you need; but, if you need more context, let me know.
>
> THE COURT: Just a minute. Dr. Brooks, if you want to look longer at your deposition at any given point, you may do that.

Vol V, 233:21-234:11 (emphasis added).

The second example is also during Dr. Brooks examination. He was asked to

confirm that several exhibits were the Dean's journal articles that were reviewed by the

CII.

> Q. Are those publications you investigated on the CII of the Dean?
>
> A. It has my handwriting on it. I, frankly, don't recall if they were the publications. I would assume so. It's reasonable.

Q. Well, I need you to end up doing more than just assume, sir. This is evidence. They either are, or they aren't. Okay?

A. I'm not your guy to tell you they are. I finished the investigation. I put it aside. It's been how many years since then?

Q. Well, --

A. So, to hold up a publication and say "Is this the one?" I simply don't recall.

Q. Well, why don't you then -- I mean, I hate to do this to the jury, but why don't you take out PX185, and you slowly match up those exhibits, because I have to have them in evidence, and you're the one with the handwriting on them.

. . .

Q. That's what I need you to tell me. Are the PX numbers I'm asking you to look at the same publications that are part of that investigation, because you're the one who has got to do it? I'm sorry to do that to you, but somebody needs to authenticate them.

. . .

MR. ROSENBERG: I mean, Your Honor, if OSU wants to stipulate to these exhibits, I'd be happy to move on. I mean, there shouldn't be this problem.

. . .

Q. I'm just wondering, for the jury's sake, if OSU will stipulate to the authenticity of these as the Dean's publications, we can save ourselves a lot of time. They haven't stipulated in yet, but --

A. Well, I wouldn't know that they're the correct ones.

Q. I'm not asking you, sir. I'm asking if OSU wants to stipulate.

THE COURT: Right, but just stick to the facts at hand.

Vol. V, 239:17-240:9, 241:1-5, 241:17-19, 241:25-242:8. Mr. Rosenberg stated that if OSU

was willing to stipulate to the exhibits, Mr. Brooks would not have to go through the

process of matching up the articles to the CII report. OSU, however, did not agree to

stipulate to the documents. Mr. Rosenberg's request for a stipulation was not unreasonable. Vol. V, 67:17-19. The decision whether to stipulate or not to a party's request is a tactical decision made at trial. OSU was not required to stipulate to Mr. Rosenberg's requests. A refusal to stipulate, however, may prove unwise when little is to be gained by forcing a party to go through a lengthy process when there is no arguable basis for questioning their authenticity.

OSU also contends that Mr. Rosenberg's references to his need to call Mr. Dasta as a witness and the length of Mr. Balkrishnan's video deposition were prejudicial. *See* Vol. VIII 142:1-3 ("MR. ROSENBERG: Your Honor, I only -- I only got this witness because they wouldn't stipulate to that what he said was true. Otherwise, he wouldn't even be on the screen.") *and* Vol. VI, 128: 16-17 ("I didn't expect a three-hour Raj Balkrishnan video. So, I apologize to everybody. That was not my intent."). Neither of the incidents were relevant to any material issue to be decided by the jury. Mr. Rosenberg's comment about "a three-hour Raj Balkrishnan video" was not tied in anyway to OSU's counsel:

> MR. ROSENBERG: I just have a couple of followup questions, Your Honor. And I want to ask if you could --Dr. Boyd is my next witness. He has a medical procedure tomorrow. And I'd ask -- I plan on getting him in here really quickly, but I'm asking if the jury could hang out for a little bit after 5:00, or if the Court would do it. Otherwise, I can't get him back here.
>
> I didn't expect a three-hour Raj Balkrishnan video. So, I apologize to everybody. That was not my intent.

*Id*., 128:9-17. If anything, Mr. Rosenberg was apologizing to the jury for his own

miscalculation.[4]

I note, however, that Mr. Rosenberg's continued insistence that exhibits had been

changed on the basis that deposition exhibit stickers had been removed was wholly

without merit. It was counsel's responsibility to review the exhibits before trial and

become familiar with them. It only confuses a jury, and potentially the court and

counsel, to have two exhibit stickers on an exhibit. It is the better practice to provide the

jurors with a clean copy of the exhibit with only the trial exhibit sticker affixed to it.

"Testifying". Mr. Rosenberg was advised on several occasions that he could not

testify.  The instances cited by defendants, however, do not show that Mr. Rosenberg's

conduct likely influenced the jury to reach a verdict that it otherwise would not have

made.

Mr. Rosenberg improperly read portions of Dr. Moseley deposition in an effort to

show that a closing letter was typically sent to mark the closing of an investigation.

Plaintiff did not prevail on her claim against OSU for retaliation, and any information

---

[4]Before Dr. Balkrishnan's deposition was played, Mr. Rosenberg addressed the
Court:
> Actually, Your Honor, this is a mutual witness. This is not what I was planning
> on playing. It's what I plan on playing plus what you said OSU could play in my
> case. So it's not -- everything is not my witness.
Vol. VI, 63:13-16. That statement accurately told the jury that I had ordered that the
portions of Dr. Balkrishnan's deposition defendant wanted the jury to hear had to be
played during plaintiff's case.

that was presented to the jury during this examination did not prejudice OSU. *See* Vol. IV, 20:21. Mr. Rosenberg identified the handwriting on PX1 as that of Mr. Gibson, but this statement was unlikely to have any bearing on any issue before the jury. *See* Vol. 54:2-3. The handwritten note on PX1 appears to state "went beyond." When discussing JX9, Mr. Rosenberg answered a question asked by Dr. Moseley as to the date of Dr. Balkrishnan's whistleblower complaint and stated that "Raj has already admitted it in his deposition". Vol. IV 59:24- 60:18. Mr. Rosenberg acknowledged that there was no date on the whistleblower complaint but stated it was in May. Vol. IV 62:22. In response to a statement by Dr. Moseley, he said, "That's my recollection, too." Vol IV. 66:25. Mr. Rosenberg made several attempts to ask Dr. Moseley whether any other CII had been formed to examine what he characterized as "citation issues." The Court instructed Mr. Rosenberg to refer to the whistleblower complaint, which he did. *Id.*, 77:14-78:17. Counsel for OSU objected that failing to cite her previous article was only part of the charge, and in response, Mr Rosenberg stated, "[the witness] knows – everyone knows the answer." Vol IV. 80:14. OSU's objection was overruled, and Dr. Moseley testified that she did not remember any other CII formed to look into citation issues. *Id.*, 80:18-21. Defendant objects to other statements made by Mr. Rosenberg. *See* Vol. IV at 84:9-10 (ROSENBERG: "We talked about it, already, many times. It's Raj's ADR proposal"[5]); *Id.*

---

[5]This remark was made during Mr. Rosenberg's examination of Dr. Moseley. He was asking her about the ADR proposal Dr. Balkrishnan made to Dean Brueggemeier that he would withdraw his academic misconduct allegations if Dr. Szeinbach would "withdraw in writing baseless allegations of gender-based discrimination and sign a statement that she will not without due-cause and consultation with the chair/dean

at 94:5-6 (ROSENBERG: "We looked at this in your deposition. It is an editorial

comment published about Raj's two publications"[6]); *Id.* at 103:1 (ROSENBERG: "In your

deposition you said it was"[7]); *Id.* at 106:19-21 (ROSENBERG: "That's exactly what you

said in your deposition. And Dr. Kinghorn said that the CII got this letter. And that's on

his deposition  at page 103"[8]). Although these examples may reflect poor wording on

the part of counsel, I cannot say that Mr. Rosenberg's examination of Dr. Moseley

allowed him to expose the jury to evidence that was not otherwise admissible or,

---

pursue such baseless complaints in the future." (JX34.) Dr. Mosely did not recall ever
seeing Dr. Balkrishnan's email. Vol. IV, 85:4-7.

[6]This comment was made merely to assist the witness. Mr. Rosenberg showed
Dr. Moseley PX-15 and told her: "We looked at this in your deposition. It is an editorial
comment published about Raj's two publications. It was–", at which point defendant's
counsel objected. The Court then asked for the exhibit number, and Mr. Rosenberg
described the exhibit as "a correction letter". Defendant's counsel objected to that
characterization. Plaintiff's counsel was then permitted to ask the question, and Dr.
Moseley said she had not seen the editorial before she was deposed. Vol., IV, 94:5-21.

[7]Defendant doesn't contest the accuracy of Mr. Rosenberg's comment, which
came toward the end of a long, objection filled exchange during which he was
attempting to ask Dr. Moseley whether a particular exhibit was given to a CII
investigating the research misconduct charge against Dean Brueggemeier. Dr. Moseley
agreed that it had been given to the CII. Vol. IV, 100:15-103:3.

[8]This comment was made during Mr. Rosenberg's examination of Dr. Moseley
about PX-16, a March 2008 letter from Dr. Ladenson to Dean Brueggemeier
communicating concerns the journal had about one of his articles it had published. Dr.
Moseley said that if she had received the letter she would have passed it on to the CII.
Then Mr. Rosenberg made the comment set out in the text. Defendant does not dispute
the accuracy of that statement; and, in fact, Dr. Moseley testified during her deposition
that she had seen Dr. Ladenson's letter before and that it would have been her normal
practice to have sent it to the CII. Moseley Dep., 5: 17 and 86:5-28, Doc. 68-1, PageID
3369 and 3450.

indeed, evidence that was not already in the record or was not later admitted into the record.

Dr. Szeinbach alleged that two types of retaliation occurred. First, members of management at OSU and/or OSU's College of Pharmacy retaliated against her by pursuing an unjustified research misconduct investigation and allowing the disclosure of confidential information related to this investigation. Second, plaintiff Szeinbach alleged that her co-faculty member Dr. Balkrishnan retaliated against her for her opposition to unlawful employment practices by providing information to those investigating the complaints of Seoane Vazquez's discrimination and/or retaliation claims and/ or her charges filed with the EEOC. Mr. Rosenberg's examination of Dr. Moseley primarily concerned Dr. Szeinbach's first claim.[9] Because the jury found for OSU on plaintiff's first claim, OSU cannot show that any improprieties on the part of Mr. Rosenberg prejudiced it on issues related to that claim.

OSU maintains that Mr. Rosenberg repeatedly testified during his cross-exam-ination of Dean Brueggemeier. In questioning Dean Brueggemeier about complaints he received concerning Dr. Szeinbach's statements to a prospective faculty member, Mr.

_____

[9]Mr. Rosenberg did question Dr. Moseley about Dr. Balkrishnan's statement concerning possible alternative dispute resolution and his proposal that Dr. Szeinbach "withdraw in writing baseless allegations of gender-based discrimination and sign a statement that she will not without due-cause and consultation with the chair/dean pursue such baseless complaints in the future." JX34. The only testimony elicited from Dr. Moseley concerning this statement was that she had never seen an ADR proposal request that a Title VII retaliation case be dismissed. Vol. IV 85:4-16.

Rosenberg stated "[t]he only documents produced that I've ever seen are Raj doing it. I've never seen anybody else do it." Vol. XI, 43:17-18. Preceding this comment, Mr. Rosenberg questioned Dean Brueggemeier about a conflict between the Dean's deposition testimony about Dr. Balkrishnan's statements during a Promotion and Tenure Committee meeting considering whether Dr. Seoane Vazquez should be given tenure and an audiotape of that meeting. Dean Brueggemeier responded:

> A. I didn't review the audiotape. My recollection is Raj did stand up and make that statement.
>
> Q. That's not what you told the–we'll move on. We're not trying Enrique's case here.
>
> MR. MCPHILLIPS: Objection, Your Honor. Can counsel be directed not to testify?
>
> MR. ROSENBERG: I'm just following up on opening the door on the lawsuit.
>
> THE COURT: The objection is sustained and the jury is reminded that what counsel argue is argument and they're not testifying and you're not to consider anything that counsel says to be testimony.
>
> BY MR. ROSENBERG:
>
> Q. Yesterday you testified about Defendant's Exhibit BB. And this was your e-mail to Sheryl about telling her to stop talking to Shaw. Isn't it true that you received this supposed conversation between Sheryl and Shaw from Raj. Raj was the one that told you that, hey, Sheryl's talking to Shaw?
>
> A. There were a couple of faculty that indicated that there was discussions going on with Dr. Shaw. Raj was one of those.
>
> *Q. The only documents produced that I've ever seen are Raj doing it. I've never seen anybody else do it.*
>
> MR. MCPHILLIPS: Objection. Counsel is testifying.
>
> THE COURT: Objection is sustained. You can't --you're not a witness.
>
> MR. ROSENBERG: I understand. But yesterday we had --in the depths of the recession you gave a raise.

33

THE COURT: Mr. Rosenberg, please just ask questions.

*Id.*, 42:16-43:25. While Mr. Rosenberg should not have made the comment, defendant does not assert that the statement was in any way inaccurate. Plaintiff's counsel did not further pursue whether there was any communication in writing about Dr. Szeinbach's conduct toward Dr. Shaw.

In response to Dean Brueggemeier's statement that attorneys are frequently present at CII meetings, Mr. Rosenberg stated "That's not what all the CII members said." Vol. XI, 54:4. Again, the Court instructed Mr. Rosenberg not to testify.

OSU argues that Mr. Rosenberg violated the spirit of Rule 615 of the Federal Rules of Evidence, which requires a court, upon a party's request to exclude witnesses so that they cannot hear other witnesses' testimony. OSU maintains that Mr. Rosenberg repeatedly discussed prior trial testimony during his direct and cross examination of witnesses.

While examining Dr. Carnes, Mr. Rosenberg stated that Dr. Hayton told him that Dr. Szeinbach asked him to investigate the allegation that Dr. Balkrishnan was harassing one of her students. Vol. V, 60:5-6. Although his statement was perhaps phrased improperly, it is clear from the context that Mr. Rosenberg's intent was not to testify but to recall for Dr. Carnes testimony she, as OSU's representative, had heard earlier in the trial in preparation for asking her a question about the same subject

34

matter.  OSU did not object. In its briefs, OSU fails to provide any explanation as to how this statement prejudiced it.

Similarly, OSU objects to Mr. Rosenberg's statement, "You are correct on that, Dr. King[horn]. You're absolutely right that what happened was, Raj sends out one email; Sheryl responds back with a response, which is quoted here." Vol. V, 131:4-6.  But OSU fails to articulate how this statement was prejudicial. JX19 is the email exchanged referred to by Mr. Rosenberg, and OSU did not object to its admissibility. Mr Rosenberg's statement was factually accurate: Dr. Balkrishnan sent the August 13, 2007 email to the College of Pharmacy faculty, and Dr. Szeinbach responded with her August 21, 2007 email. JX19.

Mr. Rosenberg also stated that Dr. Szeinbach's article was never retracted. Vol. V, 218:11-13. Dr. Kinghorn agreed with Mr. Rosenberg's statement that the article was never retracted and acknowledged that a "retraction" is a term used to describe a different situation.

OSU cites to many examples of Mr. Rosenberg asking witnesses about prior statements or testimony given by other witnesses. OSU fails to provide any statement made by Mr. Rosenberg revealing information prejudicial to OSU or not legally admissible that likely influenced the jury to reach a verdict that it otherwise would not have made.

35

Speaking objections. The Court reminded counsel early in the trial, that "if you're going to have a long speaking objection, please ask to come to the sidebar." Vol. II, 60:19-20. Most of the speaking objections referenced in defendant's brief concern the cross-examination of Dr. Szeinbach. OSU maintains that Mr. Rosenberg's speaking objections interfered with defense counsel's ability to cross examine Dr. Szeinbach. While Mr. Rosenberg did make speaking objections, nothing contained in those objections introduced evidence or information to the jury that pertained to an element of plaintiff's claim. I do agree that Mr. Rosenberg's speaking objections were disruptive to the flow of the cross-examination.

The first example of a speaking objection occurred when defense counsel questioned Dr. Szeinbach about the research misconduct charge filed against Dr. Balkrishnan:

> Q. And at the time there was an open investigation that you had filed against Dr. Balkrishnan for retaliation, correct?
>
> MR. ROSENBERG: Objection, Your Honor. Those are facts not in evidence. Balkrishnan's papers were never investigated by OSU and Sheryl did not file a complaint against him. It was in her --
>
> THE COURT: The objection is overruled.
>
> BY MS. GOLIAN:
>
> Q. Whistleblower complaint was filed a few days earlier on August 10th of '07?
>
> A. What --
>
> MR. ROSENBERG: It's night and day, Your Honor.
>
> THE WITNESS: What are you referring to?

THE COURT: That will be enough, Mr. Rosenberg.

THE WITNESS: So, Ms. Nash Golian, would you please repeat this whole sequence because something doesn't sound right to me there in what you're referring to.

Q. So there was an open investigation regarding your charge against Dr. Balkrishnan for retaliation, correct?

. . .

Q. You filed the complaint on August 10th of '07.

A. I believe that something is out of sync here. I just don't know what your reference is.

Q. You're aware of the confidentiality provisions of investigations, right?

MR. ROSENBERG: Objection. What policy?

THE COURT: Sustained. You don't have to answer.

BY MS. GOLIAN:

Q. And you sent this to the entire Listserv at the College of Pharmacy, correct?

A. I did not discuss any investigation in this e-mail that I sent. So I didn't make any reference at all to any investigation.

Q. You just said that it was a further example of discrimination and retaliation?

A. But there's no reference to any investigation as Dr. Balkrishnan made a reference to my investigation that was a confidential investigation and broke the confidentiality . . . . So I did not do that.

Vol. II, 35:20-37:17. The apparent thrust of this cross-examination is that Dr. Szeinbach's

August 21, 2007 email included the following sentence:

> I believe that Dr. Balkrishnan has chosen to bring this matter to your attention in an attempt to undermine the reputations of Dr. Enrique Seoane Vazquez and me, and that this is a further example of Dr. Balkrishnan's discrimination and retaliation against us.

37

JX 19, p. 2, bottom. However, the objection was elicited by an ambiguity in defense counsel's question. Mr. Rosenberg accurately stated that Dr. Szeinbach never filed a research misconduct complaint against Dr. Balkrishnan.[10] Defense counsel's statement about a "whistleblower complaint" being filed August 10 further muddied the waters, eliciting Mr. Rosenberg's "It's night and day" comment. While that comment was uncalled for, and the Court admonished him, defense counsel's questions were confusing and their factual predicate unclear. Once defense counsel clarified that she was talking about the "discrimination and retaliation" language in the email and the August 20007 EEO charge Dr. Szeinbach filed naming Dr. Balkrishnan, plaintiff's counsel did not interfere with defense counsel's cross-examination on that topic.

In defendant's next example,[11] defense counsel asked Dr. Szeinbach whether Jessie Au had helped look into Dean Brueggemeier's and Dr. Balkrishnan's publication practices. Dr. Szeinbach responded, "I don't know about now. I don't know. Maybe at one time, yes." Vol. II, 115:15-22. Asked again whether in February-March 2008, after the CII voted to refer one of the research misconduct charges against her for further investigation Dr. Au helped look into Dean Brueggemeier's and Dr. Balkrishnan's publication practices, Dr. Szeinbach said, ". . . after the CII rejected my, you know, said

---

[10]The evidence is that Dr. Seoane Vazquez filed the academic research complaint against Dr. Balkrishnan.

[11]The italicized portion of the text below is the example set out in defendant's brief. doc. 359, PageID 24968. I have added additional material to give a fuller context.

that my publications violated policy then I may have, you know, talked to her then." *Id.*, 116:5-11. Defense counsel then asked:

> Did you talk to her about the Dean's and Dr. Balkrishnan's research misconduct?
>
> A. As far as I know there was no investigation.
>
> *Q. Did you talk to her about the Dean's and Dr. Balkrishnan's research misconduct?*
>
> *MR. ROSENBERG: Objection. Asked and answered.*
>
> *MS. GOLIAN: I don't think it's answered.*
>
> *MR. ROSENBERG: She said she didn't know. You're talking about the publications or research misconduct, they're two different things?*
>
> *THE COURT: Mr. Rosenberg, that's enough.*
>
> MR. ROSENBERG: I'm sorry.
>
> THE COURT: There is a difference between research misconduct and publication practices.
>
> MR. ROSENBERG: Thank you, Your Honor.
>
> Q. Was Jessie Au helping you dig up dirt on the Dean with regard to his publication practices?
>
> A. I don't know.
>
> Q. How about Dr. Seone, was he helping dig up dirt on the Dean's publication practices?
>
> A. When? When are you talking about?
>
> Q. Same time period, February, March, April of '08.
>
> A. . . It would have been after the CII . . . said that my papers violated the policy that I may have, you know, talked to them briefly at that time.
>
> . . .
>
> Q. So you asked Jessie Au and Dr. Seoane about Dean Brueggemeier's papers. You asked them to help you, correct?

A.  I don't know about help me but I may have had a question or something.

Q.  About whether his papers violated the policy, correct?

A.  I don't even remember if it was that. I may have just had a question about the research or whatever to understand or something on the science.

Q.  You're certainly aware that Dr. Seone filed a complaint against the Dean that he violated the research misconduct policy, right?

A. No.

MR. ROSENBERG: Your Honor, I want to object.

THE COURT: We have to have a time frame.

MR. ROSENBERG: Well, I want to talk about what she learned in discovery and didn't.

THE COURT: We're just talking -- the questioning up to this point has been what did you know February through May of 2008.

MS. GOLIAN: Correct.

THE WITNESS: You mean early on right there, no, I didn't know.

BY MS. GOLIAN:

Q. You didn't know that. Okay.

And during the same time period did you talk to Jessie Au and Dr. Seoane about your own research misconduct investigation or inquiry?

A. It was only the Dean's, just a question I had on the Dean's papers or something. That's it, that I recall.

*Id.*, 116:15-118:21.

Mr. Rosenberg's first objection came after defense counsel shifted the question

from whether Szeinbach talked with Au and Seoane Vazquez about the Dean's and Dr.

Balkrishnan's research *practices*, to whether she talked with them about their research

*misconduct*. Dr. Szeinbach's answer was that she then had no knowledge of a research

misconduct investigation for the Dean's or Dr. Balkrishnan's publications. After the

40

objection, defense counsel returned to the earlier question–whether Dr. Szeinbach talked with Au about the Dean's and Dr. Seoane-Vazquez's research *practices*; and plaintiff's counsel interposed no further objection. To the extent that Mr. Rosenberg's objection and comment interrupted the flow of cross-examination, the interruption was warranted because defense counsel's question had changed, and Dr. Szeinbach had made a responsive answer to the new question.

Defendant next points to Mr. Rosenberg's comments when objecting during defense counsel's cross-examination of Dr. Szeinbach. The first example occurred during cross-examination about letters Dr. Szeinbach and her husband wrote to a journal editor about a publication by Dr. Balkrishnan:

> Q. You and your husband both wrote a letter to Dr. Walson about Dr. Balkrishnan's publications, correct?
>
> MR. ROSENBERG: Objection. They both wrote the same --
>
> BY MS. GOLIAN:
>
> Q. Why don't you take a look at Exhibit YYY.
>
> A. I'm confused. Are you saying that we both wrote a letter together or that we each wrote a letter? I apologize. I'm confused on your wording.
>
> Q. Why don't you take a look at Defendant's Exhibit YYY.
>
> *MR. ROSENBERG: Your Honor, may we approach, please?*
>
> *THE COURT: No. Not right now.*
>
> *MR. ROSENBERG: I want to object then, Your Honor, because we're using all these hearsay and trying to say that they're true by making things -- I know you're telling the jury don't, you know, don't take it as truth but what we're doing over and over again is using hearsay documents from people that I can't cross-examine to question my witness --*
>
> *THE COURT: Well YYY is an e-mail to Dr. Szeinbach.*

41

*MR. ROSENBERG: That's what I'm saying. From Vicki Donoso from the Clinical Therapeutics, and what I understand it was going to use to show somehow both Sheryl and Harry were communicating with the journal around the same time. If Ms. Donoso would come here to testify I could cross-examine on what it is she's saying. But we continually go back to hearsay from people who aren't here and you can't unring the bell 50 times.*

*THE COURT: The question asked is what Dr. Szeinbach knew in this time frame February through May of 2008, and this exhibit is relevant to that question.*

MR. ROSENBERG: Thank you, Your Honor.

Vol. II, 105:12-106:17. First, Mr. Rosenberg did ask to approach the bench. When permission was denied, he was forced to make his objection in the hearing of the jury. Second, to the extent the letter may have contained factual assertions relevant to material disputed issues of fact, it was hearsay.

Defense counsel then continued with the same line of questioning:

Q. And the journal says that, frankly, both the editor-in-chief and I feel very strongly that in light of this relationship you should have added your name to the letter and that, frankly, I am not happy about the journal being used to apparently air personal disagreements between you and Dr. Balkrishnan, correct?

MR. ROSENBERG: Your Honor, again, there's no questions. They're just reading from hearsay documents. The witness is confused because she believes she's not allowed to testify about what she learned in discovery. She read Harry's deposition. We had a conversation this morning. I'm trying to follow this Court's directives on that issue. But it's confusing because what she knew outside the deposition and what she learned after are totally separate issues and it's confusing my client.

THE COURT: It's cross-examination. You'll have an opportunity to examine your client on redirect.

Vol. II, 113:20-114:11. Here defense counsel appeared to want to communicate to the jury the contents of the letter rather than question Dr. Szeinbach about the central

underlying fact issue regarding her communication to the journal editor, whether she and her husband jointly acting to discredit Dr. Balkrishnan. The letter from the journal editor assumes that they were, but there is no direct evidence in the record that they were. And both Dr. Szeinbach and her husband denied acting jointly. *Id.*, 111:15-113:19.

The next examples involve Dr. Szeinbach's compensation:

> *Q. Okay. And this is all going to your company, which is Health Consultants, LLC, correct?*
>
> *MR. ROSENBERG: Objection, Your Honor. She said it doesn't go to her company, all; that it goes elsewhere. She said that at least six times.*
>
> *THE COURT: The objection is overruled.*
>
> THE WITNESS: It goes to fund all the people that are working on the project, and so forth, for all these projects and staff, to basically cover our costs for doing the studies.

Vol. II, 170:14-19. Dr. Szeinbach had testified earlier that money she earned on contracts went to pay for data collection and to fund students and other people working on the projects. *Id.*, 158:5-25.

The next comment defendant contends was improper regarded her raises in pay as a full professor at OSU:

> Q. Okay. Well, let's take a look at Defendant's Exhibit SS.
>
> MR. ROSENBERG: Your Honor, it's a quarter after 4:00. We just discussed we're not talking about salary raises here. She said she had a raise every year. Do we really need to go through all of her pay increase letters and see what the percentages are, because there is absolutely no relevance to how her reputation might be harmed in her small academic community? It's just not relevant, and the jury's time is kind of valuable.

43

MS. GOLIAN: Your Honor, they're claiming retaliation. You can't cherry pick retaliation. So, it's absolutely relevant. The Dean is the one that signed these letters.

THE COURT: The objection is overruled. . . .

Vol. 185:24-186:15. While it is true that speaking objections interrupt the flow of the examination, I cannot say that Mr. Rosenberg's objections prevented OSU from conducting a fair cross-examination of Dr. Szeinbach. Further, the statement was accurate. Dr. Szeinbach had withdrawn her pay raise claim before trial.

Mr. Rosenberg's insinuation that counsel for OSU improperly altered Dr. Szeinbach's tax documents is more problematic. That suggestion was wholly unjustified. Mr. Rosenberg questioned the authenticity of the documents solely based on the fact that the deposition exhibit stickers had been removed, the Bates numbers not imaged, and the documents placed in a different order than the deposition exhibit. Mr. Rosenberg did object to these documents and question the authenticity of the documents on the afternoon of June 4.[12] At that time, counsel for OSU did not ask for a

---

[12]The problem apparently arose because counsel failed to follow the Court's instructions on exchanging exhibits before trial. Defendant's counsel did not provide plaintiff's counsel with the exhibit at issue until the morning trial began. There were a large number of exhibits, and plaintiff's counsel did not look at the tax returns until defendant's counsel used them to cross-examine Dr. Szeinbach. Because he did not see the deposition exhibit sticker or Bates numbers on the tax returns, he apparently jumped to the conclusion that they might not be the tax returns obtained from the IRS shortly before trial. Why he came to this conclusion, why he did not compare the trial exhibit to the deposition exhibit, and why he did not ask to consult briefly with defendant's counsel out of the hearing of the jury cannot be answered by reference to the record. As on a number of other occasions, I conjectured during trial that his challenge to the authenticity of the tax returns was a product of his evident lack of sleep, the burdens of trying a doument intensive, lengthy trial alone, and his failure to

sidebar conference. Mr. Rosenberg asked to approach for a sidebar conference. *See* Vol.

II 193:13-15. The following exchange occurred in the presence of the jury:

> MR. ROSENBERG: Your Honor, how is she supposed to know, when they didn't produce --
>
> THE COURT: Now --
>
> MS. GOLIAN: Your Honor, --
>
> THE COURT: Just let the witness answer the question.
>
> MR. ROSENBERG: But I'm the one that has to object to, not only the relevancy, but the authenticity. I'm supposed to have been --okay. I'll sit down. I'm sorry. I'm sorry. I withdraw my objection.
>
> THE COURT: She didn't keep copies of the Health System Consultants returns. And, so, this is the way of finding out whether these are her returns or not.
>
> MR. ROSENBERG: But they weren't even requested in discovery.
>
> MS. GOLIAN: Oh, my goodness!
>
> MR. ROSENBERG: No, really. Read your discovery requests. They were not in discovery. Your Honor, you did order them, and we did get them afterwards, but --
>
> THE COURT: I'm not saying anything about discovery. I'm just saying that she didn't retain copies; and, therefore, they had to be obtained from the IRS. And this is the opportunity for defense counsel to find out whether these are, in fact, the returns that were filed by Health System Consultants.
>
> MR. ROSENBERG: Yeah, not under the guise of a deposition exhibit that's completely different from this one. That's all I'm saying. It was marked as a deposition exhibit. I assumed it was until I just looked at it right now in exchanges. I will withdraw my -- I will sit down and no longer object.
>
> THE COURT: You may proceed.

---

review and organize the exhibits in a way that they could be quickly and easily accessed.

THE WITNESS: The -- I question the 2008 return. I question the 2010. I question the validity of these documents. I'm okay with 2011. It has the IRS number at the top.

BY MS. GOLIAN:

Q. So, after you've already testified that these were true and accurate copies, you're now saying that they're not? Is that your testimony?

A. I had asked the IRS to provide documents. And they all should have that DNL number at the top for those that were provided by the IRS. And the top two don't. So, I'm not sure exactly what, you know, why -- I don't know why they're different, is what I'm --

Q. So, you can't look at that and tell whether or not that's your return?

A. Not right off the top of my head, no.

. . .

BY MS. GOLIAN:

Q. So, even though, to be clear, your original testimony was, yes, in fact, these were true and accurate copies and you knew who you worked with, what the amounts were, the amount that you traveled, you can't testify as to whether or not these are your tax returns? Is that your testimony?

A. I'm okay, I said, with the ones that had the IRS stamp on them, which you all were not -- did not -- because I self prepare, there was disagreement, or something, whether they were authentic.

. . .

BY MS. GOLIAN:

Q. You prepared these documents, correct?

A. Yes.

Q. Okay. Then, please take a look at them. You're the one that prepared them. Go ahead. Look.

A. But I can't remember, you know, what my returns were from 2008 and '09. You know, it loads in; it's gone.

Q. Let's look at 2008. And tell me what you think might be wrong.

A. Well, I don't know. I'd have to go back and look at what I actually got from the IRS.

46

Q. Is there anything on this page that looks wrong?

MR. ROSENBERG: Objection. Asked and answered. She said she would have to go look back at what she got from the IRS in response to OSU's request for these documents. She doesn't have those here.

Vol. II, 196:16-198:14; 199:8-17; 200:1-17. After having made vigorous objections to the authenticity of the tax returns, Mr. Rosenberg later withdrew his objection. Vol. II 196:16-24. On June 5, with the jury out of the courtroom, counsel for OSU responded to Mr. Rosenberg's insinuation that OSU had altered the tax returns. Counsel for OSU stated that Mr. Rosenberg's conduct before the jury was outrageous and that he should acknowledge that he was wrong when he stated the documents were altered and apologize to the jurors. Vol. III, 4:2-4. The jury was instructed as follows:

> Before we begin Dr. Szeinbach's redirect examination, I want to refer you to Defendant's Exhibit B. Plaintiff's counsel raised a question about whether this was the exhibit that the parties had used during discovery or not and I'm going to tell you this morning that it is the exhibit that the parties used during discovery. These are the tax returns that Dr. Szeinbach filed with the Internal Revenue Service. These exhibits were in the possession of Plaintiff's counsel the morning the trial began. Defendant's counsel represented that they provided the exhibits to him the Friday before trial.

> The reason for the delay was a discovery issue and it took that amount of time to get the documents from the IRS. The only difference in the exhibits was that they had the bates numbers not duplicated when they were duplicated for the defendant's exhibits. But they are exactly the tax returns that Dr. Szeinbach filed with the IRS.

Vol. III, 14:4-19. The jury was provided with a clear statement that the documents in question had not been altered in any manner. Furthermore, the jury was informed that Mr. Rosenberg had the documents in his possession no later than the start of trial. Given

47

the fact that Dr. Szeinbach herself appeared to question the validity of the documents even though they were identical to the ones she filed with the IRS, the Court's statement to the jury would appear to undermine her credibility in the eyes of the jury rather than that of counsel for OSU. I find that Mr. Rosenberg's conduct was unprofessional and wholly unacceptable, but it was not done with deliberate intent to discredit defendant's counsel in the eyes of the jury. Further, given the Court's instruction, I find it implausible that his comments did undermine their credibility.

To determine whether there is a reasonable probability that the verdict of a jury was influenced by improper conduct that warrants that the verdict be set aside, a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself. *City of Cleveland* v. *Peter Kiewit Sons' Co.*, 624 F.2d 749 (6th Cir. 1980).  I will discuss each of these factors in turn.

While I agree that counsel for plaintiff made inappropriate comments at times, including challenges to the court's orders, I cannot say his comments were "deliberate, intentional and calculated to improperly get inadmissible information before the jury for the purpose of unfairly prejudicing the jury against plaintiff." *Park West Galleries, Inc. v. Global Fine Art Registry*, LLC, 732 F. Supp. 2d 727 (E.D. Mich. 2010). When reprimanded, Mr. Rosenberg promptly and frequently apologized. I believe that his

apologies were sincere and that he attempted to comply with the orders of the court despite his failure to do so at times.

The relevance of OSU's complaints concerning the conduct of Mr. Rosenberg and the real issues before the jury varied. At times, it would have been reasonable to expect Mr. Rosenberg's missteps to harm his client rather than prejudice OSU.

The manner in which the parties and the Court treated comments made by plaintiff's counsel do not support granting defendant's motion for a new trial. When he overstepped the bounds of the rules of evidence and acceptable trial practice, if I had believed Mr. Rosenberg's conduct merited sanctioning beyond my instructions to the jury, I would have imposed them. Counsel for plaintiff was consistently and firmly reprimanded by the Court. OSU does not support its motion with incidents in where it objected and the Court failed to act appropriately. OSU never sought sanctions against plaintiff's counsel or sought a mistrial. Presumably, OSU was willing to take its chances with the jury as evidenced by its failure to seek a mistrial.

As for the strength of the case, I believe that it was a close case based on the verdict in favor of defendant on two of plaintiff's claims and the length of the jury deliberations. To decide this case, the jury had to make credibility determinations and to evaluate each party's position as to the salient facts. Defendant has not pointed to any evidence that was improperly before the jury that might have influenced their verdict.

49

The verdict itself does not suggest that jury's decision was based on improper, inflammatory and unfairly prejudicial information rather than admissible evidence. Here, OSU does not argue that Mr. Rosenberg made inflammatory statements such as the case in *City of Cleveland v. Peter Kiewit Sons' Co.* or *Park West Galleries, Inc. v. Global Fine Art Registry, LLC.* Rather , OSU maintains that counsel's failure to abide by the procedural and evidentiary rules prejudiced the jury against it. While the Federal Rules of Civil Procedure and Federal Rules of Evidence ensure that fair administration of court proceedings, counsel's lapses do not constitute the egregious, prejudicial, and deliberate misconduct necessary to justify a new trial.

**B. Motion for a Remittitur**

OSU argues that the amount of damages awarded must be reduced as a matter of law because the amount exceeds the maximum amount of compensatory damages for nonpecuniary losses:

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed . . . $300,000.

42 U.S.C. § 1981a(b)(3)(D).

Plaintiff argues that the jury awarded $213, 368.00 for lost back pay opportunities, which is not subject to the cap on noneconomic compensatory damages. The purpose of a back pay award is to make the plaintiff whole, that is, to place her in the position she would have been in but for discrimination. In *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975), the Supreme Court held that an award of back pay should only be denied for reasons that would not frustrate the statutory purpose of eradicating discrimination and "and making persons whole for injuries suffered for past discrimination." *Id*. at 421.  Absent exceptional circumstances, back pay should always be awarded when a Title VII violation is found. *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 626 (6th Cir. 1983).

Dr. Schondelmeyer provided a comparison of salaries at OSU with other universities as reported by the American Association of colleges of Pharmacy ("AACP"). Defendant argues that his analysis is flawed. His calculations were based on the salary surveys of calendar year institutions whose faculty have twelve month contracts. OSU faculty have nine month contracts. *See* Vol. VI, 124:19-125:4. In response to the Court's question regarding the difference between a nine month and a twelve month contract, Dr. Schondelmeyer stated:

> Universities hire faculty. Some call it an academic year, which means they teach the fall semester and the spring semester and they're off during the summer, at which time they're encouraged to bring in research projects on their own to pay their own salary and to compensate them, but they're not paid by the university for that time.

There are other universities that pay on a calendar year basis, that is, a 12-month year-round.

Now, those that are nine months, typically, have one month of vacation as well. So, they're really covered -- it's not unusual that they're covered for about ten months, rather than just nine.

I did look at the faculty positions in the country. Of all the faculty positions in this discipline for a full professor in social and administrative sciences, greater than 80 percent of those were in calendar year institutions. Less than two out of ten would have been at an academic institution.

So, if Dr. Szeinbach were to take a faculty position elsewhere, the probability is that she would have been at a calendar-year institution, not an academic-year institution like Ohio State.

Ohio State is one of the few, in pharmacy and public institutions, that is still on an academic year.

Vol VI, 125:17-126:14. Although Dr. Schondelmeyer testified that there were not as many positions on a nine month calendar and that it was likely that Dr. Szeinbach would have obtained a position on a twelve month contract, Dr. Schondelmeyer's testimony does not provide a factual basis to support the damages award. There are significant differences between the duties of a professor on a nine month contract and one on a twelve month contract. Dr. Schondelmeyer failed to acknowledge that a person on a twelve month contract is paid more because the length of the contract is greater. Although OSU pays Dr. Szeinbach over 12 months, she is paid for work that is performed over a nine month period. Dr. Szeinbach only performs for three quarters of the time compared to a person on a twelve month contract. A person earning $154,381 on a twelve month contract who only worked for nine months of their month contract

would earn $115,785.75, considerably less than the $129,189. Dr. Schondelmeyer's testimony fails to account for the fact that a professor on a nine month contract has the opportunity to work on their own research projects and earn compensation from outside the university. Dr. Schondelmeyer's comparison of Dr. Szeinbach's salary under a nine month contract with salaries under twelve month contracts is flawed and cannot be used to support his conclusion that her salary would have been higher at another university. Although Dr. Szeinbach's salary would have been higher under a twelve month contract at another university, her work responsibilities would have differed significantly in that she would have been required to perform an additional three months worth of work under the contract.

In the alternative, I conclude that plaintiff is not entitled to an award of back pay because she remained employed by OSU and was not demoted. Had plaintiff succeeded on her salary differential claims, she could have been awarded back pay, but plaintiff dismissed those claims. Back pay consists of lost money and benefits from the employer who discriminated against the plaintiff. *See Kaiser v. Buckeye Youth Center*, 812 F. Supp. 118, 119 (S.D. Ohio 1983)("The plain language of the statute restricts the term "back pay" to the compensation for performing work for the employer who discriminated against the worker ("reinstatement or hiring of employees, with or without back pay ...")."). Plaintiff does not cite to any case law for the proposition that back pay is pay that would have been earned from employment other than with the employer who engaged in discriminatory conduct. The Fifth Circuit held that Section 2000e–5(g) does

53

not require "that the employer liable for back pay be the same entity for whom the plaintiff would have worked had he not suffered unlawful retaliation" *Nassar v. University of Texas Southwestern Medical Center*, 674 F.3d 448, 454 -455 (5th Cir. 2012).[13]

The *Nassar* decision is at odds with the Sixth Circuit's ruling in *Kaiser*. Because this Court is bound by the Sixth Circuit's decision in *Kaiser*, I conclude that plaintiff is not entitled to an award of back pay for employment she might have obtained in the absence of Dr. Balkrishnan's retaliatory conduct.

OSU also seeks to reduce the $300,000.00 compensatory damages award on the basis that the verdict is "an affront to the victims of true civil rights violations." This

---

[13] The *Nassar* decision stated:

UTSW argues that back pay should have been determined by comparing Nassar's compensation at UTSW and his compensation at CCFMG, and not, as the district court allowed, by comparing his prospective compensation at Parkland and his compensation at CCFMG. "A back pay award, as all damages awarded pursuant to Title VII, should make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Community College*. [Footnote omitted.] By retaliating against Nassar and blocking his job with Parkland, UTSW deprived Nassar of the pay he otherwise would have earned there. Therefore, to make Nassar whole, the back pay ought to be measured against what Nassar would have made at Parkland. Title 42, United States Code, § 2000e–5(g) authorizes back pay awards. Unlawful retaliation can take the form of a former employer preventing a plaintiff from getting a job with another employer. *Robinson v. Shell Oil Co.* [Footnote omitted.] Section 2000e–5(g) states that back pay is "payable by the employer ... responsible for the unlawful employment practice." It does not require that the employer liable for back pay be the same entity for whom the plaintiff would have worked had he not suffered unlawful retaliation.

*Nassar v. University of Texas Southwestern Medical Center*, 674 F.3d 448, 454 -455 (5th Cir. 2012) (footnotes omitted) (overruled on other grounds).

54

request is denied. Dr. Szeinbach and OSU each had the opportunity to present their story to the jury. The jury considered all the evidence before it and reached a decision on the merits of plaintiff's claims. I am unwilling to second guess the decision reached by nine jurors. Plaintiff introduced evidence suggesting that Dr. Balkrishnan filed his whistleblower complaint against Dr. Szeinbach based on her support of Dr. Seoane-Vazquez's claims of discrimination and retaliation. A reasonable juror could find that OSU tolerated Dr. Balkrishnan's actions, which included communicating the existence of the research misconduct investigation into Dr. Szeinbach's publication practices to professionals throughout the academic community. As a result, remittitur is not appropriate under these circumstances.

III.     **Conclusion**

       Defendant The Ohio State University's July 22, 2014 motion for a new trial or in the alternative, for a remittitur (doc. 359) is GRANTED in part and DENIED in part. Defendant's motion for a new trial is DENIED. The jury verdict is REDUCED by $213,368.00 because plaintiff is not entitled to an award of back pay.

                                             s/Mark R. Abel
                                             United States Magistrate Judge